## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DANIMER SCIENTIFIC, INC., *et al.*, | ) | Case No. 25 – 10518 (MFW) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

### MOTION OF DEBTORS
### FOR ENTRY OF INTERIM AND FINAL
### ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
### POSTPETITION SENIOR SECURED FINANCING, (II) AUTHORIZING
### THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND
### PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
### GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
### (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") file this *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**Motion**")[2] and in support respectfully submit the following:

### JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing*

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Danimer Scientific, Inc. (4518); Danimer Bioplastics, Inc. (8734); Danimer Scientific Holdings, LLC (8521); Danimer Scientific Kentucky, Inc. (6371); Danimer Scientific Manufacturing, Inc. (0322); Danimer Scientific, L.L.C. (7346); Meredian Bioplastics, Inc. (5822); Meredian Holdings Group, Inc. (7239); Meredian, Inc. (7507); and Novomer, Inc. (4173).  The location of the Debtors' corporate headquarters is:  140 Industrial Boulevard, Bainbridge, Georgia, 39817.

[2]     To the extent there are any inconsistencies between this Motion and the Interim Order and/or the DIP Term Sheet, then the Interim Order and/or the DIP Term Sheet, as applicable, shall control.

*Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 507, and 552 of title 11 of the United States Code (the "***Bankruptcy Code***"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Local Rules 2002-1(b), 4001-2, 9006-1, and 9013-1.

## BACKGROUND

4. Danimer Scientific, Inc. (collectively with its subsidiaries "***Danimer***") is a performance-polymer company specializing in bioplastic replacements for traditional petroleum based plastics. The Debtors are a leading producer of polyhydroxyalkanoate ("***PHA***"), a key biodegradable ingredient in a wide range of engineered materials that are plastics alternatives. Danimer sells and utilizes PHA under the proprietary "Nodax" brand name for use in a wide variety of plastic applications including straws, food containers, and cutlery, among other things. Danimer also produces proprietary biopolymers using a natural plastic called polylactic acid ("***PLA***") as a base resin. Danimer primarily operates and produces PLA out of its Winchester, Kentucky facility, which has a total plant capacity of up to 55 million pounds of Nodax-based (PHA) finished

2

products per year and has a PLA reactive extrusion facility in Bainbridge, Georgia with a total PLA-based resin capacity of up to 25 million pounds per year.

5.     On March 18, 2025 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").  The Debtors commenced the Chapter 11 Cases to implement a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders.  Through the Chapter 11 Cases, the Debtors will immediately commence an orderly and value-maximizing wind-down of their businesses.  The Debtors will use their time in chapter 11 to market a sale or sales of all or substantially all of their assets.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the Petition Date, no request for the appointment of a trustee or examiner has been made and no official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

6.     Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the Declaration of Frank A. Pometti in Support of Chapter 11 Cases and First-Day Motions (the "***First Day Declaration***"), filed contemporaneously herewith and incorporated herein by reference.[3]

## RELIEF REQUESTED

7.     By this Motion, the Debtors seek entry of an interim order (the "***Interim Order***"), substantially in the form attached hereto as **Exhibit A**, and subsequently a final order (the "***Final Order***"):

---

[3]     Capitalized terms used but not otherwise defined in this Motion shall have the meaning set forth in the First Day Declaration.

3

i.　　authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis (the "***DIP Facility***" and the loans thereunder, the "***DIP Loans***") equal to $15,000,000 consisting of:

    (a)　　a new money term loan facility in the aggregate principal amount of up to $1,000,000 (the "***New Money Term Loan***") of which $1,000,000 shall be available upon entry of the Interim Order (the "***New Money Term Loan Amount***"),

    (b)　　a delayed draw new money term loan facility in the aggregate principal amount of up to $2,000,000 (the "***New Money DDTL***", and together with the New Money Term Loan, the "***New Money DIP Loans***") available upon entry of the Final Order and subject to the terms and conditions (including the draw conditions) set forth in the DIP Term Sheet (the "***New Money DDTL Amount***" and, together with the New Money Term Loan Amount, the "***New Money Amount***"), and

    (c)　　a roll-up, to be effected on or immediately after the entry, and in accordance with the terms of the Final Order, of certain Super Senior Bridge Loan Obligations in the Roll-Up Amount on a cashless dollar-for-dollar basis into DIP Loans under the DIP Facility, in each case, pursuant to the terms and conditions of the Interim Order, the Final Order, the Approved Budget (as defined below), and that certain term sheet attached to the Interim Order as **<u>Exhibit A</u>** (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "***DIP Term Sheet***"), by and among Danimer Scientific Inc., as borrower, the Guarantors, WSFS Bank, as administrative agent (in such capacity, the "***DIP Agent***"), and the lenders party thereto from time to time (the "***DIP Lenders***," and together with the DIP Agent, the "***DIP Secured Parties***");

ii.　　approving the terms of and authorizing each of the Debtors to enter into and perform under the DIP Term Sheet and any other agreements, instruments, and documents related thereto or concurrently or subsequently executed in connection therewith (collectively, the "***DIP Documents***"), which shall be on terms consistent with the terms set forth in the DIP Term Sheet and otherwise in form and substance acceptable to the Required DIP Lenders (or as otherwise provided in the DIP Documents), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

iii.　　authorizing each of the Debtors to incur all obligations under the DIP Documents to the DIP Secured Parties, including, after entry of the Final

4

Order, the Roll-Up Obligations (as defined in the Interim Order) (collectively, the "***DIP Obligations***"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined in the Interim Order), subject only to the Carve-Out and Prepetition Permitted Liens (each as defined in the Interim Order);

iv.  subject to the terms of the Interim Order, granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and priming liens on all of the DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (as defined in the Interim Order), which liens shall be in accordance with the relative lien priorities set forth in **Exhibit C** of the Interim Order;

v.  authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral to: (a) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, the Interim Order, and the DIP Documents; (b) make permitted adequate protection payments as specified below; (c) pay the principal, interest, fees, expenses, and other amounts payable and reimbursable under the DIP Documents or the Interim Order as such become due, including, without limitation, the DIP Fees (as defined below) and the fees and expenses of the professionals for the DIP Secured Parties; and (d) any other purposes agreed upon in the DIP Documents, in each case solely in accordance with the Approved Budget, the Interim Order, and the DIP Documents;

vi.  authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral, on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition Secured Parties (as defined in the Interim Order) for any diminution of their interests in the Prepetition Collateral, including the Cash Collateral;

vii.  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

viii.  authorizing the DIP Agent, at the direction of the Required DIP Lenders, upon the occurrence of an Event of Default and upon three business days'

5

notice to the Debtors: to (1) terminate the funding obligations under the DIP Documents in accordance with their terms; (2) declare the DIP Obligations to be immediately due and payable in full, to the extent permitted by the terms thereof; and (3) subject to the Interim Order, be granted relief from the automatic stay to foreclose on the DIP Liens and DIP Collateral;

ix.    approving the stipulations in paragraph G of the Interim Order by the Debtors with respect to the Prepetition Loan Documents and the liens and security interests arising therefrom subject to the Challenge Period described in paragraph 44 of the Interim Order;

x.    authorizing payment of the DIP Fees;

xi.    waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order;

xii.    scheduling a final hearing (the "*Final Hearing*") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

xiii.    granting related relief.

## CONCISE STATEMENT PURSUANT
## TO BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2

8.    In accordance with Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2, the below chart summarizes certain of the material provisions of the proposed Interim Order and the DIP Term Sheet:[4]

| Term | Summary of Material Terms | Reference |
|---|---|---|
| **Borrower**<br>FED. R. BANKR. P. 4001(c)(1)(B) | Danimer Scientific Inc., a Delaware corporation, as debtor and debtor-in-possession under the Bankruptcy Code. | DIP Term Sheet (Borrower) |

---

[4]    The following summary of the terms of the Interim Order and the DIP Term Sheet is subject entirely to the respective terms thereof.  If there are any inconsistencies between the following summary and the Interim Order and/or the DIP Term Sheet, then the Interim Order and/or the DIP Term Sheet, as applicable, shall control.  Unless otherwise indicated, capitalized terms used in the following summary shall have the meanings ascribed to them in the Interim Order and/or the DIP Term Sheet, as applicable.

6

| Term | Summary of Material Terms | Reference |
|---|---|---|
| **Guarantors**<br>FED. R. BANKR. P. 4001(c)(1)(B) | Each of (a) each subsidiary of Borrower party to the Super Senior Bridge Loan Agreement (as defined below) as a "Guarantor", (b) any other subsidiary or affiliate of the Borrower that has commenced a bankruptcy case related to the Chapter 11 Cases, and (c) any other subsidiary of Borrower, subject to exclusions consistent with the Super Senior Bridge Loan Agreement (collectively, the "***Guarantors***"). | DIP Term Sheet (Guarantors) |
| **DIP Lenders**<br>FED. R. BANKR. P. 4001(c)(1)(B) | The Prepetition Bridge Lenders who elect to provide DIP financing, as set forth in Exhibit A of the DIP Term Sheet | DIP Term Sheet (DIP Lenders) |
| **DIP Agent**<br>FED. R. BANKR. P. 4001(c)(1)(B) | WSFS Bank | DIP Term Sheet (DIP Agent) |
| **Maturity**<br>FED. R. BANKR. P. 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i) | The earliest to occur of (a) the 100th day following the Petition Date, (b) the 30th day following the Petition Date if the Final Order has not been entered by the Court on or prior to such date, (c) the date a sale of all or substantially all of the assets of the Debtors is consummated, (d) the effective date of a plan of reorganization or liquidation, (e) entry of an order by the Court approving (i) a motion seeking conversion or dismissal of the Chapter 11 Cases or (ii) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business, and (f) the date any or all of the DIP Obligations are accelerated in accordance with the DIP Orders. | DIP Term Sheet (Maturity Date) |
| **Commitment**<br>FED. R. BANKR. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i) | The DIP Facility will consist of:<br><br>(a) a new money term loan facility in the aggregate principal amount of up to $1,000,000 of which $1,000,000 shall be available upon entry of the Interim Order,<br><br>(b) a delayed draw new money term loan facility in the aggregate principal amount of up to $2,000,000 available upon entry of the Final Order and subject to the terms and conditions (including the draw conditions) set forth in the DIP Term Sheet, and<br><br>(c) a roll-up, to be effected on or immediately after the entry, and in accordance with the terms of the Final Order, of certain Super Senior Bridge Loan Obligations in the Roll-Up Amount on a cashless dollar-for-dollar basis into DIP Loans under the DIP Facility, in each case, pursuant to the terms and conditions of the Interim Order, the Final Order, the Approved Budget, and that certain term sheet attached to the Interim Order as **Exhibit A**, by and among Danimer Scientific Inc., as borrower, the Guarantors, WSFS Bank, as administrative agent, and the lenders party thereto from time to time. | Interim Order, Recitals (i) |

| Term | Summary of Material Terms | Reference |
|---|---|---|
| **Material Conditions of Borrowing** <br> FED. R. BANKR. P. 4001(c)(1)(B) Local Rule 4001-2(a)(i) | The funding of the Interim Draw in the amount of $1.0 million shall be conditioned upon the satisfaction of the following conditions precedent unless waived by each DIP Lender in its sole and absolute discretion: <br><br> (i)  the Debtors shall have timely delivered each DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with the DIP Term Sheet and the Interim Order; <br><br> (ii)  the Debtors shall have not failed to disclose any material assumptions with respect to the Approved Budget; <br><br> (iii)  the Debtors shall have delivered to the DIP Agent a notice of borrowing in connection with such Interim Draw request no later than 11:00 AM ET two (2) business days prior to the requested funding date for such Interim Draw (or such later time as the DIP Agent may agree to in its sole discretion); <br><br> (iv)  the Interim Order shall have been entered by the Court in the Chapter 11 Cases (after appropriate notice and a hearing), which Interim Order shall not have been reversed, modified, amended, stayed, vacated, or subject to a stay pending appeal, in each case, without the prior written consent of the Required DIP Lenders and the Debtors shall be in compliance in all respects with the Interim Order; <br><br> (v)  the Chapter 11 Cases shall have been commenced in the Court and all of the "first day" motions, orders and related pleadings (including a cash management order encompassing the cash management arrangements currently in place under the Super Senior Bridge Loan) and all other pleadings which relate to the DIP Facility shall have been reviewed in advance by each DIP Lender and shall be reasonably satisfactory in form and substance to Required DIP Lenders; <br><br> (vi)  Each DIP Lender shall be satisfied that the liens and security interests of the DIP Agent have been perfected in the DIP Collateral and shall constitute first-priority liens (subject only to Prepetition Permitted Liens and the NMTC Liens with respect to the NMTC Cash Collateral Accounts); <br><br> (vii) the Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is | DIP Term Sheet (Closing Conditions to Interim Draws), DIP Term Sheet (New Money DDTL Draw Conditions) |

| Term | Summary of Material Terms | Reference |
|------|---------------------------|-----------|
| | reasonably acceptable to each DIP Lender (which shall be deemed satisfied if such insurance as required by the Super Senior Bridge Loan remains in place); | |
| | (viii) upon entry of the Interim Order, the entry into the DIP Term Sheet shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently; and | |
| | (ix) all applicable Milestones that are required to be complied with prior to or concurrently with the entry of the Interim Order and each Interim Draw shall have been complied with (or waived by the Required DIP Lenders). | |
| | The funding of each Subsequent Draw shall be conditioned upon the satisfaction of the following conditions precedent unless waived by each DIP Lender in its sole and absolute discretion: | |
| | (i) the Debtors shall have timely delivered to each DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with the DIP Term Sheet and the DIP Orders and such other information (financial or otherwise) as may be reasonably requested by the Required DIP Lenders or the DIP Agent; | |
| | (ii) the Debtors shall have not failed to disclose any material assumptions with respect to the Approved Budget; | |
| | (iii) the Debtors shall have delivered to the DIP Agent a Notice of Borrowing in connection with such Subsequent Draw request no later than 11:00 AM ET two (2) business days prior to the requested funding date for such Subsequent Draw (or such later time as the DIP Agent may agree to in its sole discretion); | |
| | (iv) Such Subsequent Draw shall be in a maximum amount not to exceed the forecasted amount of cash required to comply with the Approved Budget for the applicable week; | |
| | (v) the Final Order shall have been entered by the Court in the Chapter 11 Cases, which Final Order shall not have been reversed, modified, amended, stayed, vacated, or subject to a stay pending appeal, in each case, without the prior written consent of the Required DIP Lenders and the | |

| Term | Summary of Material Terms | Reference |
|---|---|---|
| | Debtors shall be in compliance in all respects with the Final Order; | |
| | (vi) the Debtors shall have received one or more binding, non-rescindable Qualifying Bids (to be defined in court-approved bidding procedures, which will be subject to the consent of the Required DIP Lenders) which bid or bids, collectively, include sufficient cash consideration to fund the Carve-Out and repay the DIP Obligations in full in cash, including any Subsequent Draws; | |
| | (vii) all applicable Milestones that are required to be complied with prior to or concurrently with the entry of the Final Order and each Subsequent Draw shall have been complied with (or waived by the Required DIP Lenders); | |
| | (viii) the Debtors remain in compliance with the Approved Budget, including after taking into account any Permitted Variances; | |
| | (ix) there have existed no projections showing any deviation in future weeks in excess of the Permitted Variances; | |
| | (x) the Approved Budget expressly reflects a need for any such additional funds; | |
| | (xi) there is no reasonable likelihood of material delay in the projected timeline to liquidate existing A/R, Inventory and WIP as determined in good faith by the Required DIP Lenders; | |
| | (xii) there is no challenge to the rights, liens, claims of any of the DIP Lenders or the Super Senior Bridge Lenders existing nor any reduction or adverse effect of the rights, liens or claims of any of the DIP Lenders having occurred; | |
| | (xiii) the occurrence of a material adverse effect on the collateral or the Debtors as determined in good faith by the Required DIP Lenders has not occurred; and | |
| | (xiv) the 100-day DIP draw period not having expired absent express written consent of each DIP Lender. | |
| **Interest Rate**<br>FED. R. BANKR. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i) | New Money DIP Loans: 12.50% per annum, compounded weekly, paid in kind.<br><br>Roll-Up Loans: Same as the non-default rate on the | DIP Term Sheet (Interest Rate) |

| Term | Summary of Material Terms | Reference |
|---|---|---|
| | corresponding Super Senior Bridge Loans as in effect on the Petition Date under the Super Senior Bridge Loan, paid in kind.<br><br>At all times following the occurrence and during the continuance of an Event of Default and notice from the Required DIP Lenders to the Borrower, principal, interest and all other amounts due on the DIP Loans shall bear interest at a rate equal to 3.00% per annum in excess of the interest rate set forth above and, for the avoidance of doubt, shall be paid in kind. | |
| **Fees**<br>FED. R. BANKR. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i) | (i) An upfront fee of 10.00% on the principal amount of the New Money DIP Loans (the "***Upfront Fee***") payable in kind; and (ii) an exit fee of 5.00% on the principal amount of the New Money DIP Loans, payable on the Maturity Date, payable in kind (the "***Exit Fee***" and, together with the Upfront Fee, the "***DIP Fees***").   The Upfront Fee shall be fully earned upon entry of the Interim Order, and the Exit Fee shall be fully earned upon entry of the Final Order.<br><br>The Debtors shall reimburse the DIP Agent and the DIP Lenders for all reasonable and documented costs and expenses, including legal fees, financial advisor fees, and other similar fees, costs and expenses incurred in connection with the DIP Facility and the Chapter 11 Cases, whether incurred on a prepetition or postpetition basis, which shall be payable by Borrower in accordance with the terms of the DIP Order and without the requirement for Court approval.  A copy of the summary invoice shall be provided to counsel to the Debtors, the U.S. Trustee, and counsel to the UCC, if any.<br><br>No DIP Fees shall be earned on account of any of the Roll-Up Loans. | DIP Term Sheet (Fees and Expenses; Indemnity) |
| **Mandatory Prepayments**<br>FED. R. BANKR. P. 4001(c)(1)(B) | The Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations) until such obligations are paid in full immediately as follows:<br><br>(i)   100% of the net cash proceeds of any sale or disposition of the Liquidation Assets and the 363 Sale Assets (each as defined in the Milestones) simultaneous with the consummation thereof, after funding the Professional Fee Reserve and the Health Insurance Reserve (if applicable) and reserving proceeds sufficient to pay estimated, accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved Budget, subject to the Permitted Variance; | DIP Term Sheet (Mandatory Prepayments) |

11

| Term | Summary of Material Terms | Reference |
|------|---------------------------|-----------|
| | (ii) 100% of the net cash proceeds of Extraordinary Receipts,[5] after funding the Professional Fee Reserve and the Health Insurance Reserve (if applicable) and reserving proceeds sufficient to pay estimated, accrued, unpaid and allowed administrative expenses to the extent set forth in the Approved Budget, subject to the Permitted Variance; and<br><br>(iii) If, at any time, the Debtors' aggregate cash receipts exceed the amounts forecast to be collected over the entire 13-week period covered by the initial Approved Budget by more than $500,000 (such excess amount, the "***Excess Cash***"), 100% of such Excess Cash shall be used to repay the DIP Loans, after funding the Professional Fee Reserve and the Health Insurance Reserve (if applicable) and reserving proceeds sufficient to pay estimated, accrued, unpaid and allowed administrative expenses to the extent set forth in the Approved Budget, subject to the Permitted Variance. Notwithstanding the foregoing, the Debtors may seek, subject to express written consent of the Required DIP Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed), a formal waiver of the requirement to prepay all or a portion of the Excess Cash.<br><br>Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any Extraordinary Receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lenders.<br><br>Mandatory payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will otherwise be applied in the following order of priority (unless otherwise determined by the DIP Lenders in their sole discretion), after giving effect to the Professional Fee Reserve, the Carve-Out and any other payments required pursuant to the DIP Orders:<br><br>(1) <u>first</u>, to pay all documented out-of-pocket expenses of the DIP Lenders and the DIP Agent | |

---

[5] "***Extraordinary Receipts***" means any cash received by the Debtors not in the ordinary course of business (and not consisting of proceeds described in sub-clause (i) or (ii), but excluding sales tax receipts contemplated to be received by the Debtors as set forth in the Approved Budget), including, (a) tax refunds, (b) net proceeds of any judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (c) indemnity payments, (d) net proceeds of any payment made under an insurance policy or agreement, other than insurance proceeds received in respect of damage to equipment used to effect the repair or replacement of such equipment in the ordinary course of business, and (e) net proceeds of any condemnation or taking by any governmental authority.

| Term | Summary of Material Terms | Reference |
|---|---|---|
| | (including, without limitation, fees and expenses of counsel); | |
| | (2) <u>second</u>, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding New Money DIP Loans; | |
| | (3) <u>third</u>, to repay any principal amounts outstanding in respect of the New Money DIP Loans (including any amounts and interest that have been added to the principal balance); | |
| | (4) <u>fourth</u>, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding Roll-Up Loans; | |
| | (5) <u>fifth</u>, to repay any principal amounts outstanding in respect of the Roll-Up Loans (including any amounts and interest that have been added to the principal balance); | |
| | (6) <u>sixth</u>, all other amounts owing to the DIP Lenders and the DIP Agent; and | |
| | (7) <u>last</u>, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of the Super Senior Bridge Loan Lenders in accordance with the Super Senior Bridge Loan. | |
| **Repayment Features/Roll-Up**<br>Local Rule 4001-2(a)(i) | Upon entry of the Final Order, the Super Senior Bridge Loan Obligations held by the DIP Lenders (or their affiliates) shall be "rolled up" and converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations, on a *pro rata* basis according to the DIP Lenders' holdings under the DIP Facility in a ratio of 4:1 of the total DIP Commitment. | Interim Order, ¶ I(vii), 8 |

13

| Term | Summary of Material Terms | Reference |
|---|---|---|
| **Entities with Interests in Cash Collateral**<br>FED. R. BANKR. P. 4001(b)(l)(B)(i) | All parties set forth below have an interest in the Cash Collateral and shall be collectively referred to as the **"*Prepetition Secured Parties*"**:[6]<br><br>• **Super Senior Bridge Loan Lenders.**  The lenders from time to time party to the Super Senior Bridge Loan Agreement.<br><br>• **IP Term Loan Agent.** U.S. Bank Trust Company, National Association, as administrative agent under the IP Term Loan Agreement.<br><br>• **IP Term Loan Lenders.**  The lenders from time to time party to the IP Term Loan Agreement. | Interim Order, ¶ G |
| **DIP Budget and Related Covenants**<br>FED. R. BANKR. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(iii) | (a)      The Debtors shall use Cash Collateral and the proceeds of the DIP Facility solely in accordance with the Approved Budget and the DIP Documents (it being agreed that the initial budget attached to the Interim Order (the "*Initial Budget*") is in form and substance acceptable to the Required DIP Lenders).  The "***Approved Budget***" means, initially the Initial Budget, and thereafter, any subsequently Updated Budget that meets the requirements set forth below in this sub-paragraph (a).  Commencing on April 1, 2025 at 5:00 p.m. (Eastern Time) and continuing on each two-week anniversary thereafter (or such other times as the Debtors may elect with the consent of the DIP Agent, acting at the direction of the Required DIP Lenders), the Debtors shall deliver to counsel for the DIP Lenders, the Committee, and the U.S. Trustee an updated budget (an "***Updated Budget***") with the form and level of detail set forth in the Initial Budget, and shall include, weekly basis cash revenues, receipts, expenses, professional fees, and other disbursements, net cash flows, inventory receipts, and other items on a line item basis.  Such Updated Budget shall constitute the "Approved Budget" for purposes of the DIP Order (i) upon written notice from the DIP Lenders' counsel to the Debtors (which may be in the form of an email) that such budget is in form and substance satisfactory to the DIP Agent Any amendments, supplements, or modifications to the form of the Approved Budget (not including updates to the Budget described above) shall be subject to the prior written approval of the Required DIP Lenders, prior to the implementation thereof.<br><br>(b)      Commencing on Tuesday, March 25, 2025 at 5:00 p.m. (Eastern Time), and on each Tuesday on a weekly basis thereafter (or at such other times as the Debtors may elect with the consent of the Required DIP | Interim Order, ¶ 17 |

---

[6]    For the avoidance of doubt, "Cash Collateral" shall not include any collateral securing the NMTC Loans, and the Debtors do not seek to use any such collateral for any purpose other than ordinary course payments in respect of the NMTC Loans.  Therefore, the applicable lenders under the NMTC Loans are not entitled to adequate protection pursuant to sections 361, 362, and 363 of the Bankruptcy Code.

| Term | Summary of Material Terms | Reference |
|------|---------------------------|-----------|
| | Lenders), the Debtors shall deliver to counsel to the DIP Lenders a variance report in form and substance reasonably acceptable to the Required DIP Lenders (an "***Approved Variance Report***") showing comparisons of actual results for each line item against such line item in the Approved Budget for the prior (Monday to Sunday) one-week period.  Thereafter, the Debtors shall deliver to counsel to the DIP Lenders an Approved Variance Report on each Tuesday on a weekly basis for (a) the preceding week (Monday to Sunday) and (b) the trailing four-week period (or, if fewer than four weeks have lapsed since the Petition Date, then for the trailing one-, two-, or three-week period, as applicable) (each a "***Testing Period***"). Any amendments, supplements, or modifications to an Approved Variance Report shall be subject to the prior written approval of the Required DIP Lenders.<br><br>(c)    Each Approved Variance Report shall indicate whether there are any adverse variances that exceed any of the Permitted Variances.  "***Permitted Variances***" shall mean variances:<br><br>    (i) up to 10% of the aggregate for all cash disbursements in the Approved Budget (excluding fees and expenses of counsel to the DIP Secured Parties and Professional Persons and disbursements for Health Insurance Claims) (such disbursements, collectively, "***Non-Professional Cash Disbursements***"),<br><br>    (ii) up to 10% of all fees and expenses of Debtor Professionals on an aggregate basis (the "***Debtor Professional Fee Variance***"), and<br><br>    (iii) up to 10% of all fees and expenses of Committee Professionals on an aggregate basis (the "***Committee Professional Fee Variance***"),<br><br>in each of (i), (ii), and (iii) calculated weekly on a rolling four-week basis commencing as of the Petition Date, with the first such testing to begin upon delivery of the second Approved Variance Report.  For the avoidance of doubt, the Approved Budget shall not serve as a cap or limitation on the amount or payment of any fees and expenses of the Debtor Professionals.<br><br>(d)    In the event that an expense budgeted in any line item in the Budget for payment during any particular week exceeds the amount actually paid in respect of such line | |

| Term | Summary of Material Terms | Reference |
|---|---|---|
| | item during such week (including with respect to Professional Persons) (the difference between the budgeted amount and the amount actually paid, the "***Carry Forward Amount***"), the Debtors shall be authorized to use the Carry Forward Amount during any subsequent weeks toward (i) the total amount of Non-Professional Cash Disbursements for any Carry Forward related to any line item for Non-Professional Cash Disbursements or (ii) the total amount of (A) Debtor Professional fees and expenses for any Carry Forward related to fees and expenses of an individual Debtor Professional or (B) Committee Professional fees and expenses for any Carry Forward related to fees and expenses of any individual Committee Professional. | |
| **Stipulations to Prepetition Liens and Claims** FED. R. BANKR. P. 4001(c)(1)(B)(iii) Local Rule 4001-2(a)(i) | Subject to paragraph 44 of the Interim Order, the Debtors admit, stipulate, acknowledge, and agree to the following (collectively, the "***Debtors' Stipulations***"): <br><br> • Indebtedness under the Super Senior Bridge Loan Documents; <br><br> • Super Senior Bridge Loan Obligations in an amount of not less than $15,239,485.92; <br><br> • Existence of the liens securing the Super Senior Bridge Loan Obligations; <br><br> • Indebtedness under the IP Term Loan Documents; <br><br> • IP Term Loan Obligations in an amount of not less than $124,541,770.69; <br><br> • Existence of the liens securing the IP Term Loan Obligations; <br><br> • Validity, extent, perfection, and priority of the Prepetition Liens and Prepetition Obligations; <br><br> • Cash collateral of the Prepetition Secured Parties; <br><br> • No claims or causes of action exist against the Prepetition Secured Parties; and <br><br> • None of the Prepetition Secured Parties controls the Debtors. | Interim Order, ¶ G |
| **Effect of Stipulations/Challenge** FED. R. BANKR. P. 4001(c)(1)(B)(iii) Local Rule 4001-2(a)(i) | The Debtors' Stipulations contained in the Interim Order shall be binding in all circumstances upon the Debtors upon entry of the Interim Order, and upon their Estates and any successor thereto in all circumstances for all purposes immediately upon entry of the Final Order.  The Debtors' Stipulations shall be binding upon each other party-in-interest, including the Committee, except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period, the chapter 7 trustee in such Successor Case), by no later than, subject to entry of the Final Order, | Interim Order, ¶ 44 |

16

| Term | Summary of Material Terms | Reference |
|---|---|---|
| | the date that is the earlier of (i) one business day before the hearing approving a sale of substantially all of the Debtors' 363 Sale Assets and (ii) seventy-five (75) calendar days following the date of entry of the Interim Order and *second*, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge (as defined below) in any such timely-filed contested matter or adversary proceeding.  For the purposes of the Interim Order, a "***Challenge***" shall mean a timely and properly filed contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases set forth in the Interim Order, including the stipulations contained in the Debtors' Stipulations, including but not limited to those in relation to (a) the amount, validity, extent, priority, or perfection of the mortgages, security interests, and liens of the Super Senior Bridge Loan Lenders (individually or collectively) and the IP Term Loan Agent with respect to the Prepetition Collateral; (b) the validity, allowability and priority of the Prepetition Obligations; and (c) any releases set forth or agreed to in the Interim Order or pursuant to the DIP Documents.  The Challenge Period shall terminate on the date that is the next calendar day after the expiration of the Challenge Period in the event that either (i) no Challenge is raised during the Challenge Period or (ii) with respect only to those parties who file a Challenge, such Challenge is fully and finally adjudicated.  The filing of a motion seeking standing to file a Challenge before expiration of the Challenge Period, which attaches a proposed Challenge, shall extend the Challenge Period solely with respect to that party until two (2) business days after the Court approves the standing motion, or such other time period ordered by the Court in approving the standing motion and solely with respect to the Challenges asserted in the complaint. | |
| **Adequate Protection** Fed. R. Bankr. P. 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection for any Diminution of the Prepetition Secured Parties' interests in their respective Prepetition Collateral: <br><br>(i)   each of the Super Senior Bridge Loan Lenders (individually or collectively) shall receive: <br><br>(a)   continuing valid, binding, enforceable, and perfected postpetition liens and replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens, Prepetition Permitted Liens, and the NMTC Prepetition Liens on the NMTC Cash Collateral Accounts in accordance with the relative priorities as set forth in **Exhibit C** of the Interim Order; <br><br>(b)   administrative superpriority expense claims in each of the Chapter 11 Cases, junior and | Interim Order, ¶ 14 |

| Term | Summary of Material Terms | Reference |
|------|--------------------------|-----------|
| | subordinate only to the Carve-Out and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;<br><br>(c)  subject to recharacterization as principal under the Super Senior Bridge Loan Agreement pursuant to separate order of the Court (if any), payment in kind of monthly interest calculated at the non-default rate set forth in the Super Senior Bridge Loan Agreement;<br><br>(d)  subject to the procedures set forth in paragraph 38 of the Interim Order, payment of the Super Senior Bridge Loan Lenders' reasonable and documented fees, costs and expenses when due and payable in accordance with the Interim Order; and<br><br>(e)  the unconditional right to credit bid the Super Senior Bridge Loan Obligations in connection with any sale of Super Senior Bridge Loan Collateral.<br><br>(ii)  the IP Term Loan Agent shall receive, for the benefit of the IP Term Loan Secured Parties:<br><br>(a)  continuing valid, binding, enforceable, and perfected postpetition liens and replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens, Prepetition Permitted Liens Bridge Loan Replacement Liens, Super Senior Bridge Loan Liens, and the NMTC Prepetition Liens on the NMTC Cash Collateral Accounts in accordance with the relative priorities as set forth in **Exhibit C** of the Interim Order;<br><br>(b)  administrative superpriority expense claims in each of the Chapter 11 Cases, junior and subordinate only to the Bridge Loan Adequate Protection Superpriority Claims, the Carve-Out and the DIP Obligations | |

18

| Term | Summary of Material Terms | Reference |
|---|---|---|
| | (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code; and<br><br>(c) subject to recharacterization as principal under the IP Term Loan Agreement pursuant to separate order of the Court (if any), payment in kind of monthly interest calculated at the non-default rate set forth of in the IP Term Loan Agreement. | |
| **Events of Default**<br>FED. R. BANKR. P. 4001(c)(l)(B) Local Rule 4001-2(a)(i) | Each of following shall constitute an "***Event of Default***":<br><br>(i)  the entry of an Interim Order or Final Order in form and substance that is not acceptable to the DIP Agent and the Required DIP Lenders in their sole discretion;<br><br>(ii)  failure by any Debtor to be in compliance in all respects with provisions of the DIP Term Sheet, the DIP Documents and/or the DIP Orders, and such failure is not cured within two (2) business days of notice of same by the DIP Agent (other than a Milestone breach);<br><br>(iii)  failure of any of the Milestones to be satisfied by the Specified Deadline, as may be extended with the consent of the Required DIP Lenders;<br><br>(iv)  failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made;<br><br>(v)  the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full in cash upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the DIP Agent and each DIP Lender; | Interim Order, ¶ 28, DIP Term Sheet (Events of Default) |

| Term | Summary of Material Terms | Reference |
|------|---------------------------|-----------|
| | (vi)   the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders) against any of the DIP Agent or any DIP Lender or any of their agents and employees to subordinate or avoid any liens made in connection with the DIP Orders;<br><br>(vii)  (1) the Debtors file a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, reconsider, supplement or otherwise modify any DIP Order, the DIP Documents, or the DIP Term Sheet or to disallow the DIP Obligations, in whole or in part, or (2) any material provision of the DIP Orders, the DIP Documents, or the DIP Term Sheet or any other order of the Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Agent and each DIP Lender);<br><br>(viii) the filing with the Court of a motion seeking approval of a sale of substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code or a plan of reorganization or liquidation in the Chapter 11 Cases that, in any such case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of the DIP Obligations and all other amounts outstanding under the DIP Term Sheet, the DIP Documents and the DIP Orders on closing of such sale (consistent with the mandatory prepayment provisions set forth above) or the effective date of such plan, without the prior written consent of the DIP Agent and each DIP Lender;<br><br>(ix)  the appointment in the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of the Debtors (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);<br><br>(x)   the granting of relief from the automatic stay by the Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $50,000 in value in the aggregate, except for the NMTC Cash Collateral Accounts;<br><br>(xi)  the failure to pay principal, cash interest (subject to a three (3) business day grace period, solely with respect to cash interest) or other DIP Obligations in | |

| Term | Summary of Material Terms | Reference |
|---|---|---|
| | full when due, including without limitation, on the Maturity Date; | |
| | (xii) the payment of, or application by the Debtors for authority to pay, any prepetition claim without prior written consent of the DIP Agent and the Required DIP Lenders other than amounts set forth in the Approved Budget (subject to any Permitted Variances); | |
| | (xiii) the failure to comply with the Approved Budget (subject to any Permitted Variances); | |
| | (xiv) a party obtains requisite standing with respect to a Challenge (as defined in Paragraph 44 of the Interim Order) that is timely filed prior to the expiration of the Challenge Period (as defined in Paragraph 44 of the Interim Order); and | |
| | (xv) the Debtors make any payments on account of Health Insurance Claims in excess of the Health Insurance Claims Cap, unless the Required DIP Lenders have provided prior consent to such payments. | |
| **Carve-Out**<br>FED. R. BANKR. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i) | The Carve-Out shall be, collectively, (a) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee (the "*U.S. Trustee*") pursuant to 28 U.S.C. §1930(a), (b) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000, and (c) subject to the Approved Budget and to the extent allowed at any time, whether by interim order, procedural order, or otherwise, unpaid fees and expenses of the professionals (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) retained by the Debtors and any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "*UCC*"), that (i) are incurred on or prior to the first business day following the date of delivery of the Carve-Out Trigger Notice (as defined below), or (ii) are incurred after the first business day following the date of delivery of a Carve-Out Trigger Notice, subject to a cap of $150,000 for the Debtors' professionals and $25,000 for the UCC's professionals (the "*Carve-Out*").<br><br>Beginning on March 26, 2025, and thereafter on a weekly basis, the Debtors will transfer cash proceeds from draws from the DIP Facility and/or cash on hand in an amount as set forth in the Approved Variance Report for the weekly fees, costs, and expenses incurred by the Debtor Professionals and Committee Professionals (if any) for the prior week until receipt of a Carve-Out Trigger Notice, in each case, excluding any restructuring, sale, success or | Interim Order, ¶ 35 |

| Term | Summary of Material Terms | Reference |
|------|---------------------------|-----------|
| | other transaction fee of any investment bankers or financial advisors of the Debtors or the Committee, into a segregated escrow account held in trust solely for the benefit of the Professional Persons (the "***Professional Fee Reserve***").  Amounts funded into the Professional Fee Reserve shall be considered used by the Debtors at such time as they are deposited into the Professional Fee Reserve for distribution to professionals in accordance with orders of the Court.  Any amounts remaining in the Professional Fee Reserve after payment of allowed fees and expenses shall be DIP Collateral. <br><br> "***Carve-Out Trigger Notice***" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to the UCC (if any), which notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility. | |
| **Milestones** <br> FED. R. BANKR. P. 4001(c)(1)(B)(v) and (vi) <br> Local Rule 4001-2(a)(i) | The Debtors shall conduct the Chapter 11 Cases in accordance with the following milestones (each, a "***Milestone***") and unless waived, modified or extended by the Required DIP Lenders, the failure of the Debtors to meet Milestones by the applicable specified deadlines set forth therefor (the "***Specified Deadline***") shall constitute an Event of Default: <br> (a)  no later than three (3) calendar days after the Petition Date, the Interim Order approving the DIP Facility shall be entered by the Court; <br> (b)  no later than five (5) calendar days after the Petition Date, the Debtors shall file with the Court an application to retain a professional liquidation firm (the "***Liquidator***"), on terms acceptable to the Required DIP Lenders, to sell the Debtors' property, plant and equipment (PP&E) associated with the Debtors greenfield project in Georgia and any other miscellaneous assets that are excluded from 363 Sale Assets (as defined below) (collectively, the "***Liquidation Assets***"); <br> (c)  no later than nine (9) calendar days after the Petition Date, the Debtors shall file with the Court a motion, in form and substance acceptable to the Required DIP Lenders and the Debtors, seeking approval of bidding procedures (the "***Bidding Procedures Motion***") in connection with a sale under Section 363 (the "***363 Sale Process***") for the following assets <br> 1.  the manufacturing and lab facilities located in Kentucky (the "***Kentucky Facility***") <br> 2.  the manufacturing and lab facilities located in Bainbridge, Georgia (the "***Bainbridge Facilities***"), | Interim Order, ¶ 29; DIP Term Sheet (Exhibit B) |

| Term | | Summary of Material Terms | Reference |
|---|---|---|---|
| | 3. | the manufacturing facility located in Rochester, NY (the "***Novomer Facility***" and, together with the Kentucky Facility and the Bainbridge Facilities, the "***Manufacturing Facilities***"), | |
| | 4. | the Debtors' portfolio of intellectual property (IP) (together with the Manufacturing Facilities, the "***363 Sale Assets***"); | |
| | (d) | no later than thirty (30) calendar days after the Petition Date, the Court shall have entered (i) an order establishing bidding procedures consistent with the Bidding Procedures Motion (such order, the "***Bidding Procedures Order***"), which order shall be acceptable in form and substance to the Required DIP Lenders and (ii) the Final Order approving the DIP Facility shall be entered by the Court; | |
| | (e) | no later than forty-five (45) calendar days after the Petition Date, if the Debtors shall have not received an qualified bids for some or all of the 363 Sale Assets in a form and substance acceptable to the Required DIP Lenders, the remaining 363 Sale Assets shall be liquidated by the Debtors' professional liquidation firm in the same manner as the Liquidation Assets or in another manner acceptable to the DIP Lenders; | |
| | (f) | no later than fifty (50) calendar days after the Petition Date, the Debtors shall have held an auction, if applicable, in connection with the 363 Sale Assets; | |
| | (g) | no later than fifty-five (55) calendar days after the Petition Date, if qualified bids are received for any of the 363 Sale Assets, the Court shall have entered an order approving the sale of the 363 Sale Assets (the "***Sale Order***"), which order shall be satisfactory in form and substance to the Required DIP Lenders; | |
| | (h) | no later than sixty (60) calendar days after the Petition Date, the Debtors shall have consummated the sale of the 363 Sale Assets in accordance with the Sale Order; | |
| | (i) | no later than sixty (60) calendar days after the Petition Date, the Debtors shall have consummated the sale of the Liquidation Assets unless extended by the Required DIP Lenders after consultation with the Debtors and the Liquidator; | |
| | (j) | no later than sixty (60) calendar days after the Petition Date, the Debtors and Required DIP Lenders shall have reached definitive agreement on a path for the orderly winddown of the estates, whether by plan of liquidation, conversion, dismissal or otherwise. | |

23

| Term | Summary of Material Terms | Reference |
|------|---------------------------|-----------|
| **Marshalling, 552(b) Waiver, and 506(c) Waiver**<br>FED. R. BANKR. P. 4001(c)(l)(B)<br>Local Rule 4001-2(a)(i) | The Interim Order includes a waiver of the equitable doctrine of "marshalling" and waivers of claims for necessary costs and expenses of preserving or disposing of property securing an allowed secured claim pursuant to section 506(c) and the section 552 "equities of the case" exception as set forth in the Final Order. | Interim Order, ¶¶ 47, 48, 49 |
| **Waiver/Modification of the Automatic Stay**<br>FED. R. BANKR. P. 4001(c)(1)(B)<br>Local Rule 4001-2(a)(i) | Upon the occurrence and during the continuance of any Event of Default, subject to three (3) business days' notice to the Debtors during which the Debtors may seek an emergency hearing before the Court (at which hearing the sole issue shall be whether or not an Event of Default has occurred or is continuing) (the "***Remedies Notice Period***"), the DIP Agent may (and, at the direction of the Required DIP Lenders, shall) take all or any of the following actions without further order of or application to the Court, and notwithstanding the automatic stay:<br><br>(a)    declare all DIP Obligations (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable;<br><br>(b)    terminate any further commitment to lend to the Borrower;<br><br>(c)    exercise rights and remedies pursuant to the terms of the DIP Orders, or applicable law (including, without limitation, direct the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of the DIP Documents, (ii) to collect accounts receivable, without setoff by any account debtor, including to direct the Debtors to collect such account receivables, (iii) to sell or otherwise dispose of any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Agent and the DIP Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code) and (iv) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); *provided* that the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Agent in the DIP Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Agent; and/or<br><br>(d)    after the expiration of the Remedies Notice Period unless otherwise prohibited by the Court during the | Interim Order, ¶¶ 20, 32 |

| Term | Summary of Material Terms | Reference |
|---|---|---|
| | Remedies Notice Period and without further notice or further court order and without seeking further relief from the automatic stay under section 362 of the Bankruptcy Code, the Debtors, at the election of the Required DIP Lenders, shall be required under the terms of the DIP Order to facilitate a strict foreclosure under UCC section 9-620 as adopted by New York by transferring ownership and title to the DIP Collateral (as may be specified by the DIP Agent at direction of Required DIP Lenders) in full or partial satisfaction of the DIP Obligations.<br><br>In each case, prior to exercising any remedies, sufficient cash on hand must be reserved to fully fund the Carve-Out and the Health Insurance Reserve and accrued, unpaid and allowed administrative expense claims to the extent set forth in the Approved Budget as set forth in the DIP Orders.<br><br>The Interim order also modifies the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order. | |
| **Release, Waivers, or Limitations on any Claim or Cause of Action**<br>FED. R. BANKR. P. 4001(c)(1)(B)(viii) | The DIP Orders contain releases and exculpations for the DIP Agent, each DIP Lender and the Prepetition Bridge Lenders (in each case, in any capacity), in form and substance satisfactory to each such party, respectively, including, without limitation, releases from any avoidance actions, in each case subject to the investigation period provided in the DIP Orders. | Interim Order, ¶ H, 51 |
| **Indemnification**<br>FED. R. BANKR. P. 4001(c)(1)(B)(ix) | The Debtors shall indemnify, pay and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the Interim Order and the DIP Documents except to the extent resulting from such party's gross negligence, bad faith, or willful misconduct as determined by a final, non-appealable judgment of a court of competent jurisdiction. | Interim Order, ¶ 39 |
| **Liens on Avoidance Actions**<br>Local Rule 4001-2(a)(i) | Subject to entry of a Final Order, the Interim Order grants the DIP Secured Parties and the Prepetition Secured Parties (as adequate protection) liens on the proceeds of any avoidance actions, but not on the avoidance actions themselves. | Interim Order, ¶ 6, 14(i)(a) |

**PROVISIONS TO BE HIGHLIGHTED PURSUANT TO LOCAL RULE 4001-2**

9.     Local Rule 4001-2(a)(i) requires a debtor to recite whether the proposed form of order approving postpetition financing and authorizing use of cash collateral contains certain provisions of the type enumerated therein, identify the location of such provisions in the proposed order, and justify the inclusion of such provisions in the proposed order.  The Debtors hereby disclose the below provisions contained in the proposed Interim Order in accordance with Local Rule 4001-2(a)(i):

a.     **Local Rule 4001-2(a)(i)(N) – *Cross-Collateralization.***  The relief sought herein does not contemplate cross-collateralization, other than replacement liens as adequate protection.

b.     **Local Rule 4001-2(a)(i)(Q) – *Validity, Perfection, and Amount of Prepetition Liens.***  Debtors have stipulated to various matters, including the validity, perfection, and priority of the liens securing the Super Senior Bridge Loan Agreement and IP Term Loan Agreement.  *See* Interim Order, ¶ G  The stipulations set forth in Paragraph G of the Interim Order are binding on the Debtors and any successors thereto.  *See id*. at ¶ 44.  In compliance with Local Rule 4001-2(a)(i)(Q), parties in interest have until the date that is the earlier of (i) one business day before the hearing approving a sale of substantially all of the Debtors' 363 Sale Assets and (ii) seventy-five (75) calendar days following the date of entry of the Interim Order, to obtain standing to challenge the stipulations set forth in the Interim Order.  *See id*. at ¶ 44.

c.     **Local Rule 4001-2(a)(i)(V) – *506(c) Waiver.***  The Interim Order includes a waiver of the Debtors' estates' rights under section 506(c) of the Bankruptcy Code; however, such relief is subject to entry of the Final Order.  *See* Interim Order, ¶ 47.  As such, parties in interest will have an opportunity to be heard regarding such matter and such waiver will not be "without notice."

d.     **Local Rule 4001-2(a)(i)(U) – *Liens on Avoidance Actions.***  Subject to entry of the Final Order, among other things, the Debtors grant liens in favor of the DIP Lenders on the proceeds of all claims and causes of action of the Debtors' estates arising under chapter 5 of the Bankruptcy Code (but not on such claims and causes of action themselves).  *See* Interim Order, ¶ 5.

e.     **Local Rule 4001-2(a)(i)(O) – *Provisions Deeming Prepetition Debt to be Postpetition Debt.***  The Debtors shall use DIP Roll-Up Loans to refinance on a cashless 4:1 basis the Prepetition Obligations held by the DIP Lenders

in their capacity as Super Senior Bridge Loan Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined in the Super Senior Bridge Loan Agreement) by such amount. *See* Interim Order, ¶ 10.

f.    **Local Rule 4001-2(a)(i)(F) – *Carve-Out.*** The proposed Adequate Protection is subject to the Carve-Out. Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for any payment owing to the Clerk of the Court, the U.S. Trustee pursuant to 28 U.S.C. § 1930, and the professionals of the Debtors and any statutory committee for professional fees and expenses. *See* Interim Order ¶ 35.

g.    **Local Rule 4001-2(a)(i)(P) – *Non-Consensual Priming.*** The Interim Order does not provide for nonconsensual priming of any existing and perfected secured lien. The Interim Order provides that the priming liens granted to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, shall be junior to (x) the Carve-Out, and (y) liens senior by operation of law and otherwise permitted by the Prepetition Loan Documents solely to the extent any such permitted liens (1) were in existence on the Petition Date, (2) are valid, unavoidable and properly perfected as of the Petition Date or perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, (3) are senior in priority to the Super Senior Bridge Loan Obligations, (4) are permitted to be incurred as senior priority liens under the Prepetition Loan Documents, and (5) are expressly identified on Schedule 1 of the Interim Order. *See* Interim Order, ¶ G.

h.    **Local Rule 4001-2(a)(i)(W) – *Provisions Affecting the Court's Power to Consider the Equities of the Case.*** Subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties, as applicable with respect to proceeds, product, offspring or profits of any of the DIP Collateral or Prepetition Collateral, as applicable. *See* Interim Order, ¶ 49.

27

## DEBTORS' PREPETITION CAPITAL STRUCTURE OVERVIEW

**A.      Prepetition Capital Structure[7]**

10.      As of the Petition Date, the principal amount of the Debtors' funded debt liabilities total approximately $402.38 million.  The Debtors' significant funded debt obligations include:

| Debt | Approximate Total Amount Outstanding[8] | Maturity[9] |
|---|---|---|
| Super Senior Bridge Loan | $15.24 million | December 2026 |
| IP Term Loan | $124.54 million | March 2027 |
| DSKY Loan | $12 million | November 2039 |
| Carver Loan | $9 million | September 2048 |
| MB Loan | $24.7 million | August 2052 |
| Senior Convertible Notes | $216.9 million | December 2026 |
| *Total Funded Debt* | *$402.38 million* | |

**i.      Super Senior Secured Uninsured Bridge Loan Agreement**

11.      In the months preceding the Petition Date, the Debtors were in need of additional liquidity.  After extensive negotiations, the Debtors were able to obtain short term bridge funding

---

[7]   The following description of the Debtors' prepetition capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements, including, but not limited to, the Prepetition Funded Debt.

[8]   As described in greater detail below, the face amount outstanding under the NMTC Loans reflected in this table likely is not the actual amount that the Debtors would be required to repay after an event of default under the NMTC Loans given the unique structure of these debt instruments.  The Debtors reserve all rights with respect to amounts that may (or may not) be owed to any of the NMTC Lenders (as defined below).

[9]   As described in greater detail below, the maturity dates of the NMTC Loans are less relevant than the date on which Credit Period (as defined below) for an NMTC Loan expires, which is expected in 2026 for the DSKY Loan and the Carver Loan, and in 2029 for the MB Loan.

pursuant to that certain Super Senior Secured Uninsured Promissory Note, dated as of December 17, 2024 (as amended, supplemented, restated, amended and restated, or otherwise modified prior to the Petition Date, the "***Super Senior Bridge Loan Agreement***," and collectively with the other Loan Documents (as defined in the Super Senior Bridge Loan Agreement and any other agreements and documents executed or delivered in connection therewith, each as may have been amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date), the "***Super Senior Bridge Loan Documents***").  Danimer Scientific, Inc. is the issuer (the "***Super Senior Bridge Loan Issuer***") and a grantor under the Super Senior Bridge Loan Agreement, and each of Danimer's wholly-owned subsidiaries (other than Meredian Bioplastics, Inc.), including all of the other Debtors, are the other grantors and guarantors party thereto (together with the Super Senior Bridge Loan Issuer, the "***Super Senior Bridge Loan Parties***"), and the Payees (as defined therein) party thereto from time to time (the "***Super Senior Bridge Loan Lenders***," and together with any collateral agent appointed pursuant to the Super Senior Bridge Loan Documents, if any, the "***Super Senior Bridge Loan Secured Parties***").

12.    The Super Senior Bridge Loan Lenders agreed to extend super senior bridge loans in the aggregate principal amount of $11.25 million (the "***Super Senior Bridge Loans***") and other financial accommodations to the Super Senior Bridge Loan Parties pursuant to the Super Senior Bridge Loan Documents.  All obligations of the Super Senior Bridge Loan Parties arising under the Super Senior Bridge Loan Documents are referred to herein as the "***Super Senior Bridge Loan Obligations***".

13.    The Super Senior Bridge Loan Documents are secured by interests and/or liens (the "***Super Senior Bridge Loan Liens***") on substantially all of the assets of the Super Senior Bridge

29

Loan Parties (subject to certain limited exceptions), in each case as described more fully in the Super Senior Bridge Loan Documents (such assets, the "***Super Senior Bridge Loan Collateral***").

14.    The Super Senior Bridge Loans included certain premiums, including certain potential prepayment premiums.  Interest on the Super Senior Bridge Loans is fifteen percent (15.00%) per annum, accruing and paid in kind quarterly.  On February 5, 2025, the Super Senior Bridge Loan was accelerated.

          **ii.**        **IP Term Loan Agreement and Collateral Insurance Policy.**

15.    Pursuant to that certain Financing Agreement, dated as of March 17, 2023 (as amended, supplemented, restated, amended and restated, or otherwise modified prior to the Petition Date, the "***IP Term Loan Agreement***," and collectively with the other Loan Documents (as defined in the IP Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as have been amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "***IP Term Loan Documents***" and, together with the Super Senior DIP Loan Documents, the "***Prepetition Secured Party Loan Documents***"), by and among (a) Danimer Scientific, Inc., as borrower (the "***IP Term Loan Borrower***"), (b) the guarantors party thereto (together with the IP Term Loan Borrower, the "***IP Term Loan Parties***"), (c) the lenders from time to time party thereto (the "***IP Term Loan Lenders***"), and (d) U.S. Bank Trust Company, National Association, as administrative agent and collateral agent (in such capacities, the "***IP Term Loan Agent***" and, together with the IP Term Loan Lenders, the "***IP Term Loan Secured Parties***"), the IP Term Loan Lenders agreed to extend a term loan facility in the aggregate principal amount of $130 million (the "***IP Term Loan***") and other financial accommodations to the IP Term Loan Parties pursuant to the IP Term Loan Documents.  All obligations of the IP Term Loan Parties arising under the IP Term Loan Documents are collectively referred to herein as the "***IP Term Loan Obligations***" (together with

30

the Super Senior Bridge Loan Obligations, the "***Prepetition Secured Obligations***"). All of the Debtors were originally IP Term Loan Parties with the exception of Novomer, Inc., which, as described in more detail below, was added as a guarantor of the IP Term Loan Obligations and became an IP Term Loan Party in connection with the Debtors' entry into the Super Senior Bridge Loan Agreement in December 2024.

16. The IP Term Loan Documents are secured by interests and/or liens (the "***IP Term Loan Liens***" and, together with the Super Senior Bridge Loan Liens, the " ***Prepetition Secured Party Liens***") on, subject to certain exceptions, substantially all of the assets of the IP Term Loan Parties, in each case as described more fully in the IP Term Loan Documents (such assets, the "***IP Term Loan Collateral***" and, together with the Super Senior Bridge Loan Collateral, the "***Prepetition Collateral***").

17. Interest on the IP Term Loan is 14.4% per annum while no event of default has occurred, and 16.4% upon the occurrence and during the continuance of an event of default. Interest on the IP Term Loan was previously paid in cash monthly in arrears, but since a third amendment that became effective on February 25, 2025, interest has been accruing and paid in kind monthly.

18. Jefferies Funding LLC (and later IP Lending IX, Ltd) (collectively, the "***Lead Lender***") is the primary lender under the IP Term Loan Agreement. Prior to the third amendment to the IP Term Loan Agreement, dated as of February 25, 2025 (the "***Third Amendment to the IP Term Loan***"), the Debtors were required to hold 9.40% of the aggregate balance of the outstanding IP Term Loan in a segregated interest reserve account (the "***Interest Reserve Account***").

19. The IP Term Loan is unique because the Lead Lender (and parties related to the Lead Lender) securitized 95% ($123.5 million) (the "***Securitized Component***") of the principal

amount ($130 million) of the IP Term Loan to various third parties who were not lenders to the Debtors. The Securitized Component was 100% insured against any loss by that certain Collateral Protection Insurance Policy dated March 17, 2023 (the "***Collateral Insurance Policy***"), provided by a group of third-party insurers (the "***Insurers***") for the benefit of the IP Term Loan Agent on behalf of IP Term Loan Lenders. The Debtors were not a party to this product.

20.     On February 25, 2025, in connection with the Third Amendment to the IP Term Loan, the Insurers and the IP Term Loan Lenders reached a resolution whereby the Lead Lender maintained the ability to direct most voting decisions, and a variety of conforming and necessary changes were made to the IP Term Loan Agreement. Further, in connection with the Third Amendment to the IP Term Loan, certain reserve accounts previously established and related to the Collateral Insurance Policy were eliminated, and the Debtors received approximately $2 million from the Interest Reserve Account to improve the Debtors' liquidity position.

### iii.     New Market Tax Credit Facilities.

21.     As described in the First Day Declaration, the Debtors entered into financing arrangements under the New Markets Tax Credit ("***NMTC***") program with various unrelated third-party financial institutions during 2019 and 2022. The NMTC program was provided for in the Community Renewal Tax Relief Act of 2000 (the "***Act***") to induce capital investment in qualified lower income communities. The Act permits taxpayers to claim credits against their federal income taxes for up to 39% of qualified equity investment ("***QEI***") in the community development entities ("***CDEs***") during a seven-year credit period, beginning on the date the QEI is made (the "***Credit Period***"). The investing taxpayers typically set up an investment fund vehicle (the "***NMTC Investment Fund***"), through which the QEI is invested in the CDEs, and the CDEs in turn extend the NMTC Loans to the NMTC Borrowers (each as defined below). CDEs are

privately managed investment institutions that are certified to make qualified low-income community investments.

22.     The normal market practice is for NMTC Loans to utilize a leveraged structure, through which a Danimer affiliate of each applicable NMTC Borrower (the "***Leverage Lender***") extended an interest-only loan to the corresponding NMTC Investment Fund (each a "***Leverage Loan***"), in an amount sufficient to purchase the investing taxpayers' interest in the NMTC Investment Fund.  Each Leverage Loan is structured with a put option enforceable at the end of the Credit Period, which allows the Leverage Lender to purchase the investing taxpayers' interest in the NMTC Investment Fund at the end of the Credit Period.  The investing taxpayers, through the NMTC Investment Fund, would have exercised the put option at a *de minimis* price at the end of the Credit Period, thereby allowing the Leverage Lender to effectively acquire and extinguish each NMTC Loan for almost no consideration.  The ultimate forgiveness of the NMTC Loans is a critical component of NMTC.  However, the cessation of the Debtors' operations likely causes an event of default under each of the NMTC Loans and crystalizes an amount that the Debtors may be required to repay to the relevant NMTC Lenders (as defined below).

### *a.* **Carver** *NMTC.*

23.     Pursuant to that certain Loan Agreement, dated as of April 25, 2019 (as amended, supplemented, restated, amended and restated, or otherwise modified prior to the Petition Date, the "**Carver Loan Agreement**," and, collectively with the other Loan Documents (as defined in the Carver Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, *supplemented*, waived, or otherwise modified from time to time prior to the Petition Date, the "***Carver Loan Documents***") by and among (a) Danimer Manufacturing, Inc. as borrower (the "***Carver Borrower***"), (b) Carver Development CDR VI, LLC ("***Carver***"), and (c) ST CDE LXII, LLC

33

("**CDE**" and, together with Carver and their respective permitted successors and assigns prior to the Petition Date, the "**Carver Parties**"), the Carver Parties agreed to extend a term loan facility in the aggregate principal amount of $9,000,000 (the "**Carver Loans**") and other financial accommodations to the Carver Borrower pursuant to the Carver Loan Documents. Interest on the Carver Loans is approximately 1.96% per annum, accruing and paid in arrears quarterly. The credit period for the Carver Loans is expected to expire in April 2026.

24.     Debtor Danimer Manufacturing holds the Danimer Scientific Manufacturing NMTC - CDE Reserve Account, Danimer Scientific Manufacturing Second NMTC - CDE Reserve Account, and Danimer Scientific Manufacturing NMTC – Restricted Disbursement Reserve Account, each of which are maintained at Carver State Bank and Truist (collectively, the "**Carver NMTC Accounts**"). The Carver NMTC Accounts are required to be maintained under the Carver Loan Documents as collateral for the Carver Loans and are used to make interest payments, and as of the Petition Date held approximately $94,941 in aggregate. The Debtors do not have in their possession the relevant account control agreements for the Carver NMTC Accounts.

25.     The Carver Loan Documents purport to grant assert security interests and/or liens (the "**Carver Loan Liens**") on equipment and machinery of the Carver Borrower (subject to certain limited exceptions), in each case as described more fully in the Carver Loan Documents, including cash and other amounts on deposit or maintained in the Carver NMTC Accounts. To the extent that the Carver Loan Liens are asserted on any of the Debtors' assets other than the Carver NMTC Accounts, based on recent lien searches conducted by the Debtors, the Carver Parties do not appear to have properly renewed their security filings. The Debtors continue to investigate whether the

34

Carver Parties have appropriate account control agreements in place with respect to the Carver NMTC Accounts.

### *b.   DSKY NMTC Facility.*

26.     Pursuant to that certain Loan Agreement, dated as of November 7, 2019 (as amended, supplemented, restated, amended and restated, or otherwise modified prior to the Petition Date, the "***DSKY Loan Agreement***," and, collectively with the other Loan Documents (as defined in the DSKY Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "***DSKY Loan Documents***") by and among (a) Meredian Bioplastics, Inc. as the borrower (the "***DSKY Borrower***") and (b) AMCREF FUND 51, LLC (the "***DSKY Party***"), the DSKY Party agreed to extend a term loan facility in the aggregate principal amount of $12,000,000 (the "***DSKY Loans***" and, together with the Carver Loans and MB Loans, the "***NMTC Loans***") and other financial accommodations to the DSKY Borrower pursuant to the DSKY Loan Documents. Interest on the DSKY Loans is approximately 1.06% per annum, accruing and paid in arrears quarterly.  The credit period for the DSKY Loans is expected to expire in November 2026.

27.     Debtor Danimer Kentucky holds the Danimer Scientific Kentucky NMTC – Brownfield Reserve Account, Danimer Scientific Kentucky NMTC – Consortium America Reserve Account, and Danimer Scientific Kentucky NMTC – AMCREF Reserve Account, each of which are maintained at U.S. Bank National Association (collectively, the "***DSKY NMTC Accounts***").  The DSKY NMTC Accounts are required to be maintained under the DSKY Loan Documents as collateral for the DSKY Loans and are used to make interest payments, and as of the Petition Date held approximately $551,437 in aggregate.

35

28.     The DSKY Loan Documents purport to grant security interests and/or liens (the "**DSKY Loan Liens**") on certain equipment and machinery of the DSKY Borrower (subject to certain limited exceptions), in each case as described more fully in the DSKY Loan Documents, including cash and other amounts on deposit or maintained in the DSKY NMTC Accounts.  To the extent that the DSKY Loan Liens are asserted on any of the Debtors' assets other than the DSKY NMTC Accounts, based on recent lien searches conducted by the Debtors, the DSKY Party does not appear to have properly renewed the relevant security filings.  The Debtors continue to investigate whether the DSKY Party has appropriate account control agreements in place with respect to the DSKY NMTC Accounts.

### c.   MB NMTC Facility.

29.     Pursuant to that certain Loan Agreement, dated as of August 23, 2022 (as amended, supplemented, restated, amended and restated, or otherwise modified prior to the Petition Date, the "**MB Loan Agreement**," and, collectively with the other Loan Documents (as defined in the MB Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "**MB Loan Documents**") by and among (a) Meredian Bioplastics, Inc. (the "**MB Borrower**" and, together with the Carver Borrower and the DSKY Borrower, the "**NMTC Borrowers**"), (b) HRV SUB-CDE 45, L.L.C. ("**HRV**"), (c) AMCREF FUND 76, LLC ("**Fund 76**"), (d) ST CDE LXXXIII, LLC ("**ST CDE**"), and (e) CDVCA 23, LLC (together with HRV, Fund 76, and ST CDE, the "**MB Lenders**" and, collectively with the Carver Parties and the DSKY Party, the "**NMTC Lenders**"), the MB Lenders agreed to extend a term loan facility in the aggregate principal amount of $24,700,000 (the "**MB Loans**") and other financial accommodations to the MB Borrower pursuant to the MB Loan Documents.  Interest on the MB Loans is between approximately 1.00% and 1.34% per

36

annum, accruing and paid in arrears quarterly.  The credit period for the MB Loan Agreement expires in August 2029.

30.    Debtor Meredian Bioplastics holds the Meredian NMTC – AMCREF Reserve Account, Meredian NMTC – HRV Reserve Account, Meredian NMTC – CDVCA Reserve Account, and Meredian NMTC – TCDE Reserve Account, and Debtor Meredian Holdings Group, Inc. holds the Meredian Holdings Group NMTC – Twain Account, each of which are maintained at Truist (collectively, the "***MB NMTC Accounts***").  The MB NMTC Accounts are required to be maintained under the MB Loan Documents as collateral for the MB Loans and are used to make interest payments, and as of the Petition Date held approximately $817,757 in aggregate.

31.    The MB Loan Documents do not appear to contemplate security interests and/or liens on any assets of the MB Borrower other than the MB NMTC Accounts.

**iv.    Convertible Senior Notes.**

32.    Pursuant to that certain indenture for the 3.250% convertible senior notes due 2026 (collectively, the "***Convertible Senior Notes***"), dated as of December 21, 2021 (collectively with any other agreements and documents executed or delivered in connection therewith, each as has been amended, restated, amended and restated, supplemented, waived, or otherwise modified from time to time prior to the Petition Date, the "***Convertible Senior Notes Documents***") by and among Danimer Scientific, Inc. (the "***Convertible Senior Notes Issuer***") and U.S. Bank National Association as trustee for the benefit of the holders of the Convertible Senior Notes (the "***Convertible Senior Noteholders***"), the Convertible Senior Notes Issuer issued the Convertible Senior Notes to the Convertible Senior Noteholders under the Convertible Senior Notes Documents in the initial aggregate principal amount of $240 million.  The only obligor on the Convertible Senior Notes is Danimer Scientific, Inc.  Interest on the Convertible Senior Notes is 3.25% per annum, accruing and paid in arrears biannually.  Danimer retired approximately $28.6

million of Convertible Senior Notes pursuant to certain transactions described in the First Day Declaration. Therefore, as of the Petition Date, approximately $211.4 million Convertible Senior Notes principal remained outstanding.

### v.      Other Miscellaneous Debt

33.      In addition to the above, as described in the First Day Declaration, in December 2023 and June 2024, the Debtors entered into financing agreements related to the premiums of certain insurance policies, and each of these notes have a one-year term and bear interest at 8.24% and 8.49%, respectively. The Debtors also have nine vehicle and equipment notes outstanding as of the Petition Date, primarily relating to motor vehicles and warehouse equipment. The Debtors make monthly payments on these notes at interest rates ranging from 3.75% to 6.99%.

34.      Further, the Debtors' manufacturing process involves a complex and interdependent chain of equipment, materials, and services, all of which require regular maintenance, repair, replacement, and/or replenishment. As such, the Debtors rely on numerous key trade vendors who provide these essential goods and services to operate their businesses. As of the Petition Date, the Debtors estimate they owe approximately $5 million in unsecured trade debt.

### B.      The Debtor's Liquidity Needs and the Proposed DIP Facility

35.      As set forth in the First Day Declaration, the Debtors require immediate access to the financing provided under the DIP Facility and authority to use their existing cash on hand and cash generated from operations to avoid immediate and irreparable harm to their estates. As of the Petition Date, the Debtors have insufficient liquidity to among other things, fund payroll, satisfy their other working capital and general corporate funding requirements, market their assets to potential purchasers, and fund the administration of these Chapter 11 Cases. Without access to the DIP Facility and the ability to use Cash Collateral, the Debtors would likely be unable to generate sufficient levels of operating cash flow to cover the working capital needs and the

38

projected administrative costs of these Chapter 11 Cases, and they might be forced to immediately and abruptly shut down their facilities, potentially causing damage to their equipment or health and safety issues. Such a result would cause immediate and irreparable harm to the Debtors' estates and creditors.

36.     The terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the DIP Facility is essential to funding these Chapter 11 Cases and maximizing the value of the Debtors' estates. Based upon the Debtors' liquidity needs and the results of their search for sources of post-petition financing, the Debtors do not believe alternative sources of financing are readily available on better or comparable terms than the proposed DIP Facility. Additionally, the Debtors do not believe it would be prudent, or even possible, to administer the Debtors' chapter 11 estates solely on a "cash collateral" basis.

37.     The proposed DIP Facility and the consensual use of Cash Collateral are the product of good-faith, arms'-length negotiations with the DIP Lenders and the Prepetition Secured Parties, and are essential for funding these Chapter 11 Cases. The proposed DIP Facility was heavily negotiated to obtain the best possible outcome under these circumstances. Specifically, although the DIP Facility allows for the Super Senior Bridge Loan Parties to refinance a significant portion of their prepetition claims, this concession was critical to reaching an agreement on the DIP Facility.

38.     Based on the foregoing, the proposed DIP Facility – including all fees payable in connection therewith – represents the best financing option available to address the Debtors' liquidity needs under these circumstances. Additionally, the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances. The Debtors submit that the terms

of the DIP Facility are reflective of market terms for financings of this type and under these circumstances.

39.     The proposed DIP Facility will provide the Debtors with immediate access to liquidity that is necessary to ensure that the chapter 11 administrative costs are paid in full and value is preserved during the course of the Debtors' Chapter 11 Cases.  Based on the Debtors' financial projections, the proposed DIP Facility will provide the Debtors with the necessary liquidity to effectively market their assets for sale and pursue an orderly winddown and to maximize the value of the Debtors' estates.  Accordingly, the proposed DIP Facility should be approved on the terms and conditions described in the DIP Term Sheet and the Interim DIP Order, and entry into the DIP Facility reflects a sound exercise of the Debtors' business judgment.

C.     **The Debtors' Prepetition DIP Financing Marketing Efforts**

40.     As described in further detail in the First Day Declaration, during the Investor Outreach Process, the Debtors, with the help of its advisors, reached out to approximately 100 potential third party investors.  Through the Investor Outreach Process, the Debtors and its advisors were unable to find any third parties willing to invest in the Debtors.  During that process, no third parties were interested in providing debtor-in-possession financing unless it was specifically connected to a going concern sale of the Debtors' entire business.  Because there is likely no going concern option, and based on the understanding that no third party would be willing to provide DIP Financing on a junior basis, the Debtors are seeking approval of the DIP Facility negotiated with the DIP Lenders.

41.     The Debtors and the DIP Lenders engaged in good faith, arm's-length negotiations and ultimately agreed to the proposed DIP Facility.  The Debtors submit that the DIP Facility represents the best and only option reasonably available under the current circumstances to address the Debtors' liquidity needs during these Chapter 11 Cases.

40

## BASIS FOR RELIEF REQUESTED

**A.      Obtaining the DIP Facility is a Sound Exercise of Business Judgment.**

42.     After appropriate marketing and analysis, the Debtors have concluded that the DIP

Facility is the best option for financing available under the circumstances of these Chapter 11

Cases.  The Court should authorize the Debtors, as an exercise of the Debtors' sound business

judgment, to (a) enter into the DIP Facility Documents, (b) obtain access to the DIP Facility, and

(c) use the advances of credit under the DIP Facility and Cash Collateral in accordance with the

form of budget attached hereto as **Exhibit C** (as modified from time to time in accordance with

the Interim Order and the DIP Term Sheet).

43.     If an agreement to obtain secured credit does not run afoul of the provisions of, and

policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in

accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re Republic

Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4,

2016); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Debtors

correctly posit that courts will almost always defer to the business judgment of a debtor in the

selection of a lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994)

(approving post-petition loan and receivables facility because such facility "reflect[ed] sound and

prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y.

1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized

on grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose

is not so much to benefit the estate as it is to benefit a party-in-interest.").

44.     Bankruptcy courts generally will not second-guess a debtor's business decisions

when those decisions involve a minimum level of care in arriving at the decision on an informed

basis, in good faith, and in the honest belief that the action was taken in the best interests of the debtor. *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313. To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.' *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citations omitted); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (courts require only that the debtors "show that a sound business purpose justifies such actions") (citations omitted).

45.     Under the circumstances, the Debtors' determination to obtain the debtor-in-possession financing under the terms of the DIP Facility is a sound exercise of their business judgment following a careful evaluation of the alternatives. First, without access to the DIP Facility, the Debtors will be unable to, among other things, fund payroll for their remaining employees, market their assets for sale, conduct an orderly winddown of their businesses, and fund the administration of these Chapter 11 Cases, which would cause immediate and irreparable harm to the Debtors' estates and creditors. Second, the Debtors negotiated the DIP Term Sheet and the other DIP Facility Documents with the DIP Lenders in good faith, at arms' length, and with the assistance of their advisors, and the Debtors believe that the terms of the DIP Facility represent the most favorable terms on which such financing can be obtained under the circumstances. Accordingly, the Court should authorize the Debtors' entry into the DIP Facility Documents as a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims Under Section 364(c) of the Bankruptcy Code.**

46.     The Debtors propose to obtain financing under the DIP Facility by providing the DIP Lenders security interests and liens as set forth in the DIP Facility Documents pursuant to section 364(c) of the Bankruptcy Code. Specifically, the Debtors propose to provide the DIP

Lenders first-priority liens on substantially all of the Debtors' assets with priority over all other claims (subject and subordinate in each case only to the Carve-Out and the Prepetition Permitted Liens).

47.     The Debtors meet the requirements for relief under section 364(c) of the Bankruptcy Code, which provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> 1)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> 2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> 3)  secured by a junior lien on property of the estate that it subject to a lien[.]

11 U.S.C. § 364(c).

48.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts consider whether (a) the debtor made reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (b) the credit transaction benefits the debtor as necessary to preserve estate assets, and (c) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11*; In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40; *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991).  However, section 364 imposes no duty to seek credit from every possible lender.  *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (citation omitted).  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *In re*

43

*Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods.,*

*Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); *In re Ames Dep't Stores*, 115 B.R. at 37–39

(debtor must show that it made reasonable efforts to seek other sources of financing under section

364(a) and (b)).

49.     First, prior to the Petition Date, the Debtors, with the assistance of their advisors,

contacted numerous parties to seek proposals for an investment, including postpetition financing.

No offers were submitted on an unsecured or junior lien basis.  Accordingly, the Debtors submit

that the requirement of section 364 of the Bankruptcy Code that alternative credit on more

favorable terms be unavailable to the Debtors is satisfied.  The Court should, therefore, authorize

the Debtors to provide the DIP Lenders with superpriority administrative expense status for the

obligations under the DIP Facility (the "***DIP Obligations***") as provided for in section 364(c)(1) of

the Bankruptcy Code, with a lien on the Debtors' unencumbered property (if any) pursuant to

section 364(c)(2) of the Bankruptcy Code, and with a junior lien on any property encumbered with

an existing lien pursuant to section 364(c)(3) of the Bankruptcy Code (subject to the priorities for

such liens and claims as set forth in the Interim Order).

50.     Second, the DIP Facility is necessary to preserve the Debtors' estates.  The Debtors

require immediate access to the DIP Facility and to Cash Collateral to fund payroll for their

remaining employees, fund working capital and other general corporate needs, market their assets

for sale, conduct an orderly winddown of their businesses, and fund the administration of these

Chapter 11 Cases for the benefit of their estates and stakeholders.

51.     Third, the terms of the DIP Facility are justified under the circumstances.  The DIP

Facility represents the most favorable source of postpetition financing available to the Debtors and

is designed to provide the Debtors with sufficient liquidity to administer these Chapter 11 Cases,

market their assets, and conduct an orderly winddown of their businesses.  Absent the DIP Facility, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Term Sheet, are fair, reasonable, and adequate.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing pursuant to section 364(c) of the Bankruptcy Code.

**C.     The Debtors Should Be Authorized to Grant Priming Liens.**

52.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

53.     "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender.  However, the debtor must make an effort to obtain credit without priming a senior lien.' *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11.  Consent by secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superiority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were

45

adequately protected.").  What constitutes adequate protection is decided on a case-by-case basis.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis.");  *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept.");  *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis").  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (a) the existing secured creditors have consented or (b) such secured creditors are adequately protected.

54.     The Debtors seek authority to grant liens to the DIP Lenders on a priming basis (subject and subordinate to the Carve-Out and the Prepetition Permitted Liens).  The Debtors respectfully submit that the DIP Facility is appropriate because the proposed priming is consensual and the Debtors are providing adequate protection to secured creditors whose liens are being primed.  First, the DIP Lenders comprise a significant portion of the Prepetition Secured Parties, and have affirmatively consented to the priming features of the DIP Facility.  Indeed, they have actively participated in negotiating the terms of the proposed financing, and have agreed to the form of Interim Order.  Furthermore, the Debtors are providing adequate protection to all Prepetition Secured Parties in the form of superpriority claims and replacement liens.  Finally, the Debtors do not seek to prime any Prepetition Permitted Liens.  Accordingly, the Debtors request approval to grant the DIP Lenders priming liens pursuant to section 364(d)(1) of the Bankruptcy Code.

**D.        The Proposed Adequate Protection Should Be Approved.**

55.        In addition to advances under the DIP Facility, the Debtors require use of Cash Collateral to fund payroll, fund working capital and general corporate needs, market their assets for sale, conduct an orderly winddown, and administer these Chapter 11 Cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

56.        Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  Courts determine what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc*., 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp*., No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr.  D. Del. Dec. 7, 2012);  *In re N.J. Affordable Homes Corp*., No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006);  *In re Columbia Gas Sys., Inc*., Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp*., 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993))

47

(explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

57. The Debtors propose to provide the Prepetition Secured Parties a variety of adequate protection to protect their interests in the Debtors' property from any diminution in value of the Prepetition Collateral (including Cash Collateral) resulting from the use of the Cash Collateral by the Debtors and the imposition of the automatic stay. Such adequate protection includes:

    i. for each of the Super Senior Bridge Loan Lenders (individually or collectively):

        (a) continuing valid, binding, enforceable, and perfected postpetition liens and replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens, Prepetition Permitted Liens, and the NMTC Prepetition Liens on the NMTC Cash Collateral Accounts in accordance with the relative priorities as set forth in **Exhibit C** of the Interim Order and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code;

        (b) administrative superpriority expense claims in each of the Chapter 11 Cases, junior and subordinate only to the Carve-Out and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;

        (c) subject to recharacterization as principal under the Super Senior Bridge Loan Agreement pursuant to separate order of the Court (if any), payment in kind of monthly interest calculated at the non-default rate set forth in the Super Senior Bridge Loan Agreement;

        (d) subject to the procedures set forth in paragraph 38 of the Interim Order, payment of the Super Senior Bridge Loan Lenders' reasonable and documented fees, costs and expenses when due and payable in accordance with the Interim Order, including the professional fees and disbursements of Proskauer Rose LLP and

48

Landis Rath & Cobb LLP, without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date; and

(e) the unconditional right to credit bid the Super Senior Bridge Loan Obligations in connection with any sale of Super Senior Bridge Loan Collateral, including, without limitation, as set forth in paragraph 40 of the Interim Order and subject to paragraph 44 of the Interim Order.

ii.    For the IP Term Loan Agent, for the benefit of the IP Term Loan Secured Parties:

(a) continuing valid, binding, enforceable, and perfected postpetition liens and replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens, Prepetition Permitted Liens Bridge Loan Replacement Liens, Super Senior Bridge Loan Liens, and the NMTC Prepetition Liens on the NMTC Cash Collateral Accounts in accordance with the relative priorities as set forth in **Exhibit C** of the Interim Order and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code;

(b) administrative superpriority expense claims in each of the Chapter 11 Cases, junior and subordinate only to the Bridge Loan Adequate Protection Superpriority Claims, the Carve-Out and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code; and

(c) subject to recharacterization as principal under the IP Term Loan Agreement pursuant to separate order of the Court (if any), payment in kind of monthly interest calculated at the non-default rate set forth of in the IP Term Loan Agreement.

58.    The Debtors, therefore, submit that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties is appropriate.  The Debtors' provision of adequate protection is not only necessary to protect against any diminution in value, but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure that the Debtors are able

49

to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**E.     The Refinancing of a Portion of the Super Senior Bridge Loan Obligations is Appropriate**

59.     The proposed roll-up of the Super Senior Bridge Loan Obligations held by the DIP Lenders is justified under the circumstances.  First, the DIP Lenders specifically negotiated for such prepetition debt refinancing in the context of their commitment to provide the DIP Facility on the terms described herein.  The Debtors, on the one hand, and the DIP Lenders, on the other, engaged in arm's-length negotiations and ultimately agreed to the Super Senior Bridge Loan Refinancing as consideration for, among other things, the DIP Lenders making available millions of dollars in additional "new money" to fund the Chapter 11 Cases.  Indeed, the Super Senior Bridge Loan Refinancing is a condition of the DIP Facility, without which, the DIP Lenders would not have agreed to provide the DIP Loans.

60.     Second, the Super Senior Bridge Loan Refinancing will not prejudice the Debtors' stakeholders.  As of the Petition Date, the Super Senior Bridge Loan Obligations were secured by substantially all of the Debtors' assets, with certain limited exceptions, and the DIP Liens from which the refinanced obligations will benefit, are on substantially the same assets.  Therefore, the refinanced obligations will not benefit from substantially different collateral.

61.     Finally, roll-ups and repayments of prepetition debt, such as the Super Senior Bridge Loan Refinancing, are a common feature of debtor-in-possession financings and have been approved in a variety of cases, including pursuant to interim financing orders.  *See, e.g.*, *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. June 14, 2020) (authorizing an approximately $50 million DIP facility, including a $20 million roll-up); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Jul. 23, 2019) (authorizing an approximately $240

million DIP facility, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re Bon-Ton Stores, Inc.*, No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (authorizing full roll-up of all $489 million outstanding prepetition revolving obligations pursuant to interim order).

**F.    The Debtors Should be Authorized to Use Cash Collateral.**

62.    The Debtors should further be authorized to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor:

> [M]ay not use, sell, or lease cash collateral . . . unless:
>
> > (A) each entity that has an interest in such cash collateral consents; or
> >
> > (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

63.    Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sold, or leased by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." *Id*. § 363(e).

64.    While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what

constitutes sufficient adequate protection on a case-by-case basis. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

65.     The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180–81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

66.     The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in exchange for the provision of adequate protection as described above and provided in the Interim Order.  The adequate protection offered here is traditional and appropriate under the circumstances, and the Debtors should be authorized to use Cash Collateral pursuant to section 363(c) of the Bankruptcy Code.

**G.      The Debtors Should Be Authorized to Pay the Fees Under DIP Facility Documents.**

67.     Subject to Court approval, the Debtors have agreed to pay certain fees of the DIP Lenders in exchange for their agreement to provide the financing under the DIP Facility.  The terms of the financing, which includes the fees payable in connection therewith, is the only realistic

financing available under the circumstances.  The Debtors believe that under these circumstances, authorization to pay the fees is warranted.

**H.      The DIP Lenders Should Be Deemed Good-Faith Lenders Under Bankruptcy Code Section 364(e).**

68.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

69.      The terms of the DIP Facility Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders have offered the most favorable terms under the circumstances, and are the only realistically available terms pursuant to which the Debtors could obtain necessary postpetition financing.  All negotiations of the DIP Facility were conducted in good faith and at arm's length.  The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code.

**I.      The Automatic Stay Should Be Modified on a Limited Basis.**

70.      The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in

order to perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens on account of the DIP Obligations to the DIP Lenders and to incur all liabilities and obligations set forth in the proposed Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an DIP Termination Event (as defined in the Interim DIP Order), the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Facility Documents, or applicable law.

71.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases.  *See, e.g.*, *In re Am. Tire Distrib., Inc.*, No. 14-12391 (CTG) (Bankr. D. Del. Nov. 22, 2024) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (same); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 11, 2024) (same); *In re Appgate, Inc.*, No. 24-10956 (CTG) (Bankr. D. Del. June 12, 2024) (same); *In re MVK FarmCo LLC*, No. 23-11721 (LSS) (Bankr. D. Del. Mar. 15, 2024) (same).

**J.      Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable harm**

72.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Local Rule 4001-2(b).

73.     The Debtors request that the Court enter the Interim Order and authorize the Debtors, from entry of the Interim Order until the Final Hearing, to withdraw and borrow funds under the DIP Facility.  The Debtors will suffer immediate and irreparable harm if the Interim Order approving the DIP Facility is not entered sooner than 14 days after service of the Motion and if the Debtors are not permitted to access the funds provided under the DIP Facility.  As discussed in greater detail above, the Debtors require immediate access to the DIP Facility and Cash Collateral to preserve and maximize the value of their estates and, therefore, to avoid immediate and irreparable harm and prejudice to their estates and all parties in interest.

**<u>REQUEST FOR IMMEDIATE RELIEF</u>**

74.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed herein and in the First Day Declaration, authorizing the Debtors to enter into the DIP Facility Documents, obtain the DIP Loans, use the Cash Collateral and grant the protections to the DIP Secured Parties and the Prepetition Secured Parties as described herein and as set forth in the Interim Order, as well as granting the other relief requested herein, is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors.  Failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases might force the Debtors to shut down their facilities abruptly, potentially causing damage to their equipment, creating health and safety issues, and inhibiting the Debtors' ability to focus on preserving and maximizing the value of their estates.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

RLF1 32594185v.1

## REQUEST FOR FINAL HEARING

75.     Pursuant to Bankruptcy Rules 4001(b)(2), the Debtors request that the Court set a date for a final hearing to consider this Motion that is as soon as practicable, and in no event after 30 days after the Petition Date and fix the time and date prior to the final hearing for parties to file objections to this Motion.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

76.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

77.     Nothing contained in this Motion shall constitute, nor is it intended to constitute, (a) an implication or admission as to the validity, priority, enforceability, or perfection of any claim, lien, security interest in, or other encumbrance against the Debtors and the property of their Estates, (b) an impairment or waiver of the Debtors' or any other party in interest's rights to contest or dispute any such claim or lien, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any proposed order, (e) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

## NOTICE

78.      Notice of this Motion has been provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Ad Hoc Group of DIP Lenders; (c) counsel to the Super Senior Bridge Loan Lenders; (d) counsel to the IP Term Loan Lenders; (e) counsel to the Carver Parties; (f) counsel to the MB Lenders; (g) counsel to the DSKY Party; (h) the Debtors' 30 largest unsecured creditors (on a consolidated basis); (i) those parties entitled to notice pursuant to Local Rule 9013-1(m); (j) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (k) the Securities and Exchange Commission; (l) the Internal Revenue Service; (m) all other applicable government agencies to the extent required by the Bankruptcy Rules or the Local Rules; and (n) financial institutions where the Debtors hold bank accounts.  In light of the nature of the relief requested in this Motion, the Debtors submit that no further notice is necessary.

## NO PRIOR REQUEST

79.      No prior motion for the relief requested herein has been made to this Court or any other court.

## PRAYER

80.      The Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and subsequently the Final Order, and grant them such other and further relief to which the Debtors may be justly entitled.

*[The remainder of this page is intentionally left blank]*

57

Dated: March 19, 2025
Wilmington, DE

/s/ Matthew P. Milana
**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-770
Email: defranceschi@rlf.com; shapiro@rlf.com;
        milana@rlf.com

- and -

**VINSON & ELKINS LLP**

George R. Howard (*pro hac vice* admission pending)
David S. Meyer (*pro hac vice* admission pending)
The Grace Building
1114 Avenue of the Americas, 32nd Floor
New York, New York 10036-7708
Tel: (212) 237-0000
Fax: (212) 237-0100
Email: ghoward@velaw.com; dmeyer@velaw.com;

- and -

Trevor G. Spears (*pro hac vice* admission pending)
Sara Zoglman (*pro hac vice* admission pending)
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Tel:  (214) 220-7700
Fax: (214) 220-7716
Email: tspears@velaw.com; szoglman@velaw.com

*Proposed Attorneys for the Debtors and Debtors in
Possession*

## EXHIBIT A

**Form of Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DANIMER SCIENTIFIC, INC., *et al.*, | ) | Case No. 25 – 10518 (MFW) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. __** |
|  | ) |  |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SENIOR SECURED FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon the motion, dated March 19, 2025 (the "***Motion***") of the debtors and debtors in possession (collectively, the "***Debtors***") in the above-captioned chapter 11 cases (collectively, the "***Chapter 11 Cases***"), seeking entry of an interim order (this "***Interim Order***")[2] and, subsequently, a Final Order (as defined herein) pursuant to sections 105, 361, 362, 363, 364, 503, 507, and 552 of title 11 of the United States Code (as amended, the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rules 2002-1, 4001-2 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are: Danimer Scientific, Inc. (4518); Danimer Bioplastics, Inc. (8734); Danimer Scientific Holdings, LLC (8521); Danimer Scientific Kentucky, Inc. (6371); Danimer Scientific Manufacturing, Inc. (0322); Danimer Scientific, L.L.C. (7346); Meredian Bioplastics, Inc. (5822); Meredian Holdings Group, Inc. (7239); Meredian, Inc. (7507); and Novomer, Inc. (4173). The location of the Debtors' corporate headquarters is: 140 Industrial Boulevard, Bainbridge, Georgia, 39817.

[2] Capitalized terms used in this Interim Order but not defined herein shall have the meanings given to them in the DIP Term Sheet (as defined below).

(the "***Local Rules***") of the United States Bankruptcy Court for the District of Delaware (the "***Court***"), *inter alia*:

(i)    authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis (the "***DIP Facility***" and the loans thereunder, the "***DIP Loans***") equal to $15,000,000 consisting of:

        (a)    a new money term loan facility in the aggregate principal amount of up to $1,000,000 (the "***New Money Term Loan***") of which $1,000,000 shall be available upon entry of the Interim Order (the "***New Money Term Loan Amount***"),

        (b)    a delayed draw new money term loan facility in the aggregate principal amount of up to $2,000,000 (the "***New Money DDTL***", and together with the New Money Term Loan, the "***New Money DIP Loans***") available upon entry of the Final Order, subject to the terms and conditions (including the draw conditions) set forth in the DIP Term Sheet (the "***New Money DDTL Amount***" and, together with the New Money Term Loan Amount, the "***New Money Amount***"), and

        (c)    a roll-up, to be effected on or immediately after the entry, and in accordance with the terms of the Final Order, of certain Super Senior Bridge Loan Obligations (as defined below) in the Roll-Up Amount (as defined below) on a cashless dollar-for-dollar basis into DIP Loans under the DIP Facility, in each case, pursuant to the terms and conditions of this Interim Order, the Final Order, the Approved Budget (as defined below), and that certain term sheet attached hereto as **Exhibit A** (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "***DIP Term Sheet***"), by and among Danimer Scientific Inc., as borrower, the Guarantors, WSFS Bank, as administrative agent (in such capacity, the "***DIP Agent***"), and the lenders party thereto from time to time (the "***DIP Lenders***," and together with the DIP Agent, the "***DIP Secured Parties***");

(ii)    approving the terms of and authorizing each of the Debtors to enter into and perform under the DIP Term Sheet and any other agreements, instruments, and documents related thereto or concurrently or subsequently executed in connection therewith (collectively, the "***DIP***

***Documents***"), which shall be on terms consistent with the terms set forth in the DIP Term Sheet and otherwise in form and substance acceptable to the Required DIP Lenders (or as otherwise provided in the DIP Documents), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    authorizing each of the Debtors to incur all obligations under the DIP Documents to the DIP Secured Parties, including, after entry of the Final Order, the Roll-Up Obligations (as defined below) (collectively, the "***DIP Obligations***"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below), subject only to the Carve-Out and Prepetition Permitted Liens (each as defined below);

(iv)    subject to the terms of this Interim Order, granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and priming liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date (as defined below)) and any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (as defined below) (collectively, "***Cash Collateral***"), which liens shall be in accordance with the relative lien priorities set forth in **Exhibit C** of this Interim Order;

(v)    authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral to: (a) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the

3

Approved Budget, this Interim Order, and the DIP Documents; (b) make permitted adequate protection payments as specified below; (c) pay the principal, interest, fees, expenses, and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, the DIP Fees (as defined below) and the fees and expenses of the DIP Professionals (as defined below); and (d) any other purposes agreed upon in the DIP Documents, in each case solely in accordance with the Approved Budget, this Interim Order, and the DIP Documents;

(vi)    authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral, on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition Secured Parties (as defined below) for any Diminution (as defined below) of their interests in the Prepetition Collateral, including the Cash Collateral;

(vii)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(viii)    authorizing the Required DIP Lenders and the DIP Agent at the direction of the Required DIP Lenders, upon the occurrence of an Event of Default (as defined below) and upon three business days' notice to the Debtors: to (1) terminate the funding obligations under the DIP Documents in accordance with their terms; (2) declare the DIP Obligations to be immediately due and payable in full, to the extent permitted by the terms thereof; and (3) subject to this Interim Order, be granted relief from the automatic stay to foreclose on the DIP Liens and DIP Collateral;

4

(ix)    approving the stipulations in paragraph G of this Interim Order by the Debtors with respect to the Prepetition Loan Documents and the liens and security interests arising therefrom subject to the Challenge Period described in paragraph 44 hereof;

(x)    authorizing payment of the DIP Fees;

(xi)    waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order and providing for the immediate effectiveness of this Interim Order;

(xii)    scheduling a final hearing (the "***Final Hearing***") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

(xiii)    granting related relief.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of Frank A. Pometti in Support of Chapter 11 Cases and First-Day Motions* (the "***First Day Declaration***"), the DIP Term Sheet, all other DIP Documents, and the evidence submitted and argument made at the interim hearing (the "***Interim Hearing***"); and notice of the Interim Hearing having been provided in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates (the "***Estates***") pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their Estates and all parties-in-interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and it appearing that the Debtors' entry into the DIP Term Sheet and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

Based upon the record established at the Interim Hearing, the Court makes the following findings of fact and conclusions of law:[3]

A.      <u>Disposition</u>.  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.      <u>Petition Date</u>.  On March 18, 2025 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

C.      <u>Debtors in Possession</u>.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed.

D.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363, 364, 503, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, 9006-1, and 9013-1.

E.    <u>Committee</u>.  As of the date hereof, no statutory committee has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "***Committee***").

F.    <u>Notice</u>.  Appropriate notice of the Motion and the Interim Hearing has been provided under the circumstances in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of, or hearing regarding, the entry of this Interim Order and the relief set forth herein is necessary or required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending a Final Hearing.

G.    <u>Debtors' Stipulations</u>.   Subject to paragraph 44 hereof: (i) each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations (as defined below), shall be binding upon the Debtors, their Estates, and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and (ii) the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the Petition Date.  Without prejudice to the rights of parties in interest as expressly set forth in paragraph 44 herein, the Debtors, in requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Secured Parties to provide the DIP Facility, on their own behalf and on behalf of their Estates and all representatives of such Estates, admit, stipulate, acknowledge,

7

and agree as follows (paragraphs G(i) through G(xi) below are referred to, collectively, as the

"***Debtors' Stipulations***"):

(i) *Super Senior Bridge Loan Documents*.  Pursuant to that certain Super Senior Secured Uninsured Promissory Note, dated as of December 17, 2024 (as amended, supplemented, restated, amended and restated, or otherwise modified prior to the Petition Date, the "***Super Senior Bridge Loan Agreement***," and collectively with the other Loan Documents (as defined in the Super Senior Bridge Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date, the "***Super Senior Bridge Loan Documents***"), by and among (a) Danimer Scientific, Inc. as issuer (the "***Super Senior Bridge Loan Issuer***") and a grantor, (b) the other grantors and guarantors party thereto (together with the Super Senior Bridge Loan Issuer, the "***Super Senior Bridge Loan Parties***"), and (c) the Payees (as defined therein) party thereto from time to time (the "***Super Senior Bridge Loan Lenders***"), the Super Senior Bridge Loan Lenders agreed to extend Loans (as defined in the Super Senior Bridge Loan Agreement) (the "***Super Senior Bridge Loan Facility***") and other financial accommodations to the Super Senior Bridge Loan Parties pursuant to the Super Senior Bridge Loan Documents.

(ii) *Super Senior Bridge Loan Obligations*.  As of the Petition Date, the Super Senior Bridge Loan Parties were, as applicable, justly and lawfully indebted and liable to the Super Senior Bridge Loan Lenders without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate amount of not less than $15,239,485.92 pursuant to, and in accordance with the terms of, the Super Senior Bridge Loan Documents, plus accrued and unpaid interest, fees, premiums, expenses, disbursements (including attorneys' fees and financial advisors' fees and related expenses and disbursements), indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, chargeable, or reimbursable under the Super Senior Bridge Loan Documents incurred in connection therewith as provided in the Super Senior Bridge Loan Documents (collectively, the "***Super Senior Bridge Loan Obligations***").

(iii) *Super Senior Bridge Loan Liens*.  As more fully set forth in the Super Senior Bridge Loan Documents, prior to the Petition Date, the Super Senior Bridge Loan Parties granted to the Super Senior Bridge Loan Lenders a first-priority security interest in, and continuing lien on (the "***Super Senior Bridge Loan Liens***"), all Collateral (as defined in the Super Senior Bridge Loan Documents) (including Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, subject to exclusions for, among other things, certain

8

Excluded Assets (as defined in the Super Senior Bridge Loan Agreement) (the "***Super Senior Bridge Loan Collateral***").  For avoidance of doubt, the Super Senior Bridge Loan Collateral does not include the NMTC Cash Collateral Accounts.[4]

(iv) *IP Term Loan Documents*.  Pursuant to that certain Financing Agreement, dated as of March 17, 2023 (as amended, supplemented, restated, amended and restated, or otherwise modified prior to the Petition Date, the "***IP Term Loan Agreement***", and collectively with the other Loan Documents (as defined in the IP Term Loan Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, waived, or otherwise modified prior to the Petition Date (the "***IP Term Loan Documents***," and together with the Super Senior Bridge Loan Documents, the "***Prepetition Loan Documents***")), by and among (a) Danimer Scientific, Inc. as borrower (the "***IP Term Loan Borrower***"), (b) the guarantors party thereto (together with the IP Term Loan Borrower, the "***IP Term Loan Parties***"), (c) the lenders from time to time party thereto (the "***IP Term Loan Lenders***" and together with the Super Senior Bridge Loan Lenders, the "***Prepetition Lenders***"), and (d) U.S. Bank Trust Company, National Association, as administrative agent and collateral agent (in such capacities, the "***IP Term Loan Agent***" and, together with the IP Term Loan Lenders and the other Secured Parties (as defined in the IP Term Loan Documents), the "***IP Term Loan Secured Parties***", and together with the Super Senior Bridge Loan Lenders, the "***Prepetition Secured Parties***"), the IP Term Loan Lenders agreed to extend a term loan facility (the "***IP Term Loan Facility***" and together with the Super Senior Bridge Loan Facility, the "***Prepetition Facilities***") and other financial accommodations to the IP Term Loan Parties pursuant to the IP Term Loan Documents.

(v) *IP Term Loan Obligations*.  As of the Petition Date, the IP Term Loan Parties were, as applicable, justly and lawfully indebted and liable to the IP Term Loan Lenders without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate amount of not less than $124,541,770.69  pursuant to, and in accordance with the terms of, the IP Term Loan Documents, plus accrued and unpaid interest, fees, expenses, disbursements (including attorneys' fees and financial advisors' fees and related expenses and disbursements),

---

[4]  "***NMTC Cash Collateral Accounts***" refers to the designated accounts set forth on Schedule 1 to the DIP Term Sheet secured by liens ("***NMTC Prepetition Liens***") securing the Debtors' obligations under their NMTC Facilities. "***NMTC Facilities***" means, collectively, (i) the loans extended under that certain Loan Agreement, dated as of April 25, 2019 by and among (a) Danimer Manufacturing, Inc. as borrower, (b) Carver Development CDR VI, LLC, and (c) ST CDE LXII, LLC; (ii) the loans extended under that certain Loan Agreement, dated as of August 23, 2022 by and among (a) Meredian Bioplastics, Inc., (b) HRV SUB-CDE 45, L.L.C., (c) AMCREF FUND 76, LLC, (d) ST CDE LXXXIII, LLC, and (e) CDVCA 23, LLC; and (iii) the loans extended under that certain Loan Agreement, dated as of November 7, 2019 by and among (a) Meredian Bioplastics, Inc. as the borrower and (b) AMCREF FUND 51, LLC.

9

indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, chargeable, or reimbursable under the IP Term Loan Documents incurred in connection therewith as provided in the IP Term Loan Documents (collectively, the "***IP Term Loan Obligations***", and together with the Super Senior Bridge Loan Obligations, the "***Prepetition Obligations***").

(vi) *IP Term Loan Liens*.  As more fully set forth in the IP Term Loan Documents, prior to the Petition Date, the IP Term Loan Parties granted to the IP Term Loan Secured Parties a first-priority security interest in, and continuing lien on (the "***IP Term Loan Liens***", and together with the Super Senior Bridge Loan Liens, the "***Prepetition Liens***"), on all Collateral (as defined in the IP Term Loan Documents) (including Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, subject to exclusions for, among other things, certain Excluded Assets (as defined in the IP Term Loan Agreement) (the "***IP Term Loan Collateral***", and together with the Super Senior Bridge Loan Collateral, the "***Prepetition Collateral***").  For avoidance of doubt, the IP Term Loan Collateral does not include the NMTC Cash Collateral Accounts.

(vii) *Validity, Extent, Perfection and Priority of Prepetition Liens and Prepetition Obligations.*  The Debtors acknowledge and agree that as of the Petition Date: (a) the Prepetition Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to (x) the Carve-Out, and (y) liens senior by operation of law and otherwise permitted by the Prepetition Loan Documents solely to the extent any such permitted liens (1) were in existence on the Petition Date, (2) are valid, unavoidable and properly perfected as of the Petition Date or perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, (3) are senior in priority to the Super Senior Bridge Loan Obligations, (4) are permitted to be incurred as senior priority liens under the Prepetition Loan Documents, and (5) are expressly identified on Schedule 1 hereto, (the "***Prepetition Permitted Liens***"); (d) the Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the applicable Debtors enforceable in accordance with the terms of the applicable Prepetition Loan Documents, and there exists no basis upon which the Debtors or their subsidiaries can properly challenge or avoid the validity, enforceability, priority, or perfection of the Prepetition Obligations or the Prepetition Liens; (e) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or the Prepetition Obligations exist, and no portion of the Prepetition Liens or the Prepetition Obligations is subject to any challenge or defense, including attachment, avoidance, disallowance, disgorgement, impairment, reduction, recharacterization, recovery, or

10

subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law (foreign or domestic); (f) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition Loan Documents or the Prepetition Obligations; (g) the Debtors waive, discharge, and release any right to challenge any of the Prepetition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens (whether arising from subrogation, reimbursement, or otherwise); and (h) subject to any exceptions, exclusions, or limitations provided for in the applicable Prepetition Loan Documents, all of the Debtors' cash, cash equivalents, negotiable instruments, investment property, and securities, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral, and the proceeds of any of the foregoing, wherever located, is the Cash Collateral within the meaning of section 363(a) of the Bankruptcy Code of all (or certain of) the Prepetition Secured Parties, as more fully described in the Prepetition Loan Documents. The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from Cash Collateral, all of which (subject to any exceptions, exclusions, or limitations provided for in the applicable Prepetition Loan Documents) constitute Prepetition Collateral subject to the applicable Prepetition Liens.  All Cash Collateral and all proceeds of the Prepetition Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, shall be used and/or applied in accordance with the terms and conditions of this Interim Order and the applicable Prepetition Loan Documents, and for no other purpose.

(viii)   The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated from the Prepetition Collateral and acquire equipment, inventory, and other personal property, all of which (subject to any exceptions, exclusions, or limitations provided for in the applicable Prepetition Loan Documents) constitute Prepetition Collateral subject to the applicable Prepetition Liens.

(ix) The Debtors desire to use a portion of such cash, rents, income, offspring, products, proceeds, and profits in their business operations that constitute Cash Collateral of certain of the Prepetition Secured Parties under section 363(a) of the Bankruptcy Code.  Certain prepetition rents, income, offspring, products, proceeds, and profits, in existence as of the Petition Date, including balances of funds in certain of the Debtors' prepetition and postpetition operating bank accounts, also constitute Cash Collateral that is subject to the applicable Prepetition Secured Parties' valid and perfected security interests.

11

(x) *No Claims or Causes of Action*.  The Debtors stipulate that no claims or causes of action exist against, or with respect to, any of the Prepetition Secured Parties and each of their respective representatives under any agreements by and among the Debtors and any such party that is in existence as of the Petition Date.

(xi) *No Control*.  The Debtors stipulate that none of the DIP Secured Parties or Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Documents, the Prepetition Facilities, the Prepetition Liens, the Prepetition Obligations, the Prepetition Loan Documents, or the transactions contemplated hereunder or thereunder.

H.    Releases.  Subject to paragraph 44 hereof, the Debtors, on behalf of themselves and their respective Estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases, and any party acting by, through or under the Debtors or their Estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit each of the DIP Secured Parties, the Prepetition Secured Parties (in each case, solely in their capacity as such) and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, each solely in their capacity as such (collectively, the "***Released Parties***") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the date of this Interim Order of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity

12

or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the DIP Documents, the Prepetition Loan Documents, the negotiation thereof and of the transactions contemplated thereby and the obligations owing and the financial obligations made thereunder, or otherwise related to the Debtors, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.  The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations that the Debtors may now have or may claim to have against the Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to this Court entering this Interim Order.

I.    <u>Findings Regarding Postpetition Financing</u>

(i)    *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer their Chapter 11 Cases and fund their operations in accordance with the Approved Budget, DIP Term Sheet, and any other DIP Documents.  At the Final Hearing, the Debtors will seek final approval of the DIP Facility and use of Cash Collateral pursuant to a proposed final order (the "***Final Order***" and, together with this Interim Order, the "***DIP Orders***"), which shall be in form and substance acceptable to the Required DIP Lenders and the Debtors.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)    *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the

13

DIP Documents and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their Estates and creditors, and the Debtors would not be able to obtain debtor-in-possession financing in a sufficient amount without the Court granting such priming liens. Consistent with the requirements of section 364(d) of the Bankruptcy Code, the Prepetition Secured Parties shall receive adequate protection as set forth in this Interim Order, pursuant to sections 361, 363, and 364 of the Bankruptcy Code, against any postpetition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, (i) the use, sale, or lease by the Debtors of such collateral, (ii) the use of Cash Collateral by each of the Debtors, (iii) the imposition of the automatic stay, and (iv) the subordination of the Prepetition Liens and Prepetition Obligations to the Carve-Out, the DIP Liens, and the DIP Obligations, in each case, as set forth in this Interim Order (collectively, "***Diminution***").

(iii)    *Need for Postpetition Financing and Use of Cash Collateral.* The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) pay the fees, costs and expenses incurred in connection with the Chapter 11 Cases, (ii) fund any obligations benefitting from the Carve-Out, (iii) effectively conduct a marketing of their assets for sale and pursue an orderly winddown, (iv) maintain business relationships with customers, vendors and suppliers, (v) make payroll, and (vi) satisfy other working capital and operational needs. The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the Debtors' estates for the benefit of all stakeholders. Immediate and irreparable harm will be caused to the Debtors and their Estates if immediate financing is not obtained and permission to use Cash Collateral is not granted.

14

The terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration. The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(iv)     *No Credit Available on More Favorable Terms.*  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors. Given their current financial condition, financing arrangements, capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. Further, the Prepetition Secured Parties are adequately protected and have consented to the Debtors incurring debtor-in-possession financing, the priming of the Prepetition Liens, and the use of their Cash Collateral, only on the terms and subject to the conditions set forth in the DIP Documents and this Interim Order. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Secured Parties: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein; (2) superpriority claims and priming liens to the extent set forth in this Interim Order, the DIP Term Sheet, and the other DIP Documents; and (3) the other protections set forth in this Interim Order.

(v)      *Use of Cash Collateral and Proceeds of the DIP Facility*.  As a condition to the Debtors' entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Prepetition Collateral, including Cash Collateral, the Debtors have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget, subject to Permitted Variances (as defined below).

(vi)      *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order, the DIP Documents, and in accordance with the relative lien priorities set forth in **Exhibit C** of this Interim Order.

(vii)  *Roll-Up of Super Senior Bridge Loan Obligations Into DIP Obligations*. Immediately upon entry of the Final Order, subject only to paragraph 44 of this Interim Order, and without any further action by the Debtors or any other party, the Super Senior Bridge Loan Obligations held by the DIP Lenders (or their affiliates) shall be "rolled up" and converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations (the "***Roll-Up Obligations***"), on a *pro rata* basis according to the DIP Lenders' holdings under the DIP Facility in a ratio of 4:1 of the total DIP Commitment (the "***Roll-Up Amount***").  The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Super Senior Bridge Loan Lenders, as DIP Lenders, to fund amounts and provide other consideration to the Debtors under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Obligations.  Notwithstanding

4923-7661-1369v.12
RLF1 32594186v.1

any other provision of this Interim Order or the DIP Documents, all rights of the Prepetition Secured Parties (except with respect to the Roll-Up Obligations which shall be subject to the rights of the DIP Lenders under the DIP Facility) shall be fully preserved. The Roll-Up Obligations are an inextricable component of the DIP Facility, and the Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of the Prepetition Liens to the DIP Liens, and the DIP Secured Parties would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Obligations in the DIP Obligations. The Roll-Up Obligations will enable the Debtors to obtain urgently needed financing to administer these Chapter 11 Cases and fund their operations.

J.      <u>Adequate Protection</u>.  In exchange for their consent to (i) the priming of the Prepetition Liens by the Carve-Out and the DIP Liens and (ii) the use of Cash Collateral to the extent set forth in this Interim Order, the Prepetition Secured Parties shall receive adequate protection to the extent of any Diminution of their interests in the Prepetition Collateral, as more fully set forth in this Interim Order.

K.      <u>Good Faith of the DIP Secured Parties</u>.

(i)      *Willingness to Provide Financing*.  The DIP Secured Parties have committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and those set forth in the DIP Documents; (c) satisfaction or waiver of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' Estates, that the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' first priority secured claims, superpriority claims, security interests and

17

liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e).*  Based on the Motion, the First Day Declaration, and the record presented to the Court at the Interim Hearing, (a) the terms of the financing embodied in the DIP Facility, including the Roll-Up Obligations, fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, (b) the adequate protection authorized by the Interim Order and DIP Documents and (c) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, were validly authorized by the Debtors without the need for any other or further approvals under applicable state or federal law, constitute reasonably equivalent value and fair consideration, and represent the best financing (and terms) available under the circumstances.  The use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties and the Prepetition Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

(iii)    *Consent to DIP Facility and Use of Cash Collateral.*  The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the Debtors' entry into the DIP Documents solely in accordance with and subject to the terms and conditions in this Interim Order, the DIP Documents.

L.    <u>Good Cause</u>.  Good cause has been shown for immediate entry of this Interim

Order, and the entry of this Interim Order is in the best interests of the Debtors, the Estates and their stakeholders. Among other things, the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to fund payroll obligations, to pay amounts owed to vendors, suppliers, landlords and to satisfy other critical expenses, including the payment of premiums on insurance policies, each as necessary to maximize the value of the Estates and in accordance with the Approved Budget. The terms of the Debtors' DIP Facility, use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

M.     <u>Immediate Entry</u>. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.     <u>DIP Financing Approved</u>. The Motion is granted on an interim basis as set forth herein, and entry into the DIP Term Sheet and other existing and subsequently executed DIP Documents are authorized and approved, and the use of Cash Collateral is authorized, in each case, subject to the terms and conditions set forth in this Interim Order. All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits. This Interim Order shall become effective immediately upon its entry.

4923-7661-1369v.12
RLF1 32594186v.1

<u>DIP Facility Authorization</u>

2.      <u>Authorization of the DIP Financing</u>.

(i)      The Debtors are expressly and immediately authorized and empowered to enter into, execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents without the need for any other or further consents or approvals under applicable state or federal law.  Upon execution and delivery, the DIP Documents shall represent legal, valid, and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms.  Each manager, member, or officer of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such manager's, member's, or officer's respective authority to act in the name of and on behalf of the applicable Debtor; <u>provided that</u> the DIP Term Sheet shall be deemed executed and delivered upon entry of this Interim Order.

(ii)      The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Documents) subject to and in accordance with the terms hereof and thereof, including, without limitation, the DIP Fees, as well as the reasonable and documented fees and disbursements of Proskauer Rose

20

LLP, Landis Rath & Cobb LLP, and any other DIP Professionals (as defined below), as set forth herein and in the DIP Documents and subject to the provisions of paragraph 38 of this Interim Order, whether or not such professional fees and disbursements arose before or after the Petition Date and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Documents.

3.    <u>Authorization to Borrow</u>.    To prevent immediate and irreparable harm to the Debtors' Estates, and to enable the Debtors to continue to operate their business and preserve and maximize the value of their Estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow the New Money Term Loan Amount, subject to any limitations on, or conditions to, borrowing under the DIP Documents, which borrowings shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors and to pay interest, fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents, and the Approved Budget.

4.    <u>DIP Obligations</u>.    The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.    All DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "***Successor Cases***").    Upon entry of this Interim Order, and subject to the Carve-Out, the DIP Obligations will include all loans, guarantees, reimbursement obligations, and any other indebtedness or obligations, contingent or

21

absolute, which may now or from time to time be owing by any of the Debtors to the DIP Secured Parties, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the Termination Date (as defined below).  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Lien) to the DIP Secured Parties, and including in connection with any adequate protection provided hereunder, shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.    <u>DIP Collateral</u>.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders), is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition

4923-7661-1369v.12
RLF1 32594186v.1

first priority security interests in and liens on (collectively, the "***DIP Liens***") the DIP Collateral, and all cash and non-cash proceeds, rents, profits, and offspring of DIP Collateral.[5]

6. <u>DIP Liens</u>. The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority to the Prepetition Liens on the Prepetition Collateral and are superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral (whether currently existing or hereafter created), except that the DIP Liens shall be subject only to (i) the Carve-Out, (ii) the Prepetition Permitted Liens, and (iii) the NMTC Prepetition Liens and shall have the priories set forth in **<u>Exhibit C</u>** of this Interim Order. Other than as expressly set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11

---

[5]   "***DIP Collateral***" means: all property of the estate under section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located), instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate, furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, including the Deposit Claim, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) subject to entry of a Final Order providing for such relief, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (c) subject to entry of the Final Order, proceeds from the Debtors' exercise of rights under section 506(c) and 550 of the Bankruptcy Code; (d) all Prepetition Collateral, (e) all property of the Debtors that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date, (f) NMTC Cash Collateral Accounts and (g) all proceeds from the sale, assignment, or other disposition of (i) any leased real property and (ii) the Debtors' right to select, identify, and designate which commercial leases may be assumed and assigned under section 365 of the Bankruptcy Code. Notwithstanding the foregoing, DIP Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable nonbankruptcy law to attach to any such real property lease.

Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7. <u>DIP Superpriority Claims</u>. Subject to the Carve-Out, upon entry of this Interim Order, the DIP Secured Parties are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "***DIP Superpriority Claims***") for all DIP Obligations: (a) except as expressly set forth herein (including with respect to the Carve-Out), with priority over any and all administrative expense claims and unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their Estates, and any successor trustee or other estate representative to the extent permitted by law.

8. <u>DIP Roll-Up Obligations</u>. Immediately upon entry of the Final Order, the Roll-Up Obligations shall be converted in an amount equal to the Roll-Up Amount on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations without any further action by the Debtors or any other party.

4923-7661-1369v.12
RLF1 32594186v.1

9.      <u>No Obligation to Extend Credit</u>.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required DIP Lenders in their sole discretion in accordance with the terms of the DIP Documents.

10.      <u>Use of Proceeds of DIP Facility</u>.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and only in compliance with the Approved Budget (subject to the Permitted Variances (as defined below)) and the terms and conditions in this Interim Order and the DIP Documents (a) to pay transaction costs, fees and expenses that are incurred in connection with the DIP Facility, (b) to pay professional fees of the Debtors and their Estates and the Committee, if any, (c) for working capital and other general corporate purposes permitted by the DIP Documents, and (d) to pay Statutory Fees (as defined herein at paragraph 35(i)).  Subject to entry of the Final Order, the deemed proceeds of the Roll-Up Obligations shall be used to refinance on a cashless 4:1 basis the Prepetition Obligations held by the DIP Lenders in their capacity as Super Senior Bridge Loan Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined in the Super Senior Bridge Loan Agreement) by such amount.

11.      <u>No Monitoring Obligation</u>.  The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Facility, and the DIP Secured Parties may rely upon the Debtors' representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents and in compliance with the Approved Budget (subject to the Permitted Variances).

25

<u>Authorization to Use Cash Collateral</u>

12.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the expiration of the Remedies Notice Period (as defined below) following the Termination Date.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as expressly permitted by this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances).

13.    <u>Consent of Prepetition Secured Parties</u>.  The Prepetition Secured Parties hereby consent to (a) the provisions of this Interim Order including the Debtors' entry into the DIP Facility on an interim basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein (including the Carve-Out), and (c) the Approved Budget.

14.    <u>Adequate Protection for Prepetition Secured Parties</u>.  As adequate protection for any Diminution of the Prepetition Secured Parties' interests in their respective Prepetition Collateral:

(i) each of the Super Senior Bridge Loan Lenders (individually or collectively) shall receive:

(a) continuing valid, binding, enforceable, and perfected postpetition liens and replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens, Prepetition Permitted Liens,

26

and the NMTC Prepetition Liens on the NMTC Cash Collateral Accounts in
accordance with the relative priorities as set forth in **Exhibit C** of this Interim
Order (the "***Bridge Loan Replacement Liens***") and which (x) shall otherwise
be senior to all other security interests in, liens on, or claims against the DIP
Collateral, and (y) shall not be made subject to or *pari passu* with any lien or
security interest heretofore or hereinafter granted in the Chapter 11 Cases or
any Successor Cases and shall be valid and enforceable against any trustee
appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not
be subject to sections 510, 549, or 550 of the Bankruptcy Code;

(b) administrative superpriority expense claims in each of the Chapter 11 Cases (the
"***Bridge Loan Adequate Protection Superpriority Claims***"), junior and
subordinate only to the Carve-Out and the DIP Obligations (including the DIP
Superpriority Claims), pursuant to section 507(b) with priority over any and all
other administrative expenses, administrative expense claims and unsecured
claims against the Debtors or their Estates, now existing or hereafter arising, of
any kind or nature whatsoever as to and to the extent provided by sections
503(b) and 507(b) of the Bankruptcy Code;

(c) subject to recharacterization as principal under the Super Senior Bridge Loan
Agreement pursuant to separate order of the Court (if any), payment in kind of
monthly interest calculated at the non-default rate set forth in the Super Senior
Bridge Loan Agreement;

(d) subject to the procedures set forth in paragraph 38 of this Interim Order,
payment of the Super Senior Bridge Loan Lenders' reasonable and documented

27

fees, costs and expenses when due and payable in accordance with this Interim Order, including the professional fees and disbursements of Proskauer Rose LLP and Landis Rath & Cobb LLP, without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date; and

(e) the unconditional right to credit bid the Super Senior Bridge Loan Obligations in connection with any sale of Super Senior Bridge Loan Collateral, including, without limitation, as set forth in paragraph 40 hereof and subject to paragraph 44 hereof.

(ii) the IP Term Loan Agent shall receive, for the benefit of the IP Term Loan Secured Parties:

(a) continuing valid, binding, enforceable, and perfected postpetition liens and replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens, Prepetition Permitted Liens Bridge Loan Replacement Liens, Super Senior Bridge Loan Liens, and the NMTC Prepetition Liens on the NMTC Cash Collateral Accounts in accordance with the relative priorities as set forth in **Exhibit C** of this Interim Order (the "*IP Replacement Liens*" and together with the Bridge Loan Replacement Liens, the "*Replacement Liens*") and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall

28

be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code;

(b) administrative superpriority expense claims in each of the Chapter 11 Cases (the "*IP Adequate Protection Superpriority Claims*" and together with the Bridge Loan Adequate Protection Superpriority Claims, the "*Adequate Protection Superpriority Claims*"), junior and subordinate only to the Bridge Loan Adequate Protection Superpriority Claims, the Carve-Out and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code; and

(c) subject to recharacterization as principal under the IP Term Loan Agreement pursuant to separate order of the Court (if any), payment in kind of monthly interest calculated at the non-default rate set forth of in the IP Term Loan Agreement.

15.     <u>Adequate Protection Reservation</u>.    Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection

29

provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected, and this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

<div align="center">Provisions Common to DIP Financing and Use of Cash Collateral</div>

16.    <u>Amendment of the DIP Documents</u>.  The Debtors, the DIP Agent and the Required DIP Lenders (or such DIP Lenders as may otherwise be required in the DIP Documents) may enter into one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent, and the Required DIP Lenders (or such DIP Lenders as may otherwise be required in the DIP Documents) agree, in such applicable DIP Lenders' sole discretion, and no further approval of this Court shall be required for any amendment, waiver, consent, or other modification to and under the DIP Documents (and any fees paid in connection therewith) that does not materially and adversely affect the Debtors or which does not (i) shorten the maturity of the DIP Facility, (ii) increase the principal amount of or the rate of interest on the DIP Facility, or (iii) change any event of default, add any covenants, or amend the covenants to be materially more restrictive; <u>provided</u>, <u>however</u>, any such material amendment, waiver, consent, or other modification shall be subject to further Court approval.  Copies of all amendments and modifications to and under the DIP Documents, regardless of materiality, shall be provided to the U.S. Trustee and the Committee, if any.  No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties, including to any such amendment, waiver, consent, or modification shall be implied by any action, inaction, or acquiescence of the DIP Secured Parties or the Prepetition Secured Parties, as applicable.

<div align="center">30</div>

17.     <u>Approved Budget; Permitted Variances; Debtor Professional Reports</u>.

(i)      Attached to this Interim Order as **<u>Exhibit B</u>** is a 13-week budget approved by the Required DIP Lenders, which sets forth, among other things, projected cash receipts and cash disbursements (the "***Approved Budget***").  Commencing on April 1, 2025 at 5:00 p.m. (Eastern Time) and continuing on each two-week anniversary thereafter (or such other times as the Debtors may elect with the consent of the Required DIP Lenders), the Debtors shall deliver to counsel to the DIP Lenders, the Committee, and the U.S. Trustee an updated budget (an "***Updated Budget***") with the form and level of detail set forth in the Initial Budget, and shall include, weekly basis cash revenues, receipts, expenses, professional fees, and other disbursements, net cash flows, inventory receipts, and other items on a line item basis.  Such Updated Budget shall constitute the "Approved Budget" for purposes of this Interim Order upon written notice from the DIP Lenders' counsel to the Debtors (which may be in the form of an email) that such budget is in form and substance satisfactory to the Required DIP Lenders.  Any amendments, supplements, or modifications to the form of the Approved Budget shall be subject to the prior written approval of the Required DIP Lenders, prior to the implementation thereof.

(ii)     Commencing on Tuesday, March 25, 2025 at 5:00 p.m. (Eastern Time), and on each Tuesday on a weekly basis thereafter (or at such other times as the Debtors may elect with the consent of the Required DIP Lenders), the Debtors shall deliver to counsel to the DIP Lenders a variance report in form and substance reasonably acceptable to the Required Lenders (an "***Approved Variance Report***") showing comparisons of actual results for each line item against such line item in the Approved Budget for the prior (Monday to Sunday) one-week period. Thereafter, the Debtors shall deliver to counsel to the DIP Lenders an Approved Variance Report on each Tuesday on a weekly basis for (a) the preceding week (Monday to Sunday) and (b) the

31

trailing four-week period (or, if fewer than four weeks have lapsed since the Petition Date, then for the trailing one-, two-, or three-week period, as applicable) (each a "***Testing Period***").  Any amendments, supplements, or modifications to an Approved Variance Report shall be subject to the prior written approval of the Required DIP Lenders.

(iii)    Each Approved Variance Report shall indicate whether there are any adverse variances that exceed any of the Permitted Variances.  "***Permitted Variances***" shall mean variances:

(a)    up to 10% of the aggregate for all cash disbursements in the Approved Budget (excluding fees and expenses of counsel to the DIP Secured Parties and Professional Persons (as defined below) and disbursements for Health Insurance Claims (as defined below)) (such disbursements, collectively, "***Non-Professional Cash Disbursements***"),

(b)    up to 10% of all fees and expenses of Debtor Professionals (as defined below) on an aggregate basis, and

(c)    up to 10% of all fees and expenses of Committee Professionals (as defined below) on an aggregate basis,

in each of (a), (b), and (c) above, calculated weekly on a rolling four-week basis commencing as of the Petition Date, with the first such testing to begin upon delivery of the second Approved Variance Report.  For the avoidance of doubt, the Approved Budget shall not serve as a cap or limitation on the amount or payment of any fees and expenses of the Debtor Professionals.

(iv)    It shall constitute an Event of Default if there are any adverse variances that exceed any of the Permitted Variances for any applicable Testing Period.

(v)    In the event that an expense budgeted in any line item in the Budget for payment during any particular week exceeds the amount actually paid in respect of such line item during such week (including with respect to Professional Persons) (the difference between the budgeted amount and the amount actually paid, the "***Carry Forward Amount***"), the Debtors shall be authorized to use the Carry Forward Amount during any subsequent weeks toward (a) the total amount of Non-Professional Cash Disbursements for any Carry Forward related to any line item for Non-Professional Cash Disbursements or (b) the total amount of (1) Debtor Professional fees and expenses for any Carry Forward related to fees and expenses of an individual Debtor Professional or (2) Committee Professional fees and expenses for any Carry Forward related to fees and expenses of any individual Committee Professional.

(vi)    The Approved Budget is approved on an interim basis.  The proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors strictly in accordance with the Approved Budget (subject to Permitted Variances), this Interim Order, and the DIP Documents.

(vii)    Other than with respect to the Carve-Out and the Health Insurance Reserve, none of the DIP Secured Parties' and the Prepetition Secured Parties' consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facility beyond the Maturity Date or the Termination Date, as applicable, or the use of Cash Collateral beyond the expiration of the Remedies Notice Period following the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

33

(viii)    Notwithstanding anything to the contrary herein, the Debtors shall pay the fees, costs and expenses of the Lender Professionals (as defined below) in accordance with the DIP Documents and this Interim Order without reference to the Approved Budget.

18.    <u>Additional Reporting</u>.    The Debtors shall make the Debtors' professionals reasonably available upon reasonable notice for telephonic or virtual meetings to update the DIP Agent, the DIP Lenders, the DIP Professionals, and the Prepetition Secured Parties on all matters affecting the Debtors and the Chapter 11 Cases, including with respect to the efforts to market and sell the DIP Collateral.

19.    <u>Health Insurance Reserve</u>.

(i)    The Debtors are authorized to use proceeds of the DIP Facility, proceeds of the DIP Collateral, and/or the Prepetition Collateral (including Cash Collateral), to fund allowed, undisputed and unpaid prepetition unsecured health care insurance obligations to current and former employees (such obligations, "***Health Insurance Claims***") in the aggregate amount not to exceed $700,000 (the "***Health Insurance Claims Cap***").  For the avoidance of doubt, payments of Health Insurance Claims shall be excluded from budget variance testing for purposes of determining whether a budget variance constitutes a Permitted Variance, as described in paragraph 17.  It shall be an Event of Default if the Debtors make any payments on account of Health Insurance Claims in excess of the Health Insurance Claims Cap unless the Required DIP Lenders have provided prior consent to such payments.

(ii)    Following the occurrence of an Event of Default (if any) and the expiration of the Remedies Notice Period, the Debtors are authorized and directed to establish and fund a reserve in a segregated account in an amount equal to the Health Insurance Claims Cap, *less* any amounts paid toward Health Insurance Claims prior to such Event of Default (the "***Health***

34

*Insurance Reserve*"); *provided*, *however*, that the Health Insurance Reserve shall not be available to the Debtors or their Estates if (a) the Final Order is not entered by the applicable Milestone date (as it may be extended with prior written consent of the Required DIP Lenders), or (b) a party obtains requisite standing with respect to a Challenge (as defined in Paragraph 44 of this Interim Order) that is timely filed prior to expiration of the Challenge Period.

(iii)    The funds in the Health Insurance Reserve shall be subject to the DIP Liens and Replacement Liens.  If there are funds remaining in the Health Insurance Reserve after final resolution of all Health Insurance Claims or upon the occurrence of either event listed in (a) or (b) in subparagraph (ii) above, such funds shall be paid to the applicable agent or lender for payment of the applicable obligations in accordance with the relative priorities set forth in **Exhibit C** of this Interim Order.

20.    <u>Modification of Automatic Stay</u>.   The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order.

21.    <u>Perfection of DIP Liens and Replacement Liens</u>.   This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Replacement Liens, subject to the priorities set forth in **Exhibit C** of this Interim Order, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, which may be an existing account control agreement already in place in connection with the Super Senior

35

Bridge Loan Facility) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Replacement Liens or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the Super Senior Bridge Loan Lenders (individually or collectively), the DIP Agent, and the IP Term Loan Agent (for the benefit of the DIP Secured Parties and the IP Term Loan Secured Parties, respectively) are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Replacement Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent, the Super Senior Bridge Loan Lenders (individually or collectively), and the IP Term Loan Agent all such financing statements, mortgages, notices and other documents as each may reasonably request, so long as the cost of maintaining or perfecting the security interest is not excessive in view of the benefits to be obtained.  The DIP Agent, the Super Senior Bridge Loan Lenders (individually or collectively), and the IP Term Loan Agent may each, in its discretion, file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. To the extent that either the Super Senior Bridge Loan Lenders (individually or collectively) or the IP Term Loan Agent is, with respect to the DIP Collateral, the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or

agreements, bailee letters, custom broker agreements, financing statement, account control agreements, or any other Prepetition Loan Documents or is listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agent (for the benefit of the DIP Secured Parties) shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable.  The Super Senior Bridge Loan Lenders (individually or collectively) and the IP Term Loan Agent shall act as agent for the DIP Secured Parties solely for purposes of perfecting the DIP Secured Parties' liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party (including any deposit account control agreement), and all of the Super Senior Bridge Loan Lenders' (individually or collectively) and the IP Term Loan Agent's respective rights in such DIP Collateral shall inure to the benefit of and be exercisable exclusively by the DIP Agent until the DIP Obligations have been indefeasibly repaid in full in cash; *provided*, that the DIP Agent shall, at the Direction of the Required DIP Lenders, require the Debtors and the Super Senior Bridge Loan Lenders (individually or collectively) and the IP Term Loan Agent to (and the Debtors and the Super Senior Bridge Loan Lenders (individually or collectively) and the IP Term Loan Agent shall) use commercially reasonable efforts to provide the DIP Agent with such possession or control as is necessary to perfect the DIP Obligations and DIP Liens. Notwithstanding the foregoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall not be effective for five (5) business days to permit the DIP Agent and the Super Senior Bridge Loan Lenders (individually or collectively) and the IP Term Loan Agent to enter into any agreements or file any documents (including credit agreements,

37

financing statements, mortgages, or other notices or documents) evidencing the DIP Obligations and the perfection and priority of the DIP Liens and Replacement Liens, and during such period, the Debtors shall comply with all reasonable requests of the DIP Agent and the Super Senior Bridge Loan Lenders (individually or collectively) and the IP Term Loan Agent to ensure the perfection of the DIP Liens and the Replacement Liens, as applicable.

22.    <u>Access to Books and Records</u>.  The Debtors will (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and, subject to attorney-client privilege, work product doctrine, and any similar applicable protections, provide to the DIP Agent and the DIP Lenders all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order or as otherwise reasonably requested by the DIP Agent and the DIP Lenders, (iii) during normal business hours, upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Agent and the DIP Lenders to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and to engage in discussions with their respective senior management and independent public accountants to the extent required by the DIP Documents or the Prepetition Loan Documents, and (iv) permit the DIP Secured Parties, and the Prepetition Secured Parties, and their respective consultants, advisors and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets.

23. <u>Proceeds of Subsequent Financing</u>. If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents or this Interim Order at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' Estates, and such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall within two (2) business days be turned over to the DIP Agent (for the benefit of the DIP Secured Parties) to be distributed in accordance with this Interim Order, including the relative priorities set forth in **<u>Exhibit C</u>** of this Interim Order, and the DIP Documents. For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facility) pursuant to Bankruptcy Code section 364(d) at any time prior to the indefeasible repayment in full in cash of the Prepetition Obligations, the Prepetition Secured Parties' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

24. <u>Cash Management</u>. The Debtors shall maintain their cash management system in compliance with the terms and conditions of any interim and/or final order, which shall be acceptable to the DIP Agent and the Required DIP Lenders, granting the Debtors authorization to continue their cash management systems and certain related relief (as amended, supplemented, or otherwise modified, the "***Cash Management Order***"), the DIP Documents, and this Interim Order.

25.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full in cash of all DIP Obligations and Prepetition Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents or the Prepetition Loan Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order, the DIP Documents, and this Interim Order.

26.    <u>Disposition of DIP Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, other than in the ordinary course of business or as otherwise permitted by the DIP Documents, without the prior written consent of the Required DIP Lenders.   The Debtors are authorized and directed to make the Mandatory Prepayments as set forth in the DIP Term Sheet, and upon the closing of a sale of any other of the DIP Collateral, to pay all cash proceeds of any such sale within two (2) business days of receipt thereof to the applicable agent or lender for payment of the applicable obligations in accordance with the relative priorities set forth in **<u>Exhibit C</u>** of this Interim Order.   Except as otherwise provided in this Interim Order or the DIP Documents, any order approving the sale or other disposition of DIP Collateral shall provide that the sale is conditioned upon the application of any proceeds toward the payment of DIP Obligations (except as otherwise agreed in writing by the Required DIP Lenders) until the DIP Obligations are paid in full, and thereafter toward the Prepetition Obligations, all in accordance with the terms of the DIP Documents.

27.    <u>Termination Date</u>.  On the Termination Date (defined below), all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the DIP Facility will terminate other than as permitted by the Carve-Out.

28.  <u>Events of Default</u>.  Until the DIP Obligations are indefeasibly paid in full in cash and all commitments thereunder are terminated in accordance with the DIP Documents, the occurrence of any of the following events, unless waived by the Required DIP Lenders (or as otherwise provided in the DIP Documents) in writing (which may be by electronic mail) and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "***Events of Default***"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order, including, without limitation, the failure to make any payment under this Interim Order when due, the failure to comply with any Milestone (as defined in the DIP Term Sheet), or the failure to comply with the Approved Budget (subject to the Permitted Variances); and (b) the occurrence and continuation of any other Event of Default under, and as defined in, the DIP Term Sheet or any other DIP Documents (subject to any notice and cure periods set forth therein).

29.  <u>Milestones</u>.  As a condition to the DIP Facility and the use of Cash Collateral, the Debtors have agreed to the Milestones.  For the avoidance of doubt, unless waived, modified or extended in writing by the Required DIP Lenders in their sole discretion, the failure of the Debtors to meet the Milestones by the applicable specified deadlines set forth thereof shall constitute an Event of Default under the DIP Documents and this Interim Order.

30.  <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence and during the continuation of any Event of Default, and subject to the terms of paragraph 32 hereof, notwithstanding the provisions of Bankruptcy Code section 362, without any application, motion or notice to, hearing before, or order from the Court, other than, subject to the terms of this Interim Order: (a) the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) may send a written notice to the Debtors, counsel to the Committee (if any), the Super

41

Senior Bridge Loan Lenders (individually or collectively), the IP Term Loan Agent, and the U.S. Trustee (any such declaration shall be referred to herein as a "***Termination Declaration***"), which shall be filed on the docket of the Chapter 11 Cases, declaring (1) all DIP Obligations owing under the DIP Documents and this Interim Order to be immediately due and payable, (2) the commitment of each DIP Lender to make New Money DIP Loans to be terminated, whereupon such commitments shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Lenders or DIP Agent, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve-Out Trigger Notice (as defined below) to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) upon delivery of the Termination Declaration, the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) shall be deemed to have declared a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Debtors' Estates.   The earliest date on which a Termination Declaration is delivered by the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) and filed on the docket of the Chapter 11 Cases shall be referred to herein as the "***Termination Date***." Following the Termination Date, and subject to paragraph 32 hereof, no DIP Secured Party or Prepetition Secured Party shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility.  The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee (if any), and the U.S. Trustee.

<div align="center">42</div>

31.     <u>No Waiver by Failure to Seek Relief</u>.  The rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties or the Prepetition Secured Parties may have under the DIP Documents, the Prepetition Loan Documents, applicable law, or otherwise.  The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights or be deemed as an admission that no Event of Default has occurred.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order, the DIP Documents, or the Prepetition Loan Documents shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  Except as expressly set forth herein, none of the rights or remedies of any party under this Interim Order, the DIP Documents, and the Prepetition Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the DIP Documents and the requisite parties under the Prepetition Loan Documents, as applicable.  No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties (as applicable).

32.     <u>Emergency Hearing</u>.  The Debtors may seek an emergency hearing on an expedited basis (the "***Emergency Hearing***") during the three (3) business days following the date a Termination Declaration is delivered (such three (3) business day period, the "***Remedies Notice Period***") for the sole purpose of determining whether an Event of Default has in fact occurred or

43

is continuing, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties or, if applicable, the Prepetition Secured Parties.  During the Remedies Notice Period, the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of this Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates.  At the end of the Remedies Notice Period, unless the Court has entered an order to the contrary, the Debtors' right to use Cash Collateral shall immediately cease, and the DIP Secured Parties shall have the rights set forth immediately below.

33.    <u>Certain Rights and Remedies Following Termination Date.</u>    Following the expiration of the Remedies Notice Period and subject to paragraph 32: (a) the Required DIP Lenders or the DIP Agent shall be entitled to exercise all rights and remedies in accordance with the DIP Documents, the DIP Orders, and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Liens based on the relative priorities set forth in **<u>Exhibit C</u>** of this Interim Order;  (b) the Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out and a reserve for any Prepetition Permitted Liens, remit to the DIP Agent (for the benefit of the DIP Lenders) one-hundred percent (100%) of all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents and the relative priorities in **<u>Exhibit C</u>** of this Interim Order; provided however, that any distribution of DIP Collateral constituting NMTC Cash Collateral Accounts is subject to the prior satisfaction of the NMTC Prepetition Liens; (c) the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) may compel the Debtors to seek authority to, (i) sell or otherwise dispose of all or any portion of the DIP Collateral (or any other property of the Debtors to the extent a lien is not

permitted by law to attach to such property, the proceeds of which are DIP Collateral) pursuant to Bankruptcy Code section 363 (or any other applicable provision) on terms and conditions pursuant to Bankruptcy Code sections 363, 365, and other applicable provisions of the Bankruptcy Code, and (ii) assume and assign any lease or executory contract included in the DIP Collateral to the Required DIP Lenders' or the DIP Agent's designees in accordance with and subject to Bankruptcy Code section 365; (d) the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders) may direct the Debtors to (and the Debtors are hereby ordered to comply with such direction without the need for any further or additional corporate approvals under applicable state or federal law) dispose of or liquidate the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds which are DIP Collateral) via one or more sales of such DIP Collateral and/or the monetization of other DIP Collateral, including a strict foreclosure in accordance with the Uniform Commercial Code as adopted by the applicable state governing the DIP Documents; (e) the Required DIP Lenders or the DIP Agent (at the direction of the Required DIP Lenders), may or may direct the Debtors to (and the Debtors shall comply with such direction to), collect any and all accounts receivable, without setoff by any account debtor; (f) the Required DIP Lenders or the DIP Agent (for the benefit of the DIP Lenders) shall be authorized to succeed to any and all of the Debtors' rights and interests under any licenses for the use of any intellectual property in order to complete the production and sale of any inventory with respect to the DIP Collateral; (g) the Debtors agree and consent to the foregoing remedies described herein and shall take all action that is reasonably necessary to cooperate with the DIP Lenders in the exercise of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Lenders in a manner consistent with the priorities set forth in **Exhibit C** of this Interim Order and the DIP Documents.

4923-7661-1369v.12
RLF1 32594186v.1

34.     <u>Access to DIP Collateral</u>.    Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Secured Parties under the Interim Order, the DIP Documents and applicable law, after the occurrence of the Termination Date and subject to paragraph 32, for the purpose of exercising any remedy with respect to any of the DIP Collateral, the Required DIP Lenders or the DIP Agent (or any of its employees, agents, consultants, contractors, or other professionals) (collectively, the "***Enforcement Agents***") shall have the right (to be exercised at the direction of the Required DIP Lenders), at the sole cost and expense of the Debtors, to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors; (ii) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, to complete any work in process); (iii) exercise any rights of the Debtors to access any DIP Collateral (including inventory) held by any third party; <u>provided</u>, <u>however</u>, the Enforcement Agents may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any prepetition (and, if applicable, postpetition) landlord waivers or consents, or (c) further order of this Court on motion and notice appropriate under the circumstances; and (iv) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment or any other similar assets of the Debtors, or assets which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses; <u>provided</u>, <u>however</u>, the Enforcement Agents may only use such assets to the extent permitted by applicable non-bankruptcy law.  The Enforcement Agents will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) on a *per diem* basis and solely for the period of time that the Enforcement Agents actually occupy any real property or use

46

the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the Enforcement Agents actually occupy or use such assets or properties). Nothing contained herein shall require the Enforcement Agents to assume any lease as a condition to the rights afforded in this paragraph 34.

35.    Carve-Out.  Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Replacement Liens, and the Adequate Protection Superpriority Claims shall be subject to payment of the Carve-Out.

(i)    "*Carve-Out*" means, collectively, the following fees and expenses: (a) all statutory fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) *plus* interest at the statutory rate, if any, pursuant to 31 U.S.C § 3717 (without regard to the Carve-Out Trigger Notice (as defined below)); (b) reasonable fees and expenses incurred by a trustee, if any, under section 726(b) of the Bankruptcy Code in an amount not exceeding $50,000 (without regard to the Carve-Out Trigger Notice) (the amounts in these clauses (a) and (b), "*Statutory Fees*"); (c) to the extent allowed at any time, whether by interim or final compensation order, procedural order or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "*Allowed Debtor Professional Fees*") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "*Debtor Professionals*") and, subject in all cases to the Approved Budget, unpaid fees and expenses (excluding any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Committee) (the "*Allowed Committee Professional Fees*" and, together with the Allowed Debtor Professional Fees, collectively, the "*Allowed Professional Fees*") incurred by persons or firms retained by the Committee (if any) pursuant to

section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") that are incurred on or prior to the first business day following delivery by the Required DIP Lenders or the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (clauses (a) through (c), the "**Pre-Carve-Out Amounts**"); and (d) Allowed Professional Fees in an aggregate amount not to exceed  $150,000 for the Debtor Professionals and $25,000 for the Committee Professionals, incurred after the first business day following delivery by the Required DIP Lenders or the DIP Agent of the Carve-Out Trigger Notice (including any restructuring, sale, success, or other transaction fee earned or payable to any Professional Person) (the amounts set forth in this clause (d) being the "**Post-Carve-Out Trigger Notice Cap**").  For the avoidance of doubt, other than the Carve-Out, no other amounts owed by any of the Debtors to any party (including any amounts set forth in the Approved Budget) as of the date of Carve-Out Trigger Notice is delivered shall be payable from the Prepetition Collateral or the DIP Collateral.  For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the Required DIP Lenders or the DIP Agent to the Debtors' lead counsel (Vinson & Elkins LLP), the U.S. Trustee, and lead counsel to the Committee (if any), which notice may only be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  No portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Facility, including any disbursements set forth in the Approved Budget or obligations benefitting from the Carve-Out, shall be used for the payment of Allowed Professional Fees, disbursements, costs or expenses incurred by any person, including, without limitation, any Committee, in connection with challenging the DIP Secured Parties' or the

48

Prepetition Secured Parties' liens or claims, preventing, hindering or delaying any of the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral, or initiating or prosecuting any claim or action against any DIP Secured Party or Prepetition Secured Party; provided that notwithstanding anything herein to the contrary, proceeds from the DIP Facility and/or Cash Collateral not to exceed $25,000 in the aggregate (the "**Investigation Budget**") may be used on account of Allowed Professional Fees incurred by Committee Professionals (if any) during the Challenge Period (as defined below) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition Facilities and Prepetition Secured Parties (but not the DIP Facility and DIP Secured Parties).

   (ii) Professional Fee Reserve.  Beginning on March 26, 2025, and thereafter on a weekly basis, the Debtors will transfer cash proceeds from draws from the DIP Facility and/or cash on hand in an amount as set forth in the Approved Variance Report for the weekly fees, costs, and expenses incurred by the Debtor Professionals and Committee Professionals (if any) for the prior week until receipt of a Carve-Out Trigger Notice, in each case, excluding any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors of the Debtors or the Committee, into a segregated escrow account held in trust solely for the benefit of the Professional Persons (the "**Professional Fee Reserve**").  Upon the delivery of a Carve-Out Trigger Notice, the Carve-Out Trigger Notice shall (a) be deemed a request by the Debtors to use DIP Loans or Cash Collateral, in an amount equal to (i) the sum of the aggregate unpaid amount of the total budgeted weekly fees of Professional Persons incurred before or on the first business day following delivery of a Carve-Out Trigger Notice (to the extent not previously funded to the Professional Fee Reserve) and (ii) the Post-Carve-Out Trigger Notice Cap (less any amounts

already funded into the Professional Fee Reserve in respect of such amounts) (any such amounts actually advanced shall constitute DIP Loans); and (b) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the amounts set forth in clauses (i) and (ii) (less any amounts already funded into the Professional Fee Reserve in respect of such amounts).  For the avoidance of doubt, in no event shall any DIP Lender be required to fund any amount in excess of its then-outstanding DIP Commitment.  Amounts funded into the Professional Fee Reserve shall be considered used by the Debtors at such time as they are deposited into the Professional Fee Reserve for distribution to Professional Persons in accordance with orders of the Bankruptcy Court.  The Debtors shall use funds held in the Professional Fee Reserve exclusively to pay Allowed Professional Fees accruing prior to the Termination Date as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court.  Any amounts remaining in the Professional Fee Reserve after payment of the Carve-Out shall be paid to the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid (a) first to the Super Senior Bridge Loan Lenders, and (b) second to the IP Term Loan Agent for the benefit of the IP Term Loan Secured Parties.

(iii)    Funds transferred to the Professional Fee Reserve shall be subject to the DIP Liens, DIP Superpriority Claims, Replacement Liens, and Adequate Protection Superpriority Claims granted hereunder to the extent of such reversionary interest; provided that, for the avoidance of doubt, such liens and claims shall be subject in all respects to the Carve-Out.

(iv)    Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or any other Court order, the Professional Fee Reserve and the amounts on deposit

50

in the Professional Fee Reserve shall be available and used only to satisfy Allowed Professional Fees accruing prior to the Termination Date benefitting from the Carve-Out, and the other obligations that are a part of the Carve-Out.  The failure of the Professional Fee Reserve to satisfy Allowed Professional Fees in full shall not affect the priority of the Carve-Out; provided that to the extent the Professional Fee Reserve is actually funded, the Carve-Out shall be reduced by such funded amount on a dollar-for-dollar basis.

(v)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  No DIP Secured Party or Prepetition Secured Party shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Secured Parties or Prepetition Secured Parties in any way to compensate, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their Estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

36.    Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order.  The DIP Secured Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section

364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties and Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

37.    Approval of DIP Fees.  In consideration for the DIP Facility and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Secured Parties shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, the Upfront Fee and, subject to entry of the Final Order, the Exit Fee, and all reasonable and documented out-of-pocket costs and expenses, including legal fees of the DIP Agent up to $15,000 and the DIP Lenders, financial advisor fees, and other similar fees, costs and expenses incurred in connection with the DIP Facility and the Chapter 11 Cases, including, without limitation, the reasonable and documented fees and expenses of (a) counsel to the DIP Secured Parties, and (b) specialty or local counsel to the DIP Secured Parties in each relevant jurisdiction (together, the "***DIP Fees***").  The DIP Fees shall be fully earned and payable in accordance with the terms of the DIP Documents, without the need for any further order of this Court.  The DIP Fees shall be part of the DIP Obligations.  Any and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Secured Parties in connection with or with respect to the DIP Facility in each case is hereby approved in full.

38.    Lender Professionals' Fees.  Professionals for the DIP Secured Parties (the "***DIP Professionals***") and professionals for the Super Senior Bridge Loan Lenders (the "***Prepetition Professionals***," and together with the DIP Professionals, the "***Lender Professionals***")

shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, this Court for compensation and reimbursement of fees and expenses. The Lender Professionals shall submit copies of summary invoices (which may be redacted to the extent necessary to protect any information subject to attorney-client privilege, attorney work product, or other applicable privilege) to the Debtors, Debtors' counsel, the U.S. Trustee, and counsel to the Committee, if any.  The invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines.  If the Debtors, U.S. Trustee, or any Committee object to the reasonableness of the fees and expenses of any Lender Professional and the parties cannot resolve such objection by 4:00 P.M. (Eastern Time) on the date that is ten (10) days after electronic delivery of such invoices (the "*Fee Objection Deadline*"), then the Debtors, U.S. Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professional a written objection (the "*Fee Objection*"), and any failure by any such party to file a Fee Objection by the Fee Objection Deadline shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs, and expenses on any invoice to which no Fee Objection has been timely filed.

4923-7661-1369v.12
RLF1 32594186v.1

39.    <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of this Interim Order and the DIP Documents except to the extent resulting from such party's gross negligence, bad faith, or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.

40.    <u>Right to Credit Bid</u>.  In connection with any sale or other disposition of the DIP Collateral or Prepetition Collateral including any sales occurring under or pursuant to section 363 of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors (any of the foregoing sales or dispositions, a "***Sale***"), the DIP Agent (at the direction of the Required DIP Lenders) and, subject to paragraph 44 of this Interim Order, the Super Senior Bridge Loan Lenders and the IP Term Loan Agent (at the direction of the Required Lenders (as defined in the IP Term Loan Agreement)), shall be authorized subject to section 363(k) of the Bankruptcy Code to credit bid on a dollar-for-dollar basis any or all of the full amount of the respective outstanding DIP Obligations (including the Roll-Up Obligations) and Prepetition Obligations (and any other applicable obligations) up to the full amount of the DIP Obligations and Prepetition Obligations (and any other applicable obligations held by the DIP Lenders and Prepetition Lenders), respectively, including any accrued interest, expenses, and fees, in a Sale (including any deposit in connection with such sale) of any DIP Collateral or Prepetition Collateral, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee, or

4923-7661-1369v.12
RLF1 32594186v.1

otherwise, without the need for further court authorization.  The DIP Agent (at the direction of the Required DIP Lenders) and the Super Senior Bridge Loan Lenders and the IP Term Loan Agent (at the direction of the Required Lenders (as defined in the IP Term Loan Agreement)) shall each have the absolute right to assign, transfer, sell, or otherwise dispose of their respective rights to credit bid to any acquisition vehicle formed in connection with such bid or other designee.

41.    <u>Proofs of Claim</u>.  Neither the DIP Secured Parties nor the Prepetition Secured Parties will be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim arising under the DIP Documents or the Prepetition Loan Documents, including any claim for adequate protection by the Prepetition Secured Parties.  The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute timely filed proofs of claim for the DIP Secured Parties and the Prepetition Secured Parties with regard to all claims arising under the DIP Documents and the Prepetition Loan Documents, and, as a result, the DIP Obligations and the Prepetition Obligations shall be deemed allowed for all purposes in accordance with section 502(a) of the Bankruptcy Code.

42.    <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>.  Except as otherwise permitted in this Interim Order and the Approved Budget (including with respect to the Investigation Budget), the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out may not be used in connection with: (a) preventing, hindering, or delaying the DIP Secured Parties or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the Required DIP Lenders; (c) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent

55

of the Required DIP Lenders; (d) incurring any indebtedness without the prior written consent of the Required DIP Lenders; (e) seeking to amend or modify any of the rights granted to the DIP Secured Parties or the Prepetition Secured Parties under this Interim Order, the DIP Documents, or the Prepetition Loan Documents; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the Prepetition Liens, the Prepetition Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties or the Prepetition Secured Parties, respectively; (g) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition Secured Parties, or any of their respective affiliates, successors, assigns, partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals; (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Obligations, the Prepetition Liens, or any other rights or interests of the DIP Secured Parties or the Prepetition Secured Parties; or (i) seeking to Challenge (as defined below), subordinate, recharacterize, disallow, or avoid the DIP Obligations or the Prepetition Obligations.

43.    <u>Turn Over</u>.  Prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations and termination of the commitments in accordance with the DIP Documents, any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the DIP Liens or a claim that is subordinate to the DIP Superpriority Claims (including any of the Prepetition Secured Parties) receives or is paid the proceeds of any DIP

Collateral other than as expressly permitted in the DIP Documents and this Interim Order (whether in connection with the exercise of any right or remedy (including setoff), payment or distribution from the Debtors, mistake or otherwise), such party shall be deemed to have received, and shall hold, such proceeds or payments in trust for the DIP Secured Parties and shall immediately turn over such amounts to the DIP Agent, in the same form as received, with any necessary endorsements, for distribution to the DIP Lenders to repay the DIP Obligations in accordance with the DIP Documents and this Interim Order until indefeasibly paid in full in cash.

44.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations contained in paragraph G and releases in paragraph H hereof shall be binding in all circumstances upon the Debtors upon entry of this Interim Order, and upon their Estates and any successor thereto in all circumstances for all purposes immediately upon entry of the Final Order.  The Debtors' Stipulations shall be binding upon each other party-in-interest, including the Committee, except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period, the chapter 7 trustee in such Successor Case), by no later than, subject to entry of the Final Order, the date that is the earlier of (i) one business day before the hearing approving a sale of substantially all of the Debtors' 363 Sale Assets and (ii) seventy-five (75) calendar days following the date of entry of this Interim Order (such time period shall be referred to as the "***Challenge Period***") and *second*, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge (as defined below) in any such timely-filed contested matter or adversary proceeding (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "***Successful Challenge***").  For the purposes of this Interim Order, a "***Challenge***" shall mean a timely and properly filed contested matter or adversary proceeding

57

challenging or otherwise objecting to the admissions, stipulations, findings, or releases set forth in this Interim Order, including the stipulations contained in the Debtors' Stipulations, including but not limited to those in relation to (a) the amount, validity, extent, priority, or perfection of the mortgages, security interests, and liens of the Super Senior Bridge Loan Lenders (individually or collectively) and the IP Term Loan Agent with respect to the Prepetition Collateral; (b) the validity, allowability and priority of the Prepetition Obligations; and (c) any releases set forth or agreed to herein or pursuant to the DIP Documents. The Challenge Period shall terminate on the date that is the next calendar day after the expiration of the Challenge Period in the event that either (i) no Challenge is raised during the Challenge Period or (ii) with respect only to those parties who file a Challenge, such Challenge is fully and finally adjudicated (collectively, the "***Challenge Period Termination Date***"). The filing of a motion seeking standing to file a Challenge before expiration of the Challenge Period, which attaches a proposed Challenge, shall extend the Challenge Period solely with respect to that party until two (2) business days after the Court approves the standing motion, or such other time period ordered by the Court in approving the standing motion and solely with respect to the Challenges asserted in the complaint. Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, motion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery, or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred,

(iii) all of the Prepetition Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations and releases shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge. Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' Estates.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' Estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this paragraph 44 or to require or permit an extension of the Challenge Period Termination Date.  To the extent any such Challenge is timely and properly commenced, the Prepetition Secured Parties shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending themselves and the other Prepetition Secured Parties in any such proceeding as adequate protection.  The Court may fashion an appropriate remedy in the event of a Successful Challenge.

45.    <u>No Third-Party Rights</u>.  Except as explicitly provided for herein or in any of the DIP Documents, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

46.    <u>No Lender Liability</u>.   In determining to make any loan (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or taking any other act permitted under this Interim Order and the DIP Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (i) be considered or deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the *United States Comprehensive Environmental Response, Compensation and Liability Act*, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal, state or local statute or regulation), (ii) shall be considered or deemed to be a joint employer with any of the Debtors, or (iii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates. Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

47.    <u>Section 506(c) Claims</u>.  Subject to entry of the Final Order and the provisions of the Carve-Out and as a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Documents (and the prior written consent of the DIP Secured Parties to the payment of the Carve-Out to the extent provided herein and the prior written consent of the Prepetition Secured Parties of the priming of the Prepetition Liens by the DIP

Facility and the use of Cash Collateral) (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, in each case pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition Secured Parties, as applicable and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition Secured Parties.

48.    <u>No Marshaling</u>.  The DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

49.    <u>Section 552(b)</u>.  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties, as applicable with respect to proceeds, product, offspring or profits of any of the DIP Collateral or Prepetition Collateral, as applicable.

50.    <u>Exculpation</u>.  Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.  In addition, (a) the DIP Secured Parties shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion

61

from any cause, (iii) any Diminution thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

51.    <u>Release of DIP Secured Parties</u>.  Upon entry of this Interim Order, the Debtors, on their own behalf and on behalf of their Estates, forever and irrevocably: (i) release, discharge, and acquit each of the DIP Secured Parties and each of their former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

52.    <u>Limitation on Liability</u>.  Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition Secured Parties any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.

53.    <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (for the benefit of the DIP Lenders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and

loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

54.    <u>NMTC Loan Payments</u>.  The Debtors are hereby authorized to continue to pay amounts owed under the NMTC Facilities solely from funds on deposit in the NMTC Cash Collateral Accounts as of the Petition Date without further notice, motion, or application to, order of, or hearing before this Court.

55.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

56.    <u>Discharge</u>.  Except as otherwise agreed in writing by the Required DIP Lenders or the DIP Agent (acting at the direction of the Required DIP Lenders), each of the Super Senior Bridge Loan Lenders and the IP Term Loan Agent (acting at the direction of the Required Lenders, as that term is defined in the IP Term Loan Agreement), the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and, in the case of DIP Obligations, indefeasibly paid in full as provided by the DIP Documents (including by credit bid)), on or before the effective date of such confirmed plan of reorganization or liquidation.  If any of the Debtors

63

propose or support any plan of reorganization, plan of liquidation, or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment (including by credit bid) of the DIP Obligations, and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "***Non-Consensual Plan or Sale***") without the written consent of the Required DIP Lenders or the DIP Agent (acting at the direction of the Required DIP Lenders), each of the Super Senior Bridge Loan Lenders, and the IP Term Loan Agent (acting at the direction of the Required Lenders, as that term is defined in the IP Term Loan Agreement), the Debtors' proposal or support of a Non-Consensual Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

57.     <u>Joint and Several</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' Estates; <u>provided however</u>, that the Debtors shall be jointly and severally liable for the DIP Obligations and all other obligations hereunder in accordance with the terms of this Interim Order and the DIP Documents.

58.     <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Interim Order and the DIP Documents, shall continue in the

64

Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated; and (ii) in respect of the Prepetition Facilities, all of the Prepetition Obligations pursuant to the Prepetition Loan Documents and this Interim Order, have been indefeasibly paid in full in cash. The terms and provisions concerning the indemnification of the DIP Secured Parties shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, and following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations. In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Secured Parties notwithstanding the repayment in full or termination of the DIP Obligations until such time as the Prepetition Obligations have been indefeasibly paid in full in cash.

59. _Priority of Terms_. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, or the Cash Management Order, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as set forth in" any of the DIP Documents, the Super Senior Bridge Loan Agreement, the IP Term Loan Agreement, or other agreement or document, the terms and provisions of this Interim Order shall govern.

60. _Final Hearing_. **The Final Hearing on the Motion shall be held on [_____], 2025, at [\_\_] [\_\_].M. (Eastern Time)**; *provided* that the Final Hearing may be

65

adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment with the consent of the Required DIP Lenders. The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court. **Any objection to the relief sought at the Final Hearing or the Proposed Final Order must be filed with the Court on or before 4:00 p.m., prevailing Eastern Time, on [_______], 2025,** and served on the following parties: (i) the Debtors, 140 Industrial Boulevard, Bainbridge, GA 39817 (Attn.: Stephen A. Martin (stevemartin@danimer.com)); (ii) proposed co-counsel to the Debtors, (a) Vinson & Elkins LLP, 1114 Avenue of the Americas, 32nd Floor, New York, New York 10036 (Attn.: George R. Howard (ghoward@velaw.com) and Matthew D. Struble (mstruble@velaw.com)), and (b) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn.: Daniel J. DeFranceschi (defranceschi@rlf.com), Zachary I. Shapiro (shapiro@rlf.com), Matthew P. Milana (milana@rlf.com), and Emily R. Mathews (mathews@rlf.com)); (iii) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Room 2207, Wilmington, DE 19801 (Attn.: Linda Casey); (iv) counsel to the DIP Lenders, (a) Proskauer Rose LLP, Eleven Times Square, New York, New York 10036 (Attn.: David M. Hillman (dhillman@proskauer.com) and Dylan J. Marker (dmarker@proskauer.com)), and (b) Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, DE 19801 (Attn: Adam G. Landis (landis@lrclaw.com) and Matthew R. Pierce (pierce@lrclaw.com)); (v) counsel to the DIP Agent, Eversheds Sutherland (US) LLP, 999 Peachtree Street, NE, Atlanta, Georgia 30309 (Attn: Todd Meyers (toddmeyers@eversheds-sutherland.com); and (vi) counsel to any statutory committee appointed in these Chapter 11 Cases. If no objections to entry of the Final Order are timely received, the Court may enter the Final Order without need for the Final Hearing.

61.    <u>Necessary Action</u>.  The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.

62.    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

63.    <u>Headings</u>.  The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

64.    <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

4923-7661-1369v.12
RLF1 32594186v.1

**EXHIBIT A**

(DIP Term Sheet)

**Danimer Scientific, Inc. et al.**

**Senior Secured Superpriority DIP Financing Term Sheet**

THIS TERM SHEET (INCLUDING ALL SCHEDULES, ANNEXES AND EXHIBITS HERETO, THE "<u>TERM SHEET</u>") DESCRIBES THE PRINCIPAL TERMS AND CONDITIONS OF A PROPOSED SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT FACILITY TO BE PROVIDED BY THE DIP LENDERS (AS DEFINED BELOW) TO DANIMER SCIENTIFIC, INC., A DELAWARE CORPORATION (THE "<u>BORROWER</u>") IN CONNECTION WITH THE CASES (THE "<u>CHAPTER 11 CASES</u>") FILED BY THE BORROWER (AS DEFINED BELOW) AND CERTAIN OF ITS DIRECT OR INDIRECT SUBSIDIARIES (THE "<u>COMPANIES</u>" OR THE "<u>DEBTORS</u>") IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE (THE "<u>BANKRUPTCY COURT</u>") PURSUANT TO CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (AS AMENDED, THE "<u>BANKRUPTCY CODE</u>") ON MARCH 18, 2025 (THE "<u>PETITION DATE</u>").  THE DIP FACILITY (AS DEFINED BELOW) IS BEING PROVIDED BY THE DIP LENDERS IN RELIANCE UPON THE PROSECUTION AND CONSUMMATION OF THE 363 SALE PROCESS (AS DEFINED BELOW).

THIS TERM SHEET IS BEING PROVIDED ON A CONFIDENTIAL BASIS AND IT, ALONG WITH ITS CONTENTS AND EXISTENCE, MAY NOT BE DISTRIBUTED, DISCLOSED OR DISCUSSED WITH ANY OTHER PARTY BUT MAY BE FILED WITH THE BANKRUPTCY COURT IN CONNECTION WITH THE CHAPTER 11 CASES.  THIS TERM SHEET IS NOT AN OFFER FOR THE PURCHASE, SALE OR SUBSCRIPTION OR INVITATION OF ANY OFFER TO BUY, SELL OR TO SUBSCRIBE FOR ANY SECURITIES.  THE TERMS AND CONDITIONS SET FORTH IN THIS TERM SHEET DO NOT CONSTITUTE OR CREATE AN AGREEMENT, OBLIGATION OR COMMITMENT OF ANY KIND BY OR ON BEHALF OF ANY PARTY, UNLESS AND UNTIL THE INTERIM ORDER (AS DEFINED BELOW) IS ENTERED IN THE CHAPTER 11 CASES BY THE BANKRUPTCY COURT.

| | |
|---|---|
| *Borrower:* | Danimer Scientific Inc., a Delaware corporation, as debtor and debtor-in-possession under the Bankruptcy Code. |
| *Guarantors:* | Each of (a) each subsidiary of Borrower party to the Prepetition Bridge Loan (as defined below) as a "Guarantor", (b) any other subsidiary or affiliate of the Borrower that has commenced a bankruptcy case related to the Chapter 11 Cases, and (c) any other subsidiary of Borrower, subject to exclusions consistent with the Prepetition Bridge Loan (collectively, the "<u>Guarantors</u>"). |
| *Prepetition Bridge Loan:* | The Borrower is a party to that certain Super Senior Unsecured Promissory Note, dated as of December 17, 2024 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Bridge Loans</u>"), by and among, *inter alia*, the Borrower, certain other subsidiaries of the Borrower, as guarantors, the payees from time-to-time party thereto (the "<u>Prepetition Bridge Lenders</u>").  The Prepetition Bridge Loans consist of term loans in an amount of not less than $15,239,485.92. |

| | |
|---|---|
| *DIP Facility:* | A $15,000,000 senior secured superpriority debtor-in-possession term loan credit facility (the "<u>DIP Facility</u>" and the obligations thereunder, the "<u>DIP Obligations</u>"), consisting of: |

(a) a multiple draw new money term loan (the "<u>New Money DIP Term Loan</u>") to be made and funded from time to time in accordance with the Approved Budget (as defined below) during the Availability Period (as defined below) in the aggregate principal amount of up to $1,000,000 (the "<u>DIP Term Loan Commitment</u>"), which shall be made available upon entry of the interim order approving the DIP Facility (each borrowing, an "<u>Interim Draw</u>"), which order shall be satisfactory to the Required DIP Lenders (as defined below) (the "<u>Interim Order</u>");

(b) upon entry of the final order approving the DIP Facility, which order shall be satisfactory to the Required DIP Lenders (the "<u>Final Order</u>" and, together with the Interim Order, the "<u>DIP Orders</u>"), a delayed draw new money term loan (the "<u>New Money DDTL Term Loan</u>", and together with the New Money DIP Term Loan, the "<u>New Money DIP Loans</u>") subject to the New Money DDTL Draw Conditions (defined below) in the aggregate principal amount of up to $2,000,000, which shall be available in $250,000 increments in weekly drawings (each borrowing, a "<u>Subsequent Draw</u>") commencing on the date that is sixty 60 days following the Petition Date (the "<u>DIP DDTL Commitment</u>", and together with the DIP Term Loan Commitment, the "<u>DIP Commitment</u>"); *provided* that after giving effect to the principal balance of all New Money DIP Loans, the aggregate principal balance of all New Money DIP Loans shall not exceed the DIP Commitment; *provided*, *further*, that no DIP Lender shall be obligated to make New Money DIP Loans in an amount in excess of the portion of the DIP Commitment set forth next to such DIP Lender's name in the table set forth on <u>Exhibit A</u> hereto; and

(c) upon entry of the Final Order, a deemed "roll up" on a cashless dollar-for-dollar basis of Prepetition Bridge Loans held by the DIP Lenders (or their affiliates) on a pro rata basis according to their term loan holdings under the DIP Facility, in a ratio of 4:1 of the total DIP Commitment (the "<u>Roll-Up Loans</u>", and together with the New Money DIP Loans, the "<u>DIP Loans</u>").

The proceeds of the New Money DIP Loans shall be funded into a deposit account of the Borrower. Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Agent, which shall be perfected pursuant to the DIP Orders and shall be subject to an account control agreement reasonably satisfactory to the Required DIP Lenders, which may be an existing account control agreement already in place in connection with the Prepetition Bridge Loans.

"<u>Availability Period</u>" means the period from the date of entry of the Interim Order to the earliest of (i) the Maturity Date (as defined below)

2

| | |
|---|---|
| | and (ii) the date of termination of the DIP Facility pursuant to the terms hereof or the DIP Orders. |
| *DIP Loan Documentation:* | At the option of the Required DIP Lenders (as defined below), the Debtors shall execute definitive financing documentation with respect to the DIP Facility, including, without limitation, a credit agreement (the "DIP Credit Agreement"), guarantees and security documents, in each case, satisfactory in form and substance to the Required DIP Lenders and the Debtors (collectively, the "DIP Documents").  The provisions of the DIP Documents shall, upon execution, supersede the provisions of this Term Sheet; *provided* that if the Required DIP Lenders determine not to require the Debtors to execute additional DIP Documents, the provisions of this Term Sheet and the DIP Orders shall govern the DIP Facility.  If the Required DIP Lenders do not require the execution of additional DIP Documents, the DIP Lenders shall enter into a letter agreement containing Agency Provisions in favor of the DIP Agent and acknowledged by the Borrower, in each case, in form and substance acceptable to the DIP Agent in its reasonable discretion.  The provisions of the DIP Documents shall be consistent with this Term Sheet and the DIP Orders. |
| | The DIP Credit Agreement shall contain representations and warranties, conditions precedent, affirmative and negative covenants, indemnities, events of default, and remedies in form and substance substantially similar to the Prepetition Bridge Loan (with such modifications as are (i) set forth herein, and (ii) usual and customary for DIP financings of this type). Other DIP Documents, such as transaction documents, subordination agreements, intercreditor agreements, and other material agreements, shall be, in each case, usual and customary for DIP financings of this type and in form and substance substantially similar to the applicable documents entered into in connection with the Prepetition Bridge Loan.  The DIP Credit Agreement shall also contain Agency Provisions in form and substance acceptable to the DIP Agent in its reasonable discretion. |
| | The definition of "Required DIP Lenders" (or any equivalent term with respect to the DIP Facility) shall refer to DIP Lenders holding at least a majority in principal amount of the outstanding DIP Loans and unfunded DIP Commitment. |
| | For purposes of this provision, the term "Agency Provisions" means customary provisions for the benefit of administrative and collateral agents including, without limitation, provisions acknowledging that: (i) the DIP Agent's duties are solely ministerial and administrative in nature; (ii) the DIP Agent is entitle to refrain from taking any action or exercising any discretion or authority unless and until the DIP Agent has received instruction regarding the same from the Required DIP Lenders; (iii) the DIP Agent has no liability for any action taken or not taken by it or its agents by direction of the Required DIP Lenders, in reliance upon any writing or communication believed by it to be genuine and authorized by the proper person or entity or in reliance on the advice of counsel or other professional advisors whether or not such advice may ultimately be determined to have been erroneous; (iv) the DIP Agent is entitled to refrain |

3

| | |
|---|---|
| | from taking any action or exercising any discretion or authority if taking such action, in its opinion, exposes the DIP Agent to any liability or is contrary to law or court order; (v) the DIP Agent has no duty to ascertain or inquire regarding the occurrence of any default or event of default and shall be deemed to have no knowledge of the same unless and until a Debtor or a DIP Lender gives written notice to the DIP Agent of the same; (vi) the DIP Lenders are obligated on a pro rata basis to indemnify the DIP Agent (and its directors, officers, members, employees, advisors and agents) for any costs or expenses incurred in connection with the DIP Facility and the Chapter 11 Cases to the extent not paid by the Debtors; (vii) and such other provisions as the DIP Agent may reasonably require. |
| *DIP Lenders:* | The Prepetition Bridge Lenders who elect to provide DIP financing (the "<u>DIP Lenders</u>"). All Prepetition Bridge Parties (or their affiliates) will be offered the right to participate in the DIP Facility *pro rata* with their holdings under the Prepetition Bridge Loan. |
| *DIP Agent:* | WSFS Bank (in such capacity, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Secured Parties</u>"). |
| *Interest Rate:* | <u>New Money DIP Loans</u>: 12.50% per annum, compounded weekly, paid in kind.<br><br><u>Roll-Up Loans</u>: Same as the non-default rate on the corresponding Prepetition Bridge Loans as in effect on the Petition Date under the Prepetition Bridge Loan, paid in kind. |
| *Default Rate:* | At all times following the occurrence and during the continuance of an Event of Default and notice from the Required DIP Lenders to the Borrower, principal, interest and all other amounts due on the DIP Loans shall bear interest at a rate equal to 3.00% per annum in excess of the interest rate set forth under "Interest Rate" above and, for the avoidance of doubt, shall be paid in kind. |
| *Security and Priority:* | The DIP Secured Parties shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition first priority security interests and liens (the "<u>DIP Liens</u>") on all tangible, intangible, real and personal property of the Debtors (including without limitation, all prepetition and post-petition property and assets of the Debtors and all equity interests owned by the Debtors), and all other property of the Debtors of whatever kind, nature or description, whether acquired or created prepetition or post-petition to secure the DIP Obligations, and the proceeds, rents, profits, and offspring of each of the foregoing (the "<u>DIP Collateral</u>"), other than contracts, leases and licenses solely to the extent a lien is not permitted by law to attach to such property, in which case the proceeds of such contracts, leases and other licenses shall be DIP Collateral; provided however, (x) the DIP Liens shall be subject only to validly perfected, enforceable and non-avoidable liens existing as of the Petition Date to which the liens securing the obligations under the Prepetition Bridge Loan were subject and which are listed on a |

4

|  | schedule to the DIP Orders (the "<u>Prepetition Permitted Liens</u>") and (y) DIP Liens shall be junior in priority to the liens (the "<u>NMTC Prepetition Liens</u>") on the designated accounts set forth on Schedule 1 ("<u>NMTC Cash Collateral Accounts</u>") that secure the Debtors' obligations under their NMTC Facilities.[1]<br><br>Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents, but (subject to entry of the Final Order) shall include the proceeds therefrom. For the avoidance of doubt, the DIP Liens shall include, and the DIP Collateral shall consist of all proceeds of real property, including non-residential leaseholds.<br><br>For the avoidance of doubt, the DIP Liens shall prime and be senior to the liens of the Prepetition Bridge Lenders. The DIP Liens granted under Section 364(d)(1) of the Bankruptcy Code shall not be *pari passu* with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to the Carve-Out and any Prepetition Permitted Liens.<br><br>All DIP Obligations shall also constitute allowed superpriority administrative expense claims (the "<u>Superpriority Claims</u>") in the Chapter 11 Cases and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code. The DIP Liens and the Superpriority Claims shall be subject to the Carve-Out (as defined below).<br><br>The DIP liens shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the Required DIP Lenders or the DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral. |
|---|---|
| *Carve-Out:* | The Carve-Out shall be, collectively, (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee (the "<u>U.S. Trustee</u>") pursuant to 28 U.S.C. §1930(a), (b) reasonable fees and expenses incurred by a trustee and payable under |

---

[1] <u>NMTC Facilities</u>" means, collectively, (i) the loans extended under that certain Loan Agreement, dated as of April 25, 2019 by and among (a) Danimer Manufacturing, Inc. as borrower, (b) Carver Development CDR VI, LLC, and (c) ST CDE LXII, LLC; (ii) the loans extended under that certain Loan Agreement, dated as of August 23, 2022 by and among (a) Meredian Bioplastics, Inc., (b) HRV SUB-CDE 45, L.L.C., (c) AMCREF FUND 76, LLC, (d) ST CDE LXXXIII, LLC, and (e) CDVCA 23, LLC; and (iii) the loans extended under that certain Loan Agreement, dated as of November 7, 2019 by and among (a) Meredian Bioplastics, Inc. as the borrower and (b) AMCREF FUND 51, LLC.

5

|  | section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000, and (c) subject to the Approved Budget and to the extent allowed at any time, whether by interim order, procedural order, or otherwise, unpaid fees and expenses of the professionals (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors) retained by the Debtors and any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "UCC"), that (i) are incurred on or prior to the first business day following the date of delivery of the Carve-Out Trigger Notice (as defined below), or (ii) are incurred after the first business day following the date of delivery of a Carve-Out Trigger Notice, subject to a cap of $150,000 for the Debtors' professionals and $25,000 for the UCC's professionals (the "Carve-Out").<br><br>On a weekly basis, budgeted fees, costs and expenses of professionals retained by the Debtors and the UCC, if any, shall be funded into a segregated escrow account held in trust in an amount as set forth in the Approved Variance Report (the "Professional Fee Reserve"). Amounts funded into the Professional Fee Reserve shall be considered used by the Debtors at such time as they are deposited into the Professional Fee Reserve for distribution to professionals in accordance with orders of the Bankruptcy Court. Any amounts remaining in the Professional Fee Reserve after payment of allowed fees and expenses shall be DIP Collateral.<br><br>"Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to the UCC (if any), which notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility. |
|---|---|
| *Health Insurance Claims and Reserve:* | (a) The Debtors are authorized to use proceeds of the DIP Facility, proceeds of the DIP Collateral, and/or the Prepetition Collateral (as defined in the DIP Order) (including Cash Collateral) (as defined in the DIP Orders), to fund allowed, undisputed and unpaid prepetition unsecured health care insurance obligations to current and former employees (such obligations, "Health Insurance Claims") in the aggregate amount not to exceed $700,000 (the "Health Insurance Claims Cap"). For the avoidance of doubt, payments of Health Insurance Claims shall be excluded from budget variance testing for purposes of determining whether a budget variance constitutes a Permitted Variance. It shall be an Event of Default if the Debtors make any payments on account of Health Insurance Claims in excess of the Health Insurance Claims Cap unless the Required DIP Lenders have provided prior consent to such payments.<br><br>(b) Following the occurrence of an Event of Default (if any) and the expiration of the Remedies Notice Period, the Debtors are authorized and directed to establish and fund a reserve in a segregated account in an amount equal to the Health Insurance Claims Cap, *less* any amounts paid toward Health Insurance Claims prior to such Event of Default |

6

<table>
<tr><td></td><td>(the "<u>Health Insurance Reserve</u>"); <em>provided</em>, <em>however</em>, that the Health Insurance Reserve shall not be available to the Debtors or their estates if (i) the Final Order is not entered by the applicable Milestone date (as it may be extended with the prior written consent of the Required DIP Lenders), or (ii) a party obtains requisite standing with respect to a Challenge (as defined in Paragraph 44 of the Interim Order) that is timely filed prior to the expiration of the Challenge Period (as defined in the DIP Orders).<br><br>(c)  The funds in the Health Insurance Reserve shall be subject to the DIP Liens and adequate protection replacement liens.  If there are funds remaining in the Health Insurance Reserve after final resolution of all Health Insurance Claims or upon the occurrence of either event listed in (i) or (ii) in subparagraph (b) above, such funds shall be paid to the applicable agent or lender for payment of the applicable obligations in accordance with the relative priorities set forth in **<u>Exhibit C</u>** of the Interim Order.</td></tr>
<tr><td><em>Maturity Date:</em></td><td>The earliest to occur of (a) the 100th day following the Petition Date, (b) the 30th day following the Petition Date if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (c) the date a sale of all or substantially all of the assets of the Debtors is consummated, (d) the effective date of a plan of reorganization or liquidation, (e) entry of an order by the Bankruptcy Court approving (i) a motion seeking conversion or dismissal of the Chapter 11 Cases or (ii) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business, and (f) the date any or all of the DIP Obligations are accelerated in accordance with the DIP Orders.</td></tr>
<tr><td><em>Fees and Expenses; Indemnity:</em></td><td>(i) An upfront fee of 10.00% on the principal amount of the New Money DIP Loans (the "<u>Upfront Fee</u>") payable in kind; and (ii) an exit fee of 5.00% on the principal amount of the New Money DIP Loans, payable on the Maturity Date, payable in kind (the "<u>Exit Fee</u>" and, together with the Upfront Fee, the "<u>DIP Fees</u>").  The Upfront Fee shall be fully earned upon entry of the Interim Order, and the Exit Fee shall be fully earned upon entry of the Final Order.<br><br>The Debtors shall reimburse the DIP Agent and the DIP Lenders for all reasonable and documented costs and expenses, including legal fees, financial advisor fees, and other similar fees, costs and expenses incurred in connection with the DIP Facility and the Chapter 11 Cases, whether incurred on a prepetition or postpetition basis, which shall be payable by Borrower in accordance with the terms of the DIP Order and without the requirement for Bankruptcy Court approval.  A copy of the summary invoice shall be provided to counsel to the Debtors, the U.S. Trustee, and counsel to the UCC, if any.<br><br>The Debtors shall indemnify, pay and hold harmless the DIP Agent and each DIP Lender (and each of their respective directors, officers, members, employees, advisors and agents) against any loss, liability, cost</td></tr>
</table>

7

| | |
|---|---|
| | or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).<br><br>No DIP Fees shall be earned on account of any of the Roll-Up Loans. |
| *Releases:* | The DIP Orders shall contain releases and exculpations for the DIP Agent, each DIP Lender and the Prepetition Bridge Lenders (in each case, solely in their capacity as such), in form and substance satisfactory to each such party, respectively, including, without limitation, releases from any avoidance actions, in each case subject to the investigation period provided in the DIP Orders. |
| *Closing Conditions to Interim Draws:* | The funding of the Interim Draw in the amount of $1.0 million shall be conditioned upon the satisfaction of the following conditions precedent unless waived by each DIP Lender in its sole and absolute discretion:<br><br>(i) the Debtors shall have timely delivered to each DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet and the Interim Order;<br><br>(ii) the Debtors shall have not failed to disclose any material assumptions with respect to the Approved Budget;<br><br>(iii) the Debtors shall have delivered to the DIP Agent a notice of borrowing in connection with such Interim Draw request no later than 11:00 AM ET two (2) business days prior to the requested funding date for such Interim Draw (or such later time as the DIP Agent may agree to in its sole discretion);<br><br>(iv) the Interim Order shall have been entered by the Bankruptcy Court in the Chapter 11 Cases (after appropriate notice and a hearing), which Interim Order shall not have been reversed, modified, amended, stayed, vacated, or subject to a stay pending appeal, in each case, without the prior written consent of the Required DIP Lenders and the Debtors shall be in compliance in all respects with the Interim Order;<br><br>(v) the Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day" motions, orders and related pleadings (including a cash management order encompassing the cash management arrangements currently in place under the Prepetition Bridge Loan) and all other pleadings which relate to the DIP Facility shall have been reviewed in advance by each DIP Lender and shall be reasonably satisfactory in form and substance to Required DIP Lenders;<br><br>(vi) Each DIP Lender shall be satisfied that the liens and security interests of the DIP Agent have been perfected in the DIP |

8

| | |
|---|---|
| | Collateral and shall constitute first-priority liens (subject only to Prepetition Permitted Liens and the NMTC Liens with respect to the NMTC Cash Collateral Accounts); |
| | (vii) the Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is reasonably acceptable to each DIP Lender (which shall be deemed satisfied if such insurance as required by the Prepetition Bridge Loan remains in place); |
| | (viii)    upon entry of the Interim Order, the entry into this Term Sheet shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently; and |
| | (ix) all applicable Milestones that are required to be complied with prior to or concurrently with the entry of the Interim Order and each Interim Draw shall have been complied with (or waived by the Required DIP Lenders). |
| *New Money DDTL Draw Conditions* | The funding of each Subsequent Draw shall be conditioned upon the satisfaction of the following conditions precedent unless waived by each DIP Lender in its sole and absolute discretion: |
| | (i) the Debtors shall have timely delivered to each DIP Lender the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet and the DIP Orders and such other information (financial or otherwise) as may be reasonably requested by the Required DIP Lenders or the DIP Agent; |
| | (ii) the Debtors shall have not failed to disclose any material assumptions with respect to the Approved Budget; |
| | (iii) the Debtors shall have delivered to the DIP Agent a Notice of Borrowing in connection with such Subsequent Draw request no later than 11:00 AM ET two (2) business days prior to the requested funding date for such Subsequent Draw (or such later time as the DIP Agent may agree to in its sole discretion); |
| | (iv) Such Subsequent Draw shall be in a maximum amount not to exceed the forecasted amount of cash required to comply with the Approved Budget for the applicable week; |
| | (v) the Final Order shall have been entered by the Bankruptcy Court in the Chapter 11 Cases, which Final Order shall not have been reversed, modified, amended, stayed, vacated, or subject to a stay pending appeal, in each case, without the prior written consent of the Required DIP Lenders and the Debtors shall be in compliance in all respects with the Final Order; |

9

| | |
|---|---|
| | (vi) the Debtors shall have received one or more binding, non-rescindable Qualifying Bids (to be defined in court-approved bidding procedures, which will be subject to the consent of the Required DIP Lenders) which bid or bids, collectively, include sufficient cash consideration to fund the Carve-Out and repay the DIP Obligations in full in cash, including any Subsequent Draws; |
| | (vii) all applicable Milestones that are required to be complied with prior to or concurrently with the entry of the Final Order and each Subsequent Draw shall have been complied with (or waived by the Required DIP Lenders); |
| | (viii) the Debtors remain in compliance with the Approved Budget, including after taking into account any Permitted Variances; |
| | (ix) there have existed no projections showing any deviation in future weeks in excess of the Permitted Variances; |
| | (x) the Approved Budget expressly reflects a need for any such additional funds; |
| | (xi) there is no reasonable likelihood of material delay in the projected timeline to liquidate existing A/R, Inventory and WIP as determined in good faith by the Required DIP Lenders; |
| | (xii) there is no challenge to the rights, liens, claims of any of the DIP Lenders or the Prepetition Bridge Lenders existing nor any reduction or adverse effect of the rights, liens or claims of any of the DIP Lenders having occurred; |
| | (xiii) the occurrence of a material adverse effect on the collateral or the Debtors as determined in good faith by the Required DIP Lenders has not occurred; and |
| | (xiv) the 100-day DIP draw period not having expired absent express written consent of each DIP Lender. |
| *Budget:* | (a) The Debtors shall use Cash Collateral and the proceeds of the DIP Facility solely in accordance with the Approved Budget and the DIP Documents (it being agreed that the initial budget attached to the Interim Order (the "Initial Budget") is in form and substance acceptable to the Required DIP Lenders). The "Approved Budget" means, initially the Initial Budget, and thereafter, any subsequently Updated Budget that meets the requirements set forth below in this sub-paragraph (a). Commencing on April 1, 2025 at 5:00 p.m. (Eastern Time) and continuing on each two-week anniversary thereafter (or such other times as the Debtors may elect with the consent of the DIP Agent, acting at the direction of the Required DIP Lenders), the Debtors shall deliver to counsel for the DIP Lenders, the Committee, and the U.S. Trustee an updated budget (an "Updated Budget") with the form and level of detail set forth in the Initial Budget, and shall include, weekly basis cash |

revenues, receipts, expenses, professional fees, and other disbursements, net cash flows, inventory receipts, and other items on a line item basis. Such Updated Budget shall constitute the "Approved Budget" for purposes of the DIP Order (i) upon written notice from the DIP Lenders' counsel to the Debtors (which may be in the form of an email) that such budget is in form and substance satisfactory to the DIP Agent Any amendments, supplements, or modifications to the form of the Approved Budget (not including updates to the Budget described above) shall be subject to the prior written approval of the Required DIP Lenders, prior to the implementation thereof.

(b)     Commencing on the Tuesday of the first full calendar week after the Petition Date at 5:00 p.m. (Eastern Time), and on each Tuesday on a weekly basis thereafter (or at such other times as the Debtors may elect with the consent of the  Required DIP Lenders), the Debtors shall deliver to counsel to the DIP Lenders a variance report in form and substance reasonably acceptable to the Required DIP Lenders (an "Approved Variance Report") showing comparisons of actual results for each line item against such line item in the Approved Budget for the prior (Monday to Sunday) one-week period.  Thereafter, the Debtors shall deliver to counsel to the DIP Lenders an Approved Variance Report on each Tuesday on a weekly basis for (i) the preceding week (Monday to Sunday) and (ii) the trailing four-week period (or, if fewer than four weeks have lapsed since the Petition Date, then for the trailing one-, two-, or three-week period, as applicable).  Any amendments, supplements, or modifications to an Approved Variance Report shall be subject to the prior written approval of the Required DIP Lenders.

(c)     Each Approved Variance Report shall indicate whether there are any adverse variances that exceed any of the Permitted Variances. "Permitted Variances" shall mean variances:

(i) up to 10% of the aggregate for all cash disbursements in the Approved Budget (excluding fees and expenses of counsel to the DIP Secured Parties and Professional Persons[2] and disbursements for Health Insurance Claims) (such disbursements, collectively,  "Non-Professional  Cash Disbursements"),

(ii) up to 10% of all fees and expenses of Debtor Professionals on an aggregate basis (the "Debtor Professional Fee Variance"), and

---

[2]  "Professional Persons" means, collectively, persons or firms retained by (i) the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (each, a "Debtor Professional") and (ii) the Committee pursuant to section 327, 328, or 1103 of the Bankruptcy Code (each a "Committee Professional").

11

| | |
|---|---|
| | (iii) up to 10% of all fees and expenses of Committee Professionals on an aggregate basis (the "<u>Committee Professional Fee Variance</u>"), <br><br> in each of (i), (ii), and (iii) calculated weekly on a rolling four-week basis commencing as of the Petition Date, with the first such testing to begin upon delivery of the second Approved Variance Report (the "<u>Variance Testing Commencement Date</u>").  For the avoidance of doubt, the Approved Budget shall not serve as a cap or limitation on the amount or payment of any fees and expenses of the Debtor Professionals. <br><br> (d)　　In the event that an expense budgeted in any line item in the Budget for payment during any particular week exceeds the amount actually paid in respect of such line item during such week (including with respect to Professional Persons) (the difference between the budgeted amount and the amount actually paid, the "<u>Carry Forward Amount</u>"), the Debtors shall be authorized to use the Carry Forward Amount during any subsequent weeks toward (i) the total amount of Non-Professional Cash Disbursements for any Carry Forward related to any line item for Non-Professional Cash Disbursements or (ii) the total amount of (A) Debtor Professional fees and expenses for any Carry Forward related to fees and expenses of an individual Debtor Professional or (B) Committee Professional fees and expenses for any Carry Forward related to fees and expenses of any individual Committee Professional. |
| *Milestones:* | The Debtors shall conduct the Chapter 11 Cases in accordance with the milestones set forth on Exhibit B hereto (each, a "<u>Milestone</u>"). |
| *363 Credit Bid:* | The Interim Order shall provide that the DIP Lenders (or the DIP Agent at the direction of the Required DIP Lenders) shall be permitted to credit bid, pursuant and subject to section 363(k) of the Bankruptcy Code or applicable law, the New Money DIP Loans in connection with any sale or disposition of assets in the Chapter 11 Cases. <br><br> The Final Order shall provide that the DIP Lenders (or the DIP Agent at the direction of the Required DIP Lenders) shall be permitted to credit bid (pursuant to section 363(k) of the Bankruptcy Code or applicable law) the DIP Loans (including the Roll-Up Loans) and any Prepetition Bridge Loans (and any other applicable obligations) held by the DIP Lenders in connection with any sale or disposition of assets in the Chapter 11 Cases (including any deposit in connection with such sale) and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
| *Use of Proceeds:* | Proceeds of the DIP Facility will be used in compliance with the terms of the Approved Budget (a) to pay transaction costs, fees and expenses which are incurred in connection with the DIP Facility, (b) to pay professional fees of (i) the Debtors and their estates, and (ii) the UCC in accordance with the Approved Budget, and (c) for working capital and other general corporate purposes of the Debtors, all subject to certain restrictions to be |

| | set forth in the Interim Order or Final Order, as applicable, and the DIP Documents. |
| | |
| | The deemed proceeds of the Roll-Up Loans shall be used to refinance an equal amount on a dollar-for-dollar basis of the Prepetition Bridge Loans held by the DIP Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined under the Prepetition Bridge Loan, the "Prepetition Bridge Loan Obligations") by such amount. |
| *Adequate Protection:* | As adequate protection for any diminution of the Prepetition Bridge Lenders' interest in the "Collateral" (as defined in the Prepetition Bridge Loan) including without limitation any diminution resulting from the subordination of existing liens to the DIP Liens and/or the Debtors' use of cash collateral pursuant to the DIP Orders, each of the Prepetition Bridge Lenders shall receive the following forms of adequate protection: (i) monthly payments of the reasonable fees, costs and expenses of the Prepetition Bridge Loan Lenders and agent (including professional fees), (ii) subject to recharacterization as principal under the Prepetition Bridge Loan, monthly payment in kind of interest to the Prepetition Bridge Lenders at the non-default rate as in effect on the Petition Date under the Prepetition Bridge Loan, (iii) replacement liens on the DIP Collateral that shall be junior only to the DIP Liens and any Prepetition Permitted Liens and the NMTC Liens on the NMTC Cash Collateral Accounts, (iv) superpriority administrative expense claims with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code, other than the superpriority administrative expense claims of the DIP Lenders and DIP Agent and the Carve-Out, and (v) an acknowledgement of the unconditional right to credit bid the Prepetition Bridge Loan Obligations as further set forth in this Term Sheet and (B) as otherwise required by the Bankruptcy Court pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise. |
| *Marshalling; 552(b) Waiver and Waiver of 506(c) Claims:* | Waiver of the equitable doctrine of "marshalling" as set forth in the Interim Order and waivers of claims for necessary costs and expenses of preserving or disposing of property securing an allowed secured claim pursuant to section 506(c) and the section 552 "equities of the case" exception as set forth in the Final Order. |
| *Mandatory Prepayments:* | The Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established by the DIP Agent to cover asserted contingent and indemnity obligations) until such obligations are paid in full immediately as follows: |
| | |
| | (i)  100% of the net cash proceeds of any sale or disposition of the Liquidation Assets and the 363 Sale Assets (each as defined in the Milestones) simultaneous with the consummation thereof, after funding the Professional Fee Reserve and the Health Insurance Reserve (if applicable) and reserving proceeds sufficient to pay estimated, accrued, unpaid and allowed administrative expenses (as of the closing of such sale) to the extent set forth in the Approved |

13

Budget, subject to the Permitted Variance;

(ii)   100% of the net cash proceeds of Extraordinary Receipts,[3] after funding the Professional Fee Reserve and the Health Insurance Reserve (if applicable) and reserving proceeds sufficient to pay estimated, accrued, unpaid and allowed administrative expenses to the extent set forth in the Approved Budget, subject to the Permitted Variance; and

(iii)  If, at any time, the Debtors' aggregate cash receipts exceed the amounts forecast to be collected over the entire 13-week period covered by the initial Approved Budget by more than $500,000 (such excess amount, the "Excess Cash"), 100% of such Excess Cash shall be used to repay the DIP Loans, after funding the Professional Fee Reserve and the Health Insurance Reserve (if applicable) and reserving proceeds sufficient to pay estimated, accrued, unpaid and allowed administrative expenses to the extent set forth in the Approved Budget, subject to the Permitted Variance. Notwithstanding the foregoing, the Debtors may seek, subject to express written consent of the Required DIP Lenders (which consent shall not be unreasonably withheld, conditioned, or delayed), a formal waiver of the requirement to prepay all or a portion of the Excess Cash.

Any amounts so paid or prepaid may not be reborrowed. No reinvestment of the proceeds of any Extraordinary Receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lenders.

Mandatory payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will otherwise be applied in the following order of priority (unless otherwise determined by the DIP Lenders in their sole discretion), after giving effect to the Professional Fee Reserve, the Carve-Out and any other payments required pursuant to the DIP Orders:

(1)    first, to pay all documented out-of-pocket expenses of the DIP Lenders and the DIP Agent (including, without limitation, fees and expenses of counsel);

(2)    second, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding New Money DIP Loans;

---

[3]   "Extraordinary Receipts" means any cash received by the Debtors not in the ordinary course of business (and not consisting of proceeds described in sub-clause (i) or (ii), but excluding sales tax receipts contemplated to be received by the Debtors as set forth in the Approved Budget), including, (a) tax refunds, (b) net proceeds of any judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (c) indemnity payments, (d) net proceeds of any payment made under an insurance policy or agreement, other than insurance proceeds received in respect of damage to equipment used to effect the repair or replacement of such equipment in the ordinary course of business, and (e) net proceeds of any condemnation or taking by any governmental authority.

14

|  | |
|---|---|
|  | (3) <u>third</u>, to repay any principal amounts outstanding in respect of the New Money DIP Loans (including any amounts and interest that have been added to the principal balance); <br><br> (4) <u>fourth</u>, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders holding Roll-Up Loans; <br><br> (5) <u>fifth</u>, to repay any principal amounts outstanding in respect of the Roll-Up Loans (including any amounts and interest that have been added to the principal balance); <br><br> (6) <u>sixth</u>, all other amounts owing to the DIP Lenders and the DIP Agent; and <br><br> (7) <u>last</u>, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of the Prepetition Bridge Lenders in accordance with the Prepetition Bridge Loan. |
| *Events of Default:* | Each of following shall constitute an "<u>Event of Default</u>": <br><br> (i) the entry of an Interim Order or Final Order in form and substance that is not acceptable to the DIP Agent and the Required DIP Lenders in their sole discretion; <br><br> (ii) failure by any Debtor to be in compliance in all respects with provisions of this Term Sheet, the DIP Documents and/or the DIP Orders, and such failure is not cured within two (2) business days of notice of same by the DIP Agent (other than a Milestone breach); <br><br> (iii) failure of any of the Milestones to be satisfied by the Specified Deadline, as may be extended with the consent of the Required DIP Lenders; <br><br> (iv) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made; <br><br> (v) the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full in cash upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in the Chapter 11 Cases which is *pari passu* with or senior to the DIP Liens, excluding liens arising under the DIP Orders or pursuant to any other financing agreement made with the prior written consent of the DIP Agent and each DIP Lender; <br><br> (vi) the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders) against |

15

any of the DIP Agent or any DIP Lender or any of their agents and employees to subordinate or avoid any liens made in connection with the DIP Orders;

(vii) (1) the Debtors file a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, reconsider, supplement or otherwise modify any DIP Order, the DIP Documents, or this Term Sheet or to disallow the DIP Obligations, in whole or in part, or (2) any material provision of the DIP Orders, the DIP Documents, or this Term Sheet or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Agent and each DIP Lender);

(viii) the filing with the Bankruptcy Court of a motion seeking approval of a sale of substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code or a plan of reorganization or liquidation in the Chapter 11 Cases that, in any such case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of the DIP Obligations and all other amounts outstanding under the Term Sheet, the DIP Documents and the DIP Orders on closing of such sale (consistent with the mandatory prepayment provisions set forth above) or the effective date of such plan, without the prior written consent of the DIP Agent and each DIP Lender;

(ix) the appointment in the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of the Debtors (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code);

(x) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $50,000 in value in the aggregate, except for the NMTC Cash Collateral Accounts;

(xi) the failure to pay principal, cash interest (subject to a three (3) business day grace period, solely with respect to cash interest) or other DIP Obligations in full when due, including without limitation, on the Maturity Date;

(xii) the payment of, or application by the Debtors for authority to pay, any prepetition claim without prior written consent of the DIP Agent and the Required DIP Lenders other than amounts set forth in the Approved Budget (subject to any Permitted Variances);

(xiii) the failure to comply with the Approved Budget (subject to any Permitted Variances);

(xiv) a party obtains requisite standing with respect to a Challenge (as defined in Paragraph 44 of the Interim Order) that is timely filed

16

| | |
|---|---|
| | prior to the expiration of the Challenge Period (as defined in Paragraph 44 of the Interim Order); and |
| | (xv) the Debtors make any payments on account of Health Insurance Claims in excess of the Health Insurance Claims Cap, unless the Required DIP Lenders have provided prior consent to such payments. |
| *Remedies Upon Event of Default:* | Upon the occurrence and during the continuance of any Event of Default, subject to three (3) business days' notice to the Debtors during which the Debtors may seek an emergency hearing before the Bankruptcy Court (at which hearing the sole issue shall be whether or not an Event of Default has occurred or is continuing) (the "Remedies Notice Period"), the DIP Agent, at the direction of the Required DIP Lenders, shall take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay: |
| | (a)  declare all DIP Obligations (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable; |
| | (b)  terminate any further commitment to lend to the Borrower; |
| | (c)  exercise rights and remedies pursuant to the terms of the DIP Orders, or applicable law (including, without limitation, direct the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of the DIP Documents, (ii) to collect accounts receivable, without setoff by any account debtor, including to direct the Debtors to collect such account receivables, (iii) to sell or otherwise dispose of any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Agent and the DIP Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code) and (iv) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); *provided* that the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Agent in the DIP Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Agent; and/or |
| | (d)  after the expiration of the Remedies Notice Period unless otherwise prohibited by the Bankruptcy Court during the Remedies Notice Period and without further notice  or further court order and without seeking further relief from the automatic stay under section 362 of the Bankruptcy Code, the Debtors, at the election of the Required DIP Lenders, shall be required under the terms of the DIP Order to |

17

| | |
|---|---|
| | facilitate a strict foreclosure under UCC section 9-620 as adopted by New York by transferring ownership and title to the DIP Collateral (as may be specified by the DIP Agent at direction of Required DIP Lenders) in full or partial satisfaction of the DIP Obligations.<br><br>In each case, prior to exercising any remedies, sufficient cash on hand must be reserved to fully fund the Carve-Out and the Health Insurance Reserve and accrued, unpaid and allowed administrative expense claims to the extent set forth in the Approved Budget as set forth in the DIP Orders. |
| *Cooperation:* | The Debtors, in consultation with the DIP Lenders, including in connection with litigation thereof in the Bankruptcy Court, shall seek to obtain a refund of amounts paid to Entek Manufacturing, LLC or any of its affiliates ("Entek") for equipment that was never delivered to the Debtors and other related relief (collectively, the "Deposit Claim"). |
| *Governing Law:* | State of New York, except as governed by the Bankruptcy Code.<br><br>In the event of a conflict or any inconsistency between the terms of this Term Sheet and the DIP Orders, the terms of the DIP Orders shall control. |

RLF1 32594187v.1

**EXHIBIT A**

**(DIP Commitment Schedule)**

| DIP Lender | DIP Term Loan Commitment | DIP DDTL Commitment |
|---|---|---|
| JEFFERIES CAPITAL SERVICES, LLC | $      266,666.67 | $      533,333.33 |
| RIVA RIDGE MASTER FUND, LTD. | $      300,000.00 | $      600,000.00 |
| BPI CREDIT 6, L.L.C. | $      433,333.33 | $      866,666.67 |
| **Total** | **$ 1,000,000.00** | **$ 2,000,000.00** |

## SCHEDULE 1

### (NMTC Cash Collateral Accounts)

| No. | Account Holder | Bank Name | Account Function | Account No. |
|---|---|---|---|---|
| 1. | Danimer Scientific Kentucky, Inc. | U.S. Bank National Association | Danimer Scientific Kentucky NMTC – Brownfield Reserve Account | Account Ending: 1008 |
| 2. | Danimer Scientific Kentucky, Inc. | U.S. Bank National Association | Danimer Scientific Kentucky NMTC – Consortium America Reserve Account | Account Ending: 0992 |
| 3. | Danimer Scientific Kentucky, Inc. | U.S. Bank National Association | Danimer Scientific Kentucky NMTC – AMCREF Reserve Account | Account Ending: 1016 |
| 4. | Meredian Holdings Group, Inc. | Truist Financial Corporation | Meredian Holdings Group NMTC - Twain Account | Account Ending: 8276 |
| 5. | Meredian Bioplastics, Inc. | Truist Financial Corporation | Meredian NMTC – Disbursement Reserve Account | Account Ending: 5989 |
| 6. | Meredian Bioplastics, Inc. | Truist Financial Corporation | Meredian NMTC – AMCREF Reserve Account | Account Ending: 6004 |
| 7. | Meredian Bioplastics, Inc. | Truist Financial Corporation | Meredian NMTC – HRV Reserve Account | Account Ending: 6012 |
| 8. | Meredian Bioplastics, Inc. | Truist Financial Corporation | Meredian NMTC – CDVCA Reserve Account | Account Ending: 6020 |
| 9. | Meredian Bioplastics, Inc. | Truist Financial Corporation | Meredian NMTC – TCDE Reserve Account | Account Ending: 6039 |
| 10. | Danimer Scientific Manufacturing, Inc. | Carver State Bank | Danimer Scientific Manufacturing NMTC - CDE Reserve Account | Account Ending: 6605 |
| 11. | Danimer Scientific Manufacturing, Inc. | Truist Financial Corporation | Danimer Scientific Manufacturing NMTC – Restricted Disbursement Reserve Account | Account Ending: 3056 |
| 12. | Danimer Scientific Manufacturing, Inc. | Truist Financial Corporation | Danimer Scientific Manufacturing Second NMTC - CDE Reserve Account | Account Ending: 3064 |

# EXHIBIT B

(Approved Budget)

**Danimer Scientific**
**DIP Budget**

$ in 000s

| Budget Week | WK1 | WK2 | WK3 | WK4 | WK5 | WK6 | WK7 | WK8 | WK9 | WK10 | WK11 | WK12 | WK13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week ending | 3/23/25 | 3/30/25 | 4/6/25 | 4/13/25 | 4/20/25 | 4/27/25 | 5/4/25 | 5/11/25 | 5/18/25 | 5/25/25 | 6/1/25 | 6/8/25 | 6/15/25 |
| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Receipts** | | | | | | | | | | | | | |
| Cash Receipts | 37 | 495 | 1,029 | 1,515 | 1,553 | 1,292 | 1,552 | 1,493 | 1,586 | 1,218 | 463 | 250 | 550 |
| **Receipts** | **37** | **495** | **1,029** | **1,515** | **1,553** | **1,292** | **1,552** | **1,493** | **1,586** | **1,218** | **463** | **250** | **550** |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll & Benefits | - | (265) | - | (458) | - | (409) | (5) | (549) | (3) | (265) | - | (120) | (85) |
| Health Claims | - | (209) | (164) | - | - | - | (164) | - | - | - | - | (164) | - |
| Rent & Utilities | - | (79) | (409) | (63) | (77) | (55) | (385) | (16) | (38) | (16) | (341) | (10) | (10) |
| Insurance | - | (23) | (122) | - | - | - | (122) | - | - | - | (293) | - | - |
| Taxes | - | - | (21) | - | - | - | - | - | - | - | (40) | - | - |
| Other Operating Disbursements | - | (169) | (176) | (109) | (69) | (65) | (78) | (84) | (89) | (39) | (51) | (41) | (64) |
| **Operating Disbursements** | **-** | **(744)** | **(891)** | **(630)** | **(146)** | **(529)** | **(754)** | **(649)** | **(129)** | **(320)** | **(724)** | **(335)** | **(159)** |
| **Operating Cash Flows** | **37** | **(249)** | **138** | **886** | **1,407** | **763** | **799** | **844** | **1,457** | **898** | **(262)** | **(85)** | **391** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | |
| Company Restructuring Professionals | - | (720) | (500) | (588) | (675) | (525) | (488) | (565) | (525) | (595) | (475) | (465) | (465) |
| UCC Professionals | - | - | - | (63) | (63) | (63) | (63) | (31) | (31) | (31) | (31) | (42) | (42) |
| Board of Director Fees | - | - | - | (30) | - | - | - | - | - | - | - | - | - |
| Utility Deposit | - | (112) | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | (175) |
| **Non-Operating Disbursements** | **-** | **(832)** | **(500)** | **(680)** | **(738)** | **(588)** | **(550)** | **(596)** | **(556)** | **(626)** | **(506)** | **(507)** | **(682)** |
| **Net Cash Flow before Debt Service** | **37** | **(1,081)** | **(362)** | **206** | **669** | **176** | **249** | **248** | **900** | **271** | **(768)** | **(592)** | **(291)** |
| **Debt Service** | | | | | | | | | | | | | |
| DIP Draws/(Repayments) | - | 1,000 | - | - | - | - | - | - | - | - | - | - | - |
| DIP Lender Professionals | - | - | (150) | - | - | - | (150) | - | - | - | (100) | - | (100) |
| **Debt Service Cash Flows** | **-** | **1,000** | **(150)** | **-** | **-** | **-** | **(150)** | **-** | **-** | **-** | **(100)** | **-** | **(100)** |
| **Net Change in Cash** | **37** | **(81)** | **(512)** | **206** | **669** | **176** | **99** | **248** | **900** | **271** | **(868)** | **(592)** | **(391)** |
| **Net Change in Liquidity** | | | | | | | | | | | | | |
| Beginning Liquidity | 1,405 | 1,441 | 1,360 | 848 | 1,053 | 1,723 | 1,898 | 1,997 | 2,245 | 3,145 | 3,416 | 2,548 | 1,956 |
| Net Change in Cash | 37 | (81) | (512) | 206 | 669 | 176 | 99 | 248 | 900 | 271 | (868) | (592) | (391) |
| **Ending Liquidity** | **1,441** | **1,360** | **848** | **1,053** | **1,723** | **1,898** | **1,997** | **2,245** | **3,145** | **3,416** | **2,548** | **1,956** | **1,566** |

**Exhibit C**

**Relative Lien Priorities in DIP Collateral**

| Priority | Prepetition Collateral | NMTC Cash Collateral Accounts | Other Collateral |
|----------|------------------------|-------------------------------|------------------|
| 1. | Prepetition Permitted Liens | NMTC Prepetition Liens | Carve-Out |
| 2. | Carve-Out | Carve-Out | DIP Liens |
| 3. | DIP Liens | DIP Liens | Bridge Loan Replacement Liens |
| 4. | Bridge Loan Replacement Liens | Bridge Loan Replacement Liens | IP Replacement Liens |
| 5. | Super Senior Bridge Loan Liens | IP Replacement Liens | |
| 6. | IP Replacement Liens | | |
| 7. | IP Term Loan Liens | | |

# SCHEDULE 1

## (Prepetition Permitted Liens)

| Debtor | Secured Party | Collateral | Lien Date |
|---|---|---|---|
| Danimer Scientific Manufacturing, Inc. | HYG Financial Services, Inc | All equipment now or hereafter leased by Lessor<br><br>UCC-1 Filing # 20198428224 | 11/27/19<br><br>Continuation filed 07/03/24 |
| Danimer Scientific Kentucky, Inc. | HYG Financial Services, Inc. | All equipment now or hereafter leased by Lessor<br><br>UCC-1 Filing # 20196851054 | 10/02/19<br><br>Continuation filed 06/07/24 |
| NOVOMER, INC. | BUELL REALTY, LLC | All of Novomer, Inc.'s tangible personal property, fixtures, leasehold improvements, trade fixtures, equipment and other personal property located at 297 Buell Road, Rochester, NY 14624 as listed on Exhibit A attached thereto; all cash and non-cash proceeds (including insurance proceeds) of such property, and all additions and accessions thereto, substitutions therefor and replacements thereof.<br><br>UCC-1 Filing # 20210060732 | 01/04/21 |
| Danimer Scientific, L.L.C | Emtek Manufacturing LLC | 27mm extruder, 40 L/D, 1200rpm, 40hp, swing gate strand die, serial no. 97736- 0272105<br><br>UCC-1 Filing #s 043-2021-000986 and 043-2021-001044 | 1/03/2021<br><br>Amendment filed 12/02/2021 |
| Danimer Bioplastics, Inc. | Wells Fargo Bank, N.A. | 2020 Doosan G25N-7 Forklift S/N FGA14-1290-04399<br><br>UCC-1 Filing # 038-2022-026690 | 08/18/2022 |
| Danimer Scientific, L.L.C | U.S. Bancorp Community Development Corporation | Any and all right, title and interest of Debtor in and with respect to that certain Collateral Assignment of Fund Loan Documents, dated September 30, 2013, between Debtor, Danimer Bioplastics Investment Fund, LLC and Secured Party<br><br>UCC-1 Filing # 043-2013-000932 | 10/23/2023 |