## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DANIMER SCIENTIFIC, INC., *et al.*, | ) | Case No. 25 – 10518 (MFW) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket No. 219** |
|  | ) |  |

## DEBTORS' RESPONSE OPPOSING KANEKA CORPORATION'S MOTION TO MODIFY THE AUTOMATIC STAY TO COMMENCE LITIGATION IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***") file this response (the "***Response***") opposing *Kaneka Corporation's Motion to Modify the Automatic Stay to Commence Litigation in the United States District Court for the District of Delaware* [D.I. 219] (the "***Motion***") and respectfully state as follows:

### PRELIMINARY STATEMENT

Kaneka Corporation ("***Kaneka***"), an admitted competitor of the Debtors, must be stopped from blatantly interfering with the Debtors' Court-approved sales process. The Motion is unfounded, has no basis in the law, and should be denied.

The Debtors and their legacy entities have produced, sold, and manufactured PHA[2] and Nodax® since acquiring Nodax® in 2007. As explained below, as a joint 50/50 owner with the

---

[1]   The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are:  Danimer Scientific, Inc. (4518); Danimer Bioplastics, Inc. (8734); Danimer Scientific Holdings, LLC (8521); Danimer Scientific Kentucky, Inc. (6371); Danimer Scientific Manufacturing, Inc. (0322); Danimer Scientific, L.L.C. (7346); Meredian Bioplastics, Inc. (5822); Meredian Holdings Group, Inc. (7239); Meredian, Inc. (7507); and Novomer, Inc. (4173). The location of the Debtors' corporate headquarters is:  140 Industrial Boulevard, Bainbridge, Georgia, 39817.

[2]   Capitalized terms that are not defined in the Preliminary Statement shall have the meaning ascribed to them elsewhere in the Motion.

Debtors of numerous PHA-related patents dating back to the 1990s, and as a party to related agreements with the Debtors dating all the way back to 2007, Kaneka has had actual knowledge of the Debtors' patents, products, and related activities for decades. In particular, the Debtors and Kaneka entered into a Patent Prosecution and Maintenance Agreement ("***Joint Ownership Agreement***") on February 4, 2015, which gives the Debtors joint ownership of the very patents that Kaneka is alleging are being infringed.

Until Kaneka filed multiple pleadings in these Chapter 11 Cases starting on April 22, 2025 – just three (3) days before the original deadline for stalking horse bids and ten (10) days before the original general bid deadline – Kaneka had ***never*** complained about or raised any concerns about the Debtors' activities causing purported infringement of patents held by Kaneka. In fact, the first time the Debtors learned about Kaneka's allegations was when Kaneka filed a limited objection and reservation of rights with respect to the Debtors' motion to sell substantially all of their assets.[3] The Debtors received no prior communications from Kaneka or its representatives, no warning about the alleged infringement, and, indeed, did not even receive a "cease and desist" letter until after the Kaneka Limited Sale Objection was filed. Kaneka also filed a proof of claim on April 22, 2025 asserting similar allegations, thereby subjecting itself to the jurisdiction of this Court, and then filed the Motion on April 24, 2025.[4]

Despite decades of silence while the Debtors and their predecessors produced PHA under the Debtors' proprietary Nodax® brand, Kaneka now claims – right in the midst of the Debtors' fight for survival and attempt to sell their business as a going concern to preserve jobs and

---

[3]    *Kaneka Corporation's Limited Objection and Reservation of Rights to Debtors' Proposed Sale Transactions of Substantially All 363 Sale Assets* [D.I. 215] (the "***Kaneka Limited Sale Objection***").

[4]    *See In re PRS Ins. Group, Inc.,* 331 B.R. 580, 586 (Bankr. D. Del. 2005) ("When a creditor files a proof of claim, it subjects itself to the jurisdiction of the Bankruptcy Court to hear all matters related to the allowance of that claim.") (Walrath, J.) (internal citation omitted); *see also* 28 U.S.C. § 157(b)(2)(B) ("Core proceedings include . . . allowance or disallowance of claims against the estate.").

maximize value – that Debtors' actions over the last decades infringed patents held by Kaneka since 2016 and 2018, respectively. Kaneka's almost decade of silence combined with the suspicious timing of its blitzkrieg of filings in these Chapter 11 Cases clearly illuminates Kaneka's true motives: Kaneka inappropriately seeks to gain leverage over other similarly situated unsecured creditors, chill bidding in the Court approved sales process, and eliminate competitors – the Debtors or the purchasers of the Debtors' assets – from the marketplace by asserting baseless allegations of patent infringement.

In addition to its apparent improper motives, as set forth in greater detail below, the Motion is woefully, even embarrassingly deficient, and falls so short of the high-burden that is required to establish "cause" to obtain relief from the automatic stay that it borders on frivolous. Indeed, the Debtors are actively investigating Kaneka's actions and reserve the right to request sanctions or other relief at an appropriate time.

## BACKGROUND

1.      Danimer Scientific, Inc. (collectively with its subsidiaries "***Danimer***") is a performance-polymer company specializing in bioplastic replacements for traditional petroleum-based plastics. The Debtors are a leading producer of polyhydroxyalkanoate ("***PHA***"), a key biodegradable ingredient in a wide range of engineered materials that are plastics alternatives. Danimer sells and utilizes PHA under the proprietary Nodax® brand name for use in a wide variety of plastic applications including straws, food containers, and cutlery, among other things. Danimer, including its legacy businesses, has sold and utilized Nodax® since 2007. *See Declaration of Frank A. Pometti in Support of Chapter 11 Cases And First-Day Motions* [D.I. 15, ¶ 18] (the "***First Day Declaration***"). Danimer also produces proprietary biopolymers using a natural plastic called polylactic acid ("***PLA***") as a base resin. Danimer primarily operates out of

its Winchester, Kentucky facility, which has a total plant capacity of up to 55 million pounds of Nodax®-based (PHA) finished products per year and has a PLA reactive extrusion facility in Bainbridge, Georgia with a total PLA-based resin capacity of up to 25 million pounds per year.

2.      On the March 18, 2025 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***"). The Debtors commenced these Chapter 11 Cases to implement a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders.

3.      As set forth in the First Day Declaration, the Debtors took numerous steps to reduce operations and preserve cash, including laying off approximately half of their workforce, just prior to the Petition Date. Indeed, during these Chapter 11 Cases, the Debtors have produced little additional inventory for sale, and have instead focused on selling existing inventory on hand and converting existing work in process to finished goods that could be sold to generate cash to fund these Chapter 11 Cases.

4.      On April 17, 2025, this Court entered an *Order (A) Approving (I) Bidding Procedures, (II) Certain Bid Protections In Connection With A Stalking Horse Agreement, If Any, (III) Form And Manner Of Notice Of Sale, Auction, And Sale Hearing, and (IV) Assumption And Assignment Procedures; (B) Scheduling Auction, Sale Hearing, And Related Deadlines; (C) Approving (I) Sale of Substantially All Of Debtors' Assets Free And Clear Of Liens, Claims, Interests, And Encumbrances, And (II) Assumption And Assignment Of Executory Contracts And Unexpired Leases; And (D) Granting Related Relief* [D.I. 196] (the "***Bidding Procedures Order***").

5.      The Bidding Procedures Order set forth bidding procedure deadlines that were originally as follows: a May 2, 2025 Bid Deadline, a May 5, 2025 Auction, a May 7, 2025 Sale Objection Deadline, and a May 12, 2025 Sale Hearing. In consultation with the Consultation

Parties, and in accordance with the Bidding Procedures Order, certain deadlines were subsequently extended by a short period of time as follows: a May 5, 2025 Bid Deadline, a May 6, 2025 Auction, a May 8, 2025 Sale Objection Deadline, and a May 12, 2025 Sale Hearing. *See Notice of Revised Dates Relating to Bidding Procedures Deadlines* [D.I. 251, pp. 2-3]. Under the milestones set forth in Debtors' DIP financing facility, any sale is currently required to close by May 19, 2025. [D.I. 14-1] Exhibit to *Notice of Filing of Exhibit B to DIP Term Sheet* (setting forth sale milestone deadlines "sixty (60) calendar days after the Petition Date.").

6.      Additional factual background and information regarding the Debtors, including their business operations, their corporate and capital structure, their restructuring activities, and the events leading to the commencement of these Chapter 11 Cases, is set forth in detail in the First Day Declaration.

### A.      Kaneka Proof of Claim

7.      Kaneka's first ever mention of Debtors alleged infringement was in a Proof of Claim filed against the Debtors on April 22, 2025. *See* Claim No. 36 attached hereto as Exhibit 1 (the "***Kaneka Proof of Claim***").

8.      Kaneka's claims are without merit, and the Debtors deny that Kaneka is entitled to any of the relief it seeks. The Kaneka Proof of Claim references purported infringement of US Patent No. 9,475,934 (the "***'934 Patent***") and US Patent No. 10,030,117 (the "***'117 Patent***"), but is nothing more than conclusory allegations. Tellingly, the Kaneka Proof of Claim fails to mention the Joint Ownership Agreement (defined below) that gives Debtors joint ownership of the patents in question. The Kaneka Proof of Claim seeks an unliquidated amount of damages. *See* Ex. 1, p. 5.

9.      Kaneka's Motion is premised on the same allegations contained in the Kaneka Proof of Claim. *See* Motion, ¶¶ 21-22. The Motion includes a woefully insufficient draft complaint that attempts to allege claims for patent infringement without any specific factual allegations. *See* Motion, Ex. D. It also fails to mention the Joint Ownership Agreement under which Debtors are joint owners of the patents in question.

## KANEKA'S MOTION LACKS GOOD CAUSE AND SHOULD BE DENIED

10.     Bankruptcy courts in Delaware follow a three-part balancing test to evaluate whether cause exists in a specific case to warrant stay relief: "a) [a]ny great prejudice to either the bankrupt estate or the debtor will result from continuation of the civil suit, b) the hardship to the [non-bankrupt party] by maintenance of the stay ***considerably outweighs*** the hardship of the debtor, and c) the creditor has a probability of prevailing on the merits." *Izzarelli v. Rexene (In re Rexene Prods. Co.)*, 141 B.R. 574, 576 (Bankr. D. Del. 1992) (internal citations omitted) (emphasis added). The party seeking stay relief bears the burden to "produce evidence that causes exists." *In re DBSI, Inc.*, 407 B.R. 159, 166 (Bankr. D. Del. 2009).

11.     In characterizing the burden faced by unsecured creditors – like Kaneka – seeking relief from the stay, courts have suggested such movants must make a showing of "extraordinary circumstances." *In re Eagle Enters., Inc.*, 265 B.R. 671, 680 (E.D. Pa. 2001) ("unsecured creditors are entitled to relief from an automatic stay only in extraordinary circumstances."); *In re Stranahan Gear Co.*, 67 B.R. 834, 838 (Bankr. E.D. Pa. 1986) ("Several factors militate strongly against the allowance of any relief in this case—or in any but the most extraordinary set of circumstances— where the moving party is an unsecured creditor."); *In re Residential Capital, LLC*, 508 B.R. 838, 848 (Bankr. S.D.N.Y. 2014) ("If the movant is an unsecured creditor, the policies of the automatic stay weigh against granting the relief requested.").

12.     Here, Kaneka wholly fails to present any evidence – let alone compelling evidence – demonstrating that the balancing test factors weigh in its favor and, as such, the Motion should be denied. *See, e.g., In re W.R. Grace & Co.*, No. 01 01139 JFK, 2007 WL 1129170, at *3 (Bankr. D. Del. Apr. 13, 2007) (denying motion to lift stay because movant "presented no compelling evidence that the balance of hardships [was] in its favor'") (internal citation omitted); *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006) (denying motion to lift stay where movant failed to demonstrate "that the balance of hardships from not obtaining relief tips significantly in [its] favor"); *see also In re Irish Bank Resol. Corp. Ltd.*, No. BR 13-12159-CSS, 2019 WL 4740249, at *7 & n.4 (D. Del. Sept. 27, 2019) (noting a movant must "submit[] evidence to establish a *prima facie* showing of cause, which is a predicate for relief").

## A.     Lifting the Stay Would Significantly Prejudice the Debtors.

13.     There could not be a worse time in the Debtors' Chapter 11 Cases to allow new frivolous litigation by an unsecured creditor to be commenced in another court. As the Court is well aware, the Debtors are in the middle of the 363 Sale Process and laser focused on consummating a value-maximizing sale of their business in the next several weeks. In other words, allowing Kaneka to file and pursue its Infringement Action in the United States District Court for the District of Delaware (the "***District Court***") right in the middle of the critical stages of these Chapter 11 Cases will impose substantial prejudice upon the Debtors and their estates, to the detriment of all stakeholders. It would divert the Debtors' senior leadership teams' and professionals' attention from the Debtors' sale process, deplete vital estate resources, and be a completely unnecessary distraction.

14.     One of the main benefits of bankruptcy is the "breathing room" afforded by the automatic stay. *In re Linear Elec. Co.*, 852 F.3d 313, 323 (3d Cir. 2017) ("The purpose of the automatic stay is to give breathing room for the development of . . . a plan."); *Raymark Indus., Inc.*

7

*v. Lai*, 973 F.2d 1125, 1130 (3d Cir. 1992) ("[T]he purpose of the stay is 'to give the debtor a breathing spell . . . [and it] permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.'") (internal citations omitted). This protection is especially important here in light of the Debtors' limited liquidity, the critical stage of these Chapter 11 Cases and the speed at which the Debtors must move to preserve any hope of keeping their business operating as a going concern and appropriately administering these Chapter 11 Cases in an orderly fashion. *See* First Day Declaration ¶¶ 96-105. Thus, it is crucial that the Debtors not be dragged into baseless litigation by Kaneka in the District Court that would force them to divert vital resources from their restructuring efforts. *See In re Fairchild Corp.*, No. 09-10899, 2009 WL 4546581, at *6 (Bankr. D. Del. Dec. 1, 2009) (recognizing the "work being done by the debtors and their professionals to reorganize the debtors' remaining assets," debtors' management should not be distracted by litigation); *In re Nw. Airlines Corp.*, No. 05-1793 (ALG), 2006 WL 2583642, at *2 (Bankr. S.D.N.Y. Jul. 7, 2006) (holding that, given the "significant tasks" required in the bankruptcy proceedings, the debtor "should not have to divert their management resources" to defend the actions before other courts).

15.     Kaneka's contrary assertion that "prompt liquidation of Kaneka's claims in the [District Court] will expedite administration of the bankruptcy estate and act to conserve the resources of this Court" (Motion, ¶ 10) is nonsensical. This is not a situation where litigation has been pending for years and a resolution can be expected in the near term. Rather, any litigation commenced in the District Court would be starting from scratch, and, on average, it currently takes

more than **2.5 years** from the filing of a complaint alleging patent infringement to even get to trial in the District Court.[5]

**B.     The Automatic Stay Imposes Minimal Hardship on Kaneka and the Balance of Hardships Heavily Favors Maintaining the Stay.**

16.     Kaneka has not shown – and cannot show – that the "hardship to [the non-bankrupt party] by maintenance of the stay **considerably** outweighs the hardship of the debtor." *Rexene*, 141 B.R. at 576 (internal citation omitted) (emphasis added); *see also W.R. Grace & Co.*, 2007 WL 1129170, at *3 (the movant "bears 'the heavy and possibly insurmountable burden of proving that the balance of hardships tips significantly in favor of granting relief.'" (citation omitted)).

17.     Kaneka has no evidence of actual harm from the continuation of the automatic stay (especially when Kaneka has lived without complaint with the Debtors' purported infringement for nearly a decade). Instead, Kaneka merely states in conclusory fashion that continuation of the stay may "cause Kaneka to sustain additional economic injury and for Kaneka to remain uncompensated for its injuries." Motion, ¶ 32. This statement, in addition to not being supported by evidence, is disproved by Kaneka's later admission that if there is no "meaningful distribution to general unsecured creditors . . . [then Kaneka may not] pursue the Infringement Action and forgo recovery of such claims." *Id.*, n. 2. In other words, Kaneka admits that its proposed lawsuit is not necessary, let alone of such importance that failure to bring it will cause substantial harm. Quite simply, Kaneka has not put forth any evidence of a need to liquidate its claim in District Court. Nor has it shown that it will suffer substantial hardship if it is required to liquidate its claim – like every other creditor – in the claims administration process in Bankruptcy Court (where the Kaneka Proof of Claim is already pending).

---

[5]        https://law.lexmachina.com/court/ded/cases/?status=all&case_types-include=27&pending-from=2020-01-01&filters=true&view=analytics&tab=timing&cols=title%2Ccivilnumber%2Ccase_type%2Ccourt%2Cfiled%2ClastDE%2Cterminated.

18.     Further, Kaneka offers no explanation for its decision to lay behind the log for years and then suddenly raise its claims against the Debtors now – at this stage in the Chapter 11 Cases. Kaneka has no evidence of substantial hardship if it is not permitted to pursue its claim in District Court immediately, especially considering it never challenged the Debtors' purported infringement until the eve of the Debtors' 363 Sale. *See e.g.* Motion, ¶ 9 (admitting that it first put the Debtors "on notice of [the Debtors' purported] infringement of Kaneka's Patents by way of Kaneka's Proof of Claim" on April 22, 2025).

**C.     Kaneka Has Not Met Its Burden to Establish Probability of Success on the Merits of Its Purported Infringement Claims.**

19.     Kaneka's purported patent infringement claims also are wholly unsupported and fail to show any probability of success on the merits. Two of the most obvious reasons the patent infringement claims are without merit are set forth below. However, the descriptions in this Response are not meant to be exhaustive and indeed there are numerous additional reasons Kaneka's patent infringement claims will never succeed. The Debtors fully reserve all rights, claims, defenses, counter-claims, and related arguments.

> **i.     Kaneka Cannot Show a Likelihood of Success on the Merits Because the Complaint Fails to Plausibly Allege Infringement by Any Specific Danimer Product.**

20.     Kaneka's proposed complaint (Motion, Ex. D) is facially deficient. The proposed complaint does not plausibly allege that any specific product of the Debtors infringes on the '117 Patent and the '934 Patent (collectively, the "***Asserted Patents***"). Nor does it explain how any Debtors' product satisfies the required claim limitations. Although the proposed complaint references a broad category of "Danimer Products" – including Nodax® resins and unspecified molded articles (*e.g.*, drinking straws) – it does not identify a single accused product by name or model number, nor does it map any product's features to the limitations of any asserted claim.

21.    Kaneka offers only bare, conclusory statements that the Debtors' products infringe various claims of the '117 and '934 patents. The proposed complaint contains no claim charts, no description of the chemical composition or structure of any accused product, and no explanation as to how the inclusion of PHA, PBSA, or calcium carbonate in Danimer's resins allegedly satisfies any claim limitation. Moreover, while the patents at issue contain specific requirements – for example, a particular combination of components including pentaerythritol as a nucleating agent – the proposed complaint does not allege that any of the Debtors' product includes such a component, let alone in the required configuration or amount.

    **ii.    Kaneka's Patent Infringement Claims Fails as a Matter of Law Because the Asserted Patents are Jointly Owned Under the Parties' Agreement.**

22.    Kaneka's purported claims also fail because the patents in question are jointly owned by the Debtors. The Joint Ownership Agreement between the Debtors and Kaneka was intended to "clarify and restate" the parties' rights and obligations flowing from their earlier Cooperation and Confidentiality Agreement ("*CCA*").[6] The Joint Ownership Agreement reflects the parties' shared understanding that certain patent rights – broadly defined – would be co-owned. Specifically, the Joint Ownership Agreement states that patents listed in Exhibit B, together with "any reissues, divisionals, continuations, reexaminations, renewals, extensions, additions, and continuations-in-part, and/or overseas counterparts thereof" shall be "jointly owned, solely and entirely, by and between the Parties."[7]

---

[6]    Potions of the Joint Ownership Agreement may contain confidential information. Out of an abundance of caution, the Debtors are not including the Joint Ownership Agreement as an exhibit to their publicly filed Response but will have the agreement available at the time of the hearing on this Motion.

[7]    *See* n. 6.

23.     In the Joint Ownership Agreement, the terms "extensions" and "additions" stand out as broad, non-technical language. Unlike terms such as "continuation," "divisional," and "reexamination," which have specific meanings in patent law, "extensions" and "additions" are not terms of art. By including these broader terms alongside narrowly defined procedural categories, the parties clearly evidenced their intent for the Joint Ownership Agreement to extend beyond formal progeny and encompass the substance of technological developments related to the patents listed in the Joint Ownership Agreement's Exhibit B. The terms "extensions" and "additions" reasonably include improvements, enhancements, refinements, or other related innovations to the original forty (40) patents listed on Exhibit B to the Joint Ownership Agreement.

24.     The '117 Patent and the '934 Patent that Kaneka claims to own exclusively incorporate and build upon *the same technologies and processes* disclosed by the patents listed in the Joint Ownership Agreement's Exhibit B and are precisely the type of later-developed "extensions" and "additions" that the parties clearly intended to be jointly owned. Fundamentally, the proposed complaint appears to focus on the use of pentaerythritol as a nucleating agent to more efficiently extract and isolate high-quality PHAs as the basis of infringement of the Asserted Patents. *See* Motion, Ex. D ¶¶ 9-20. However, multiple patents included on Exhibit B to the Joint Ownership Agreement describe substantially similar processes. For example:

- U.S. Patent No. 7,301,000 (the "*'000 Patent*") is entitled "Nucleating agents for polyhydroxyalkanoates" and discloses methods for increasing the crystallization rate or processing speed of polyhydroxyalkanoate (PHA) polymers that promote crystallization and enhance mechanical properties in biodegradable plastics.

- U.S. Patent No. 7,098,298 (the "*'298 Patent*") is entitled "Method for producing polyhydroxyalkanoate crystal" and discloses a method for "conveniently obtaining

a biodegradable polyhydroxyalkanoate (PHA) by a solvent extraction method," wherein the PHA can be derived from microorganisms and utilized in applications such as biodegradable plastics. In essence, the '298 patent enables extraction and isolation of PHAs like PHBH in a high-quality form.

- U.S. Patent No. 7,384,766 (the "'*766 Patent*") is entitled "Gene-substituted microorganisms, and production method of polyesters using the same" and discloses "an improved microbial strain useful for an industrial production of a polyhydroxyalkanoic acid (PHA)" – a biodegradable polyester.

25.    The '117 and '934 patents simply build directly on and provide more detail and specifics around the foundational work established by the '000 Patent, the '298 Patent, and the '766 Patent to enable more efficient processing and crystallization of PHAs.

26.    In other words, the Asserted Patents continue a line of innovation by refining the compositions and enhancing performance characteristics of the same technology that is clearly covered by the Joint Ownership Agreement. They are later-developed "extensions" and "additions" that fall squarely within the scope of what the parties agreed were jointly owned. Any narrower construction would improperly render portions of the Joint Ownership Agreement meaningless, contrary to Georgia's rules of contract interpretation and the clear intent of the parties.

27.    Under 35 U.S.C. § 262, each joint owner of a patent has an undivided right to practice the invention, and absent an exclusive license, a joint owner may not sue another co-owner for infringement. Because the Asserted Patents are jointly owned "additions" under the Joint Ownership Agreement, Kaneka's patent infringement claims fail as a matter of law. The Debtors

reserve the right to bring claims against Kaneka for its blatant breach of the Joint Ownership Agreement.

**D.     The Automatic Stay Applies to All of Kaneka's Claims, Regardless of Whether the Purported Infringement Occurred Post-Petition.**

28.     Kaneka's attempt to argue that "post-petition patent infringement claims are not barred by the automatic stay and can be brought against a debtor" fails for the same reasons as set forth above. Motion ¶ 38, *see also*, *supra* Section A-C.

29.     *First*, Kaneka disregards the policy behind 28 U.S.C. § 959, which clarifies that courts should "limit the seemingly unfettered power to bring suit against a debtor-in-possession, where to do so would significantly interfere with the orderly administration of the debtor's estate." *In re Television Studio*, 77 B.R. 411, 412 (Bankr. S.D.N.Y. 1987). The standard to be applied by the courts in such an analysis is to "exercis[e] sound discretion [and prohibit a Section 959 action where] . . . the action would embarrass, burden, delay, or otherwise impede the reorganization proceedings." *Id.* (internal citation omitted). If Kaneka were allowed to pursue a post-petition claim in the District Court (while the Chapter 11 Cases continue in this Court) the Debtors' management would be forced to divert their attention away from the chapter 11 process to defend a frivolous lawsuit, additional defense expenses would be incurred by the Debtors, and the Debtors' current progress in the Chapter 11 Cases could be derailed. *See id.* at 413 (enjoining and restraining the creditor from commencing an action arising out of debtor's alleged post-petition copyright infringement because resources would be diverted away from the bankruptcy proceeding and additional expenses would be incurred that the debtor could not afford).

30.     *Second*, Kaneka will suffer no prejudice by adjudicating its claims through the bankruptcy claims administration process, particularly since it has already submitted the Kaneka Proof of Claim for that very purpose. Additionally, there is no need for its claim to be liquidated

in the District Court immediately, given that it already sat on these allegations for years and because it would take years to adjudicate the Kaneka claims in District Court. *See id.* ([B]ecause [the creditor] claims the infringement began prior to the Debtor's filing of its chapter 11 petition, without [the creditor] having instituted an action, it seems that immediate commencement of an infringement action is not essential"). Kaneka's attempts to argue otherwise are unsubstantiated, particularly given that the Debtors operations – including the manufacturing and sale of PHA and Nodax® – have been reduced significantly during these Chapter 11 Cases and will halt completely, hopefully in the very near term, if the Debtors are able to complete the sale of substantially all of their assets. *See* First Day Declaration ¶¶ 96-100.

31.    *Third*, Kaneka urges this Court to ignore conflicting case law and rule as a matter of first impression "that [the Debtor's alleged] post-petition infringement [i]s entirely distinct from the prepetition infringement" (Motion, ¶ 44), but simultaneously neglects to distinguish the very post-petition patent and copyright infringement case law it cites in support of its ***own Motion***. *In re Television Studio*, 77 B.R. at 413 (refusing to allow a creditor to commence or prosecute a separate action against a debtor arising out of post-petition copyright infringement pending the outcome of the bankruptcy where the case was not trial ready); *In re Telegroup, Inc.,* 237 B.R. 87, 96 (Bankr. D.N.J. 1999) (denying creditor's application of Section 959 arising from a debtor's alleged patent infringement where the case was not trial ready). As these cases make clear, where – as here – the potential post-petition infringement action is *not* trial ready this Court should exercise its discretion to deny the availability of Section 959 to avoid impeding on the bankruptcy proceeding.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court deny the Motion and maintain the automatic stay.

Dated: May 5, 2025
Wilmington, Delaware

/s/ Matthew P. Milana
**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Zachary I. Shapiro (No. 5103)
Matthew P. Milana (No. 6681)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel: (302) 651-7700
Fax: (302) 651-7701
Email: defranceschi@rlf.com
        shapiro@rlf.com
        milana@rlf.com

- and -

**VINSON & ELKINS LLP**
George R. Howard (admitted *pro hac vice*)
David S. Meyer (admitted *pro hac vice*)
The Grace Building
1114 Avenue of the Americas, 32nd Floor
New York, New York 10036-7708
Tel: (212) 237-0000
Fax: (212) 237-0100
Email: ghoward@velaw.com
        dmeyer@velaw.com

- and -

Trevor G. Spears (admitted *pro hac vice*)
Sara Zoglman (admitted *pro hac vice*)
2001 Ross Avenue, Suite 3900
Dallas, Texas 75201
Tel:  (214) 220-7700
Fax: (214) 220-7716
Email: tspears@velaw.com
        szoglman@velaw.com

*Attorneys for the Debtors and Debtors in Possession*